# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| loanDepot.com, LLC, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case Number: 22-cv-1874 |
| STEVE SCHNEIDER, CINDY SMOLIN, SAMANTHA SIEGEL, FERNANDA BASKE, BOB BOWMAN, and CROSSCOUNTRY MORTGAGE, LLC | ) ) ) ) ) ) | Judge: Edmond E. Chang |
| | | Magistrate Judge: Sheila M. Finnegan |
| Defendants. | ) ) | |

## CINDY SMOLIN'S ANSWER TO VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant Cindy Smolin ("Defendant" or "Smolin"), by her attorneys, states the following as her Answer to Plaintiff loanDepot.com, LLC's ("Plaintiff" or "loanDepot") Verified Complaint for Injunctive Relief (the "Complaint") and her Affirmative Defenses and Counterclaims:

## INTRODUCTION

1.     This is an action for immediate injunctive relief and damages due to misappropriation of loanDepot's trade secrets, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference with loanDepot's contracts and prospective economic advantage. It arises from CrossCountry's well-honed scheme, conducted at the direction of its Chief Executive Officer ("CEO"), to raid loanDepot employees and customers, using loanDepot's trade secret information to do so.

**ANSWER:** Smolin admits that Plaintiff seeks the relief stated in the first sentence, but denies it is entitled to such relief. Smolin denies the remaining allegations of this paragraph.

2.    loanDepot is in the business of making home mortgage, home equity, and personal loans. The Former Employees were responsible for originating and closing loans. The Former Employees received years of training, customer introductions, referral source introductions, access to loanDepot's trade secret information, and thousands of dollars in expense reimbursements from loanDepot. They were handsomely compensated for their work.

**ANSWER:** Smolin admits that loanDepot is in the business of making home mortgage, home equity, and personal loans, and that the Defendants named as Former Employees in the Complaint were responsible for originating and closing loans during their employment with loanDepot. Smolin denies the remaining allegations of this paragraph.

3.    Despite this, the Former Employees schemed with CrossCountry to decimate loanDepot's Northbrook (and its satellite Chicago) branches (the "Illinois branches"). Specifically, in the days and weeks leading up to their resignations, Bowman and Smolin (key loanDepot originators) colluded with CrossCountry to solicit loanDepot employees to leave loanDepot and join CrossCountry. This is well documented in Smolin's contemporaneous notes. Smolin's notes also show that she discussed with CrossCountry how she would "stall" bringing in business to loanDepot, so that she could bring loans to CrossCountry instead. A forensic review of Smolin's loanDepot laptop indicates she did just that.

**ANSWER:** Deny.

4.    Then, while they were still employed by loanDepot, CrossCountry sent Smolin and Siegel (and upon information and belief others) detailed instructions to transfer their entire customer and referral list to CrossCountry. At CrossCountry's bidding, and in gross violation of numerous state and federal privacy laws of which Smolin and Siegel were acutely aware as licensed loan originators, Siegel surreptitiously accessed loanDepot's proprietary and password

protected database, accessed detailed information about thousands of contacts (including contact information, birth dates, loan details, marital and employment information, and volumes of other personal information), and transferred this information to CrossCountry.

**ANSWER:** Deny.

5.     In addition, while she was still employed by loanDepot and after she started talking to CrossCountry, Smolin created a personal email address that she used to secretly communicate with customers whom she identified as "prospects" on the same spreadsheet Siegel uploaded to CrossCountry's Salesforce database. Plainly, Smolin was laying the groundwork to bring these loans with her to CrossCountry.

**ANSWER:** Smolin admits that she created and/or used a personal email address while employed at loanDepot but otherwise denies the remaining allegations of this paragraph.

6.     Thereafter, in rapid succession over a two-week period, the Former Employees and their colleagues resigned from loanDepot. First Bowman, Smolin, and Siegel, followed shortly by: Schneider, Baske, Joseph Rizza ("Rizza"), John Noyes ("Noyes"), and Megan Poulin ("Poulin"). Smolin even wrote a resignation email on Siegel's behalf—underscoring the coordinated nature of the resignations. To highlight the devastating effect of these departures, the Chicago and Northbrook branches were accountable for nearly a billion dollars in closed loans in 2021 alone; the employees that left for CrossCountry were accountable for approximately 41% of those loans.

**ANSWER:** Smolin admits that the Defendants resigned from loanDepot and took up subsequent employment with CrossCounty. Smolin otherwise lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies same.

7.     As is evident by the timing and nature of the resignations, CrossCountry, as puppet master, strategically orchestrated the coordinated resignations to cause maximum disruption to loanDepot. CrossCountry targeted loanDepot employees with massive books of business, which are not easily replaceable. Certain of the Former Employees also fed compensation and sales data about loanDepot employees to CrossCountry, so that CrossCountry could strategically target specific employees to leave loanDepot, join CrossCountry, and convert customers.

**ANSWER:** Smolin denies that she fed any compensation and sales data about loanDepot employees to CrossCountry. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

8.     Moreover, after Bowman resigned from loanDepot, but before Baske resigned, Bowman and Baske colluded to divert business from loanDepot to CrossCountry. For example, Baske forwarded numerous customer business opportunities to Bowman at his CrossCountry email. loanDepot has evidence that, after Bowman received one such email, Bowman then contacted the customer from his CrossCountry email.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

9.     Similarly, on the eve of his departure, Schneider accessed scores of loanDepot's highly confidential and trade secret information, including compilations of detailed customer information, with no business reason to do so other than for his use at CrossCountry. A forensic review of Schneider's loanDepot laptop reveals that he then, not coincidentally, accessed emails in his personal email with the same file names. He also inserted two USB drives into his loanDepot device for the first time on the same day he resigned, and transferred customer lists and loan information to a USB device.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

10.     The above is consistent with CrossCountry's well-established modus operandi to grow its business not through lawful, legitimate means, but by corporate raid designed to cripple the competition. As numerous lawsuits filed against CrossCountry illustrate, CrossCountry: (a) infiltrates a competitor branch, (b) secures the departure of key business originators, (c) financially incentivizes the originators to solicit the resignations of other employees, (d) instructs the former employees to take their employer's trade secrets, and (e) deploys the new employees to use their former employer's trade secrets to steal customers. CrossCountry knows this causes the subject employees to breach their restrictive covenants and other duties to their former employer—it just does not care. *See, e.g., loanDepot.com, LLC v. CrossCountry Mortgage*, LLC, et al., Case No. 37- 2021-00022044 (Ca. Sup. Ct., San Diego Cty. May 18, 2021); *loanDepot.com, LLC v. CrossCountry Mortgage, Inc.,* 2:18-cv-12091 (D.N.J. 2018); *Homeside Financial, LLC v. CrossCountry Mortgage, Inc*., 8:18-cv-02639 (D. Md. 2018); *American Neighborhood Mortgage Acceptance Company, LLC dba AnnieMac Home Mortgage v. CrossCountry Mortgage, Inc.,* 2:20-cv-00874 (D.N.J. 2020); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-000270 (D. Nev. 2018); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.,* 2:18-cv-5783 (E.D.N.Y. 2018); *Guaranteed Rate, Inc. v. Conn, et al.*, 1:17-cv-03289 (N.D. Ill. 2017); and *Homeside Financial v. CrossCountry Mortgage, LLC, et al*., 21-cv-006488 (S.D. Ohio 2021).

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

11.     What's more, CrossCountry targets loanDepot. At the direction of its Chief Executive Officer ("CEO"), recruiters are incentivized by a $50,000 bounty if they convert an entire loanDepot branch. According to the CEO: "50k for ever [sic] depot branch they get!"

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

12.     In addition, just last month, and as recently as March 30, 2022, CrossCountry raided yet another group of employees from loanDepot's New York branches. Not coincidentally, on the day before Smolin and Siegel resigned to join CrossCountry, Smolin emailed Siegel at her personal email address a screen shot of a loanDepot "leaderboard" with the names, ranking, and purchase volume of some of loanDepot's biggest loan originators, four of whom were thereafter targeted in the CrossCountry New York raid.

**ANSWER:** Smolin admits that she emailed Siegel at her personal email address a screen shot of a loanDepot "leaderboard," but denies that it was for any improper purpose and/or any purpose other than to benefit loanDepot. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

13.     Defendants must be stopped immediately. loanDepot is also filing a Demand for Arbitration and a Verified Statement of Claims against the Former Employees, pursuant to the Former Employees' arbitration agreements with loanDepot. But that is not enough. CrossCountry is the head of the snake that must be tamed. loanDepot is forced to bring this action to obtain a temporary restraining order ("TRO") and expedited discovery in aid of a later hearing for a preliminary injunction. loanDepot requires this relief to prevent Defendants from continuing to inflict irreparable harm on loanDepot by: (a) their wrongful, threatened, and inevitable disclosure, taking, and use of loanDepot confidential, trade secret, and proprietary information; (b) wrongful

solicitation of loanDepot employees; and (c) wrongful solicitation of loanDepot customers. Unchecked, CrossCountry will continue building its business by unlawfully raiding loanDepot's trade secrets, employees, and customers, stealing for itself the business that loanDepot spent years and untold dollars developing.

**ANSWER:** Smolin admits that loanDepot seeks the relief stated in this paragraph, but denies it is entitled to such relief. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

14. Defendants' ongoing assault on loanDepot's business has caused, is continuing to cause, and threatens to cause, immediate, irreparable harm to loanDepot by, among other things: (a) impairing loanDepot's goodwill and reputation with its customers and referral sources; (b) destroying loanDepot's customer, referral, and employee relationships; (c) disrupting the continuity of loanDepot's workforce; and (e) threatening the continued disclosure, misuse, and misappropriation of loanDepot's confidential and trade secret information, including legally protected consumer information. Defendants present a serious threat to loanDepot's customers, key employees, and valuable confidential information and trade secrets and they must be stopped. Their unlawful efforts are underway, ongoing, and continuing.

**ANSWER:** Deny.

15. To be clear, loanDepot does not seek to prevent the Former Employees from working for CrossCountry. Rather, loanDepot seeks to maintain the status quo and enforce the Former Employees' limited and tailored confidentiality and non-solicitation covenants, and other legal obligations to loanDepot. loanDepot seeks to hold the Former Employees to their promises to loanDepot, and to protect its customers, referral sources, employees, confidential, proprietary, and trade secret information. Issuance of injunctive relief is necessary and appropriate in order to

maintain the *status quo* and halt the irreparable harm that loanDepot has suffered, and will continue to suffer, absent an injunction.

**ANSWER:** Smolin admits that loanDepot seeks the relief stated in this paragraph, but denies it is entitled to such relief. Smolin otherwise denies the remaining allegations of this paragraph.

16.     This is not an unreasonable or unprecedented demand. CrossCountry was previously enjoined for virtually identical conduct. *See, e.g., Homeside Fin.*, 8:18-cv-02639, Dkt. 27 (D. Md. 2018) (enjoining CrossCountry from: (a) directly or indirectly using, disclosing, or storing any of plaintiff's confidential information or trade secrets, including employee compensation information, training materials, and customer information; and (b) employing any of plaintiff's employees). The same result is necessary here.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

## THE PARTIES

17.     Plaintiff loanDepot.com, LLC is a Delaware limited liability company with its principal place of business in Orange County, California.

**ANSWER:** Admit.

18.     loanDepot is registered to do business in Illinois and operates multiple branches in Illinois, including in Chicago and Northbrook.

**ANSWER:** Admit.

19.     Defendant Schneider is an adult individual who, upon information and belief, resides in Chicago, Illinois. Schneider was a Loan Consultant at loanDepot until January 27, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER:** Admit.

20.     Defendant Smolin is an adult individual who, upon information and belief, resides in Highland Park, Illinois. Smolin was a Loan Consultant at loanDepot until January 16, 2022, when she voluntarily resigned to work for CrossCountry.

**ANSWER:** Admit.

21.     Defendant Siegel is an adult individual who, upon information and belief, resides in Highland Park, Illinois. Siegel was an Internal Loan Consultant at loanDepot until January 16, 2022, when she voluntarily resigned to work for CrossCountry.

**ANSWER:** Admit.

22.     Defendant Baske is an adult individual who, upon information and belief, resides in Valparaiso, Indiana. Baske was a Production Assistant affiliated with loanDepot's Chicago office until January 21, 2022, when she voluntarily resigned to work for CrossCountry.

**ANSWER:** Admit.

23.     Defendant Bowman is an adult individual who, upon information and belief, resides in Western Springs, Illinois. Bowman was a Loan Consultant at loanDepot until January 16, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER:** Admit.

24.     Defendant CrossCountry is a Delaware limited liability company, with its principal place of business in Brecksville, Ohio. Cross Country is registered to do business in Illinois and has offices in Illinois.

**ANSWER:** Admit.

25.      CrossCountry is a direct competitor of loanDepot.

**ANSWER:** Admit.

## JURISDICTION AND VENUE

26.     This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"). *See* 28 U.S.C. § 1331. This Court further has supplemental jurisdiction over the other counts in this Complaint because they form part of the same case or controversy as Count I. *See* 28 U.S.C. § 1367.

**ANSWER:** Deny.

27.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Northern District of Illinois because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district. *See also* 28 U.S.C. § 1391(b)(3).

**ANSWER:** Deny.

28.     CrossCountry is subject to personal jurisdiction in Illinois given its maintenance of multiple office locations in Illinois, misappropriation of trade secrets in Illinois, tortious interference in Illinois, and other suit-related conduct in Illinois.

**ANSWER:** Smolin admits that CrossCountry has multiple office locations in Illinois but otherwise denies the remaining allegations of this paragraph.

29.    The Former Employees are subject to personal jurisdiction in Illinois given that they reside and/or work in Illinois, maintain continuous contacts in Illinois, engaged in suit related conduct in Illinois, and otherwise purposefully avail themselves of Illinois.

**ANSWER:** Smolin admits that the Defendants named as Former Employees in the Complaint reside and/or work in Illinois but otherwise denies the remaining allegations of this paragraph.

## FACTUAL ALLEGATIONS

### Bob Bowman

30.    Bowman started with loanDepot in 2015. At the time of his resignation, Bowman was a Loan Consultant affiliated with loanDepot's Illinois branches. Bowman is a licensed mortgage loan originator (MLO) in twenty-five different states, including the State of Illinois. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the Illinois Department of Financial and Professional Regulation.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

31.    Bowman was a highly trusted employee who owed a fiduciary duty to loanDepot. As a Loan Consultant, Bowman was responsible for cultivating loan referrals, including through referral partners, customers, and agents. He collaborated with borrowers to determine the best loan programs to meet their individual needs and preferences, and analyzed their income, assets, credit, and property. He collected documentation from borrowers, including pay statements, bank account statements, and other highly personal and confidential protected and financial information. He would negotiate and confirm rates, fees, and lock in terms with customers. He would then lock in a loan in loanDepot's system for the customer on the agreed upon terms, and manage the locked

pipeline through the funding of the loan. He was expected to communicate regularly with customers to meet their desired expectations and to further develop the customer relationship.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies same.

32.     In 2021, Bowman's total gross pay was over seven figures.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### Cindy Smolin

33.     Smolin started with loanDepot in 2017. At the time of her resignation, Smolin was a Loan Consultant affiliated with loanDepot's Illinois branches. Smolin is a licensed MLO in five (5) different states, including the State of Illinois. Each of her MLO licenses is regulated by the applicable state regulatory agency, including the Illinois Department of Financial and Professional Regulation.

**ANSWER:** Admit.

34.     As a Loan Consultant, Smolin had the same duties and responsibilities as Bowman, noted above. Like Bowman, she had access to volumes of customer PPI and received expense reimbursements to develop customer relationships on behalf of loanDepot. Like Bowman, she was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin admits that, at times during her

tenure as a loanDepot employee, she had access to customer PPI or received expense reimbursements to develop customer relationships on behalf of loanDepot. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in the first sentence of this paragraph and therefore denies same.

35.     In 2021, Smolin's gross pay was hundreds of thousands of dollars.

**ANSWER:** Admit.

### Samantha Siegel

36.     Siegel started with loanDepot in 2017. Siegel is Smolin's daughter. At the time of her resignation, Siegel was an Internal Loan Consultant ("ILC") affiliated with loanDepot's Illinois branches. Siegel holds a MLO license in the State of Illinois, regulated by the Illinois Department of Financial and Professional Regulation.

**ANSWER:** Admit.

37.     As an ILC, Siegel was responsible for cultivating loans through inside referrals from interstate branches, employee loans, and departed loan consultants, among others. She was also responsible for supporting Loan Consultants, specifically Smolin. In her role, and like Bowman and Smolin, Siegel was responsible for managing the loan pipeline for loanDepot customers, meeting with borrowers to determine the best loan program for them, and collecting documentation from borrowers (including sensitive PPI, personal, and financial information). She was also responsible for analyzing potential marketing opportunities to develop future business. As an ILC, Siegel was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:** Admit.

38.     In 2021, Siegel's gross pay was hundreds of thousands of dollars.

**ANSWER:** Admit.

### Fernanda Baske

39.     Baske started with loanDepot in 2017. At the time of her resignation, she was a Production Assistant for Bowman.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

40.     As a Production Assistant, Baske was responsible for supporting Bowman in administrative marketing and support actions related to servicing customers and business partners. Baske assisted in managing Bowman's active pipeline. She was also responsible for reviewing customer loan files for completeness. She was expected to go the "extra mile" to build trust relationships, customer loyalty, and satisfaction through the loan process. Baske was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies same.

41.     In 2021, Baske's gross pay was nearly six figures.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### Steven Schneider

42.     Schneider started with loanDepot in December 2017. At the time of his resignation, he was a Loan Consultant affiliated with loanDepot's Illinois branches. Schneider holds a MLO

license in the State of Illinois, regulated by the Illinois Department of Financial and Professional Regulation.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

43.     As a Loan Consultant, Schneider had the same duties and responsibilities as Bowman and Smolin, described above. Like the others, Schneider was a highly trusted employee who owed a fiduciary duty to loanDepot. According to his LinkedIn profile, "Steve has been able to create a following of loyal clients and referral sources." He did this on loanDepot's dime.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent any response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies same.

44.     In 2021, Schneider's gross pay was hundreds of thousands of dollars.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

**Former Employees' Exposure to Confidential, Proprietary, and Trade Secret Information**

45.     By virtue of their positions at loanDepot, the Former Employees were entrusted with volumes of non-public personal information of consumers, applicants, and borrowers that is protected by federal and state laws and regulations, which may not be disclosed to third-parties, and which may only be used for narrowly prescribed purposes. This information includes consumer names, addresses, personal identifying information, and financial information. The

Former Employees also had access to loanDepot's custom-developed and proprietary training materials; job aids; and supplier, vendor, and referral source information.

**ANSWER:** Smolin admits that, at times during her tenure as a loanDepot employee, she had access to some categories of non-public or proprietary information but denies that all such information to which she had access was confidential, proprietary, and/or not publicly available. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

46.      loanDepot takes the protection of its confidential and trade secret information, including the security of confidential, non-public consumer information, extremely seriously. loanDepot is conscientious of the fact that its customers trust it with their most private financial information, and expect loanDepot to take every measure to protect that information from improper use and disclosure. Customer privacy, and the non-disclosure of confidential customer information, are vitally important to loanDepot, and loanDepot would be seriously harmed by the breach of customer privacy or unauthorized disclosure of their confidential information.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

47.      In addition, as licensed mortgage loan originators, Bowman, Schneider, Smolin, and Siegel were required to comply with the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809 ("GLBA"), which governs the treatment of confidential nonpublic information of consumers by financial institutions, along with comparable state laws and regulations governing consumer privacy.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same.

48.     To ensure compliance with these laws and regulations, loanDepot has implemented significant controls to safeguard and secure its information and that of its valued consumers. For example, loanDepot's proprietary databases that house consumer personal and loan information are password protected, and require dual authentication. Once an employee accesses these databases with their unique credentials, they only have access to information that employee needs to perform their duties on behalf of loanDepot.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

49.     In addition, to assist in safeguarding its data, information systems, and consumer and employee information, loanDepot developed an Information Security Program ("ISP") which is governed by a written Information Security Policy ("ISP Policy"), updated as of July 8, 2020. Employees are required to read and acknowledge the ISP and ISP Policy. *See* **Ex. A.**

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

50.     According to the ISP, the following activities are strictly prohibited: (a) accessing data, a server, or an account for any purpose other than conducting Company business, even if the employee has authorized access; (b) sharing company information with non-approved parties outside the Company; and (c) storage of company information in non-Company managed locations such as personal drives, personal cloud storage, and devices.

**ANSWER:** Smolin admits that the ISP purports to prohibit the activities described in this paragraph.

51.    loanDepot also has an Employee Handbook. The Former Employees acknowledged that they received, read, and agreed to comply with the policies in the Employee Handbook. The Employee Handbook includes or incorporates by reference these pertinent policies: (a) a "Confidential and Consumer Information" policy, which states: "the Company has placed special emphasis on the appropriate collection, storage and use of customer information. Your role in privacy protection is critical"; and (b) the ISP Policy, referenced above.

**ANSWER:** Smolin admits that the Employee Handbook purports to impose the policies described in this paragraph. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### The Former Employees' Agreements

52.    In addition to the above policies, loanDepot requires its employees to sign written agreements containing confidentiality provisions, which are designed to protect and safeguard its confidential information, trade secrets, and company assets, including its customer information.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### Bowman, Smolin, and Siegel Agreements

53.    On December 17, 2018, Bowman entered into a Retail Master Incentive Plan agreement ("Incentive Agreement") with loanDepot. *See* **Ex. B.**

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

54.    On December 26, 2018, Siegel entered into an Incentive Agreement with loanDepot. *See* **Ex. C.**

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

55.    On January 2, 2019, Smolin entered into an Incentive Agreement with loanDepot. *See* **Ex. D.**

**ANSWER:** Admit.

56.    The Bowman, Siegel, and Smolin Incentive Agreements are identical in all material respects. In each Incentive Agreement, Bowman, Siegel, and Smolin are referred to as the "Participant."

**ANSWER:** Admit.

57.    The Incentive Agreements protect and safeguard loanDepot's confidential, proprietary, and trade secret information:

> Participant agrees that, while employed by the Company [and] at any time thereafter, <u>Participant will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Participant or any other person or entity any "Confidential Information,"</u> as defined below, that Participant learned, obtained or had access to in the course of or as the result of Participant's employment with Company or using Company's systems, access means or computing or mobile devices. Participant agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.
>
> <u>"Confidential Information" means information and materials</u> in any medium learned, obtained or accessed by Participant because of or through his or her employment with Company, or using Company's systems, access means or computing or mobile devices, <u>about Company's</u> business, prospects, plans and operations, products, processes, methods of doing business, systems, <u>databases</u> and technology, inventions and other intellectual property, loan origination and <u>marketing practices</u>, training, services, <u>and Customers</u> (as defined herein) and that is not known or readily available through proper and lawful means to the general public as well as Customer data. <u>"Customers" mean… visitors or registrants to Company websites, leads, callers to Company call centers, loan or prequalification or</u>

> preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future....
>
> Participant agrees that he or she will return any such Confidential Information and property to Company upon the termination of Participant's employment or at any other time promptly upon the request of Company and that Participant will not share, copy, transmit, or use such Confidential Information or property except only to the extent required solely for and in the course of Participant's employment by Company....
>
> Upon termination of Participant's employment for any reason, or upon receipt of written request from Company, Participant shall immediately deliver to Company all tangible and intangible property (including computers, computing devices, cell phones, memory devices, files, data downloads and any other tangible item), drawings, notes, memoranda, specifications, devices, notebooks, formulas and documents, together with all copies of any of the foregoing, and any other material containing, summarizing, referencing, or incorporating in any way or otherwise disclosing any work product or Company materials.

*See* **Exs. B, C,** and **D**, Section VI (A) (1), (2), (4), and (5) (emphasis added).

**ANSWER:** Smolin admits that Exhibits B, C, and D contain the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

58.     The Incentive Agreements protect loanDepot's investment in its employees:

> Non-Solicitation. To the fullest extent permitted by applicable law, Participant agrees that he or she will not, while in the employment of Company and for a period of one (1) year after the termination of that employment regardless of reason, solicit or induce, directly or indirectly, whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity.

*See id.*, Section VI (B) (emphasis added).

**ANSWER:** Smolin admits that Exhibits B, C, and D contain the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

59. The Incentive Agreements provide that loanDepot may seek injunctive relief in Court:

> Remedies. Participant acknowledges that monetary damages alone will not be a sufficient remedy for Participant's breach of any provision of this Section VI of this Plan and that, in addition to other remedies available to Company, <u>Company shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction deems appropriate</u>. The prevailing party in any legal action arising from or relating to Section VI of this Plan shall be entitled to recover its reasonable attorneys' fees and costs including those incurred in any related appeal.

*See id*., Section VI (C) (emphasis added).

**ANSWER:** Smolin admits that Exhibits B, C, and D contain the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

**Schneider and Baske Agreements**

60. On January 31, 2020, Baske entered into an Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement with loanDepot ("Employee Agreement"). *See* **Ex. E.**

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

61. On January 13, 2022, Schneider entered into an Employee Agreement with loanDepot. *See* **Ex. F.**

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

62. The Baske and Schneider Employee Agreements are identical in all material respects, unless noted below. The Employee Agreements refer to Baske and Schneider as "Employee" or "You."

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

63. Like the Incentive Agreements, the Employee Agreements protect loanDepot's confidential, proprietary, and trade secret information:

> Employee agrees that, while employed by [loanDepot] and at any time thereafter, Employee will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Employee or any other person or entity any "Confidential Information," as defined below, that Employee learned, obtained or had access to in the course of or as the result of Employee's employment with [loanDepot] or using [loanDepot's] systems, access means or computing or mobile devices. Employee agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.
>
> "Confidential Information" means, information and materials in any medium learned, obtained or accessed by Employee because of or through [Employee's] employment with [loanDepot], or using [loanDepot's] systems, access means or computing or mobile devices, about [loanDepot's] business, prospects, plans and operations, products, processes, methods of doing business, systems, databases and technology, inventions and other intellectual property, loan origination and marketing practices, training, services, and Customers (as defined herein) and that is not known or readily available through proper and lawful means to the general public. "Customers" means for purposes of this Agreement visitors or registrants to [loanDepot] websites, leads, callers to [loanDepot] call centers, loan or prequalification or preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future.

Employee agrees that <u>Confidential Information includes,</u> without limitation… <u>custom-developed or proprietary training methods and materials… marketing and advertising plans and strategies… Customer data,</u> regardless of how collected, including by way of example,<u> all personal data and non-public personal financial information of or regarding Customers,</u> loan applications, <u>Customer loan files and all information in them</u> (including by way of example… credit reports… employment history, names, contact information, and other data that identifies or can be used to identify a person) … <u>records of Customer purchases of [loanDepot's] products or services… and the details of any loan originated by [loanDepot]</u>… [loanDepot's] "trade secrets" as defined in California Civil Code section 3426 *et seq*. and/or as defined under the law in any applicable jurisdiction… <u>Job aids</u>… Supplier and vendor information… Proprietary or confidential information disclosed by third parties to [loanDepot] which [loanDepot] is required to treat with confidentiality… [and] Any notes, analyses, summaries, reproductions, extracts, translations, compilations, logs, records, work products and work in progress, software or other material or documents obtained, accessed, or prepared by or for the Employee which contain, reflect or are based on the Confidential Information….

<u>Employee agrees that [Employee] will return any such Confidential Information and property [including customer lists] to [loanDepot] upon the termination of Employee's employment</u> or at any other time promptly upon the request of [loanDepot] and that Employee will not share, copy, transmit, or use such Confidential Information or property except only to the extent required solely for and in the course of Employee's employment by [loanDepot]….

<u>Employee understands that Employee is not authorized to remove from the place of employment or download</u>… to unencrypted mobile devices or laptops… or to sell, distribute, transfer, share, publish or otherwise communicate publicly <u>any of the Confidential Information,</u> and may use or disclose such Confidential Information to others only as may be strictly necessary for the performance of the Employee's duties for [loanDepot] as directed by [loanDepot]….

**Exs. E, F**, Section 2 (emphasis added).

 **ANSWER:** Smolin admits that Exhibits E and F contain the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

64.    In his Employment Agreement, Schneider agreed:

<u>[F]or a period of one (1) year following the termination of Employee's employment,</u> regardless of reason, <u>Employee will not, under any circumstances, utilize or disclose trade secret or Confidential Information of loanDepot,</u> including non-public Confidential Information of a Customer obtained as a result of Employee's employment with loanDepot, <u>in order to directly or indirectly call on, solicit, take away, or attempt to call on, solicit or take away any Customer</u> with whom Employee became acquainted during the term of Employee's employment, as the direct or indirect result of Employee's employment with loanDepot….

… <u>Employee will not, while in the employment of loanDepot, solicit or induce, directly or indirectly,</u> whether on Employee's own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of loanDepot to terminate that individual's employment or contractor relationship with loanDepot or apply for employment or a contractor relationship with any person, business or entity</u>.

… <u>Employee will not, for a period of one (1) year after the termination of Employee's employment</u> regardless of reason, use any unlawful or improper means, including the use or disclosure of loanDepot's Confidential Information, to <u>solicit or induce, directly or indirectly,</u> whether on Employee's own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of loanDepot to terminate that individual's employment or independent contractor relationship with loanDepot or apply for employment or a contractor relationship with any person, business or entity</u>….

**Ex. F**, Section 4 (emphasis added).

**ANSWER:** Smolin admits that Exhibit F contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

65.    In her Employment Agreement, Baske agreed that she will not:

<u>[F]or a period of one (1) year following the termination of… her employment, regardless of reason, solicit, take away, or attempt to call on, solicit or take away any Customer</u> with whom… she became acquainted

during the term of… her employment, as a result of… her employment with [loanDepot].

… while in the employment of [loanDepot] and <u>for a period of one (1) year after the termination of that employment</u> regardless of reason, <u>solicit or induce, directly or indirectly</u>, whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of [loanDepot] to terminate his or her employment or contractor relationship with [loanDepot]</u> or apply for employment or a contractor relationship with any person, business or entity.

… directly or indirectly, while in the employment of LD Holdings and for a period of one (1) year after the termination of that employment regardless of reason, or as otherwise required by law, induce any employee or independent contractor of with [loanDepot] to terminate or breach an employment, contractual, or other relationship with [loanDepot].

**Ex. E**, Section 4 (emphasis added).

**ANSWER:** Smolin admits that Exhibit E contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

66. Like the Incentive Agreements, the Employee Agreements provide for injunctive relief in Court:

Employee acknowledges that monetary damages alone will not be a sufficient remedy for Employee's breach of any provision of this Agreement and that, in addition to other remedies available to <u>[the Company], [the Company] shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction… deems appropriate.</u> The prevailing party in any legal action… arising from or relating to this Agreement shall be entitled to recover its reasonable attorneys' fees and costs including those incurred in any related appeal.

**Exs. E, F**, Section 6 (emphasis added).

**ANSWER:** Smolin admits that Exhibits E and F contain the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### The Covenants Are Reasonable

67.     The above-referenced Incentive and Employee Agreements (collectively, the "Agreements") are narrowly tailored to protect loanDepot's legitimate business interests. Indeed, loanDepot developed, through great expense, significant customer goodwill. loanDepot does this, for example, by providing Loan Consultants with generous expense reimbursements to develop customer relationships on loanDepot's behalf. As Siegel wrote to one customer, loanDepot strives to be its customer's "Lender for Life," and treats each customer not only as a highly valued customer, but also as a referral source.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

68.     loanDepot also devotes substantial resources to the recruitment, training, mentoring, and compensation of its employees so that they can perform the necessary services for customers, as well as develop and nurture the close relationships necessary to keep customers satisfied. The restrictive covenants that prohibit the direct or indirect solicitation of loanDepot employees are reasonable and narrowly tailored to protect loanDepot's legitimate interests in its investment in its employees and maintaining the stability of its workforce.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient

information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

69.     In addition, loanDepot has a legitimate interest in prohibiting its employees from taking, disclosing, and using its trade secret and confidential information, including its customer information. Because the mortgage loan industry is a competitive and regulated industry, information pertaining to loanDepot's business plans, products, services, training materials, strategies, employees, and customers is confidential and proprietary information, deserving trade secret protection. loanDepot developed and marketed an extremely successful mortgage loan operation that is highly dependent upon maintaining the secrecy of this information. The disclosure of these trade secrets would put loanDepot at a competitive disadvantage, as this information is only valuable to the extent loanDepot is able to maintain its secrecy.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

**Coordinated Resignations**

70.     On Sunday, January 16, 2022, Smolin and Siegel resigned from loanDepot. Smolin wrote in her resignation email: "Please accept this email as mine and Samantha's [Siegel's] formal resignation from loanDepot effective immediately." That Smolin resigned for Siegel underscores the coordinated nature of their resignations. According to NMLS Consumer Access, Smolin was employed by CrossCountry effective January 18, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618. According to her LinkedIn profile, Smolin is now a "SVP of Mortgage Lending" for CrossCountry. Upon information and belief, this is a position virtually identical to

the position Smolin held at loanDepot. Similarly, according to NMLS Consumer Access, Smolin was employed by CrossCountry effective January 19, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618. According to her LinkedIn profile, Siegel is now "SVP of Mortgage Lending" for CrossCountry. Upon information and belief, this is a position virtually identical to the position Siegel held at loanDepot.

**ANSWER:** Smolin admits that she resigned from loanDepot on January 16, 2022, on behalf of herself and her daughter, Samantha Siegel, as loanDepot considered them to be a single sales unit, Siegel's loans were done under Smolin's name, and basis points paid on Siegel's loans were paid to both Siegel and Smolin. Smolin further admits she was employed by CrossCountry on January 18, 2022, as "SVP of Mortgage Lending" at its branch location at 2936 West Belmont Ave, Chicago, IL 60618, and that this position is similar to the position she held at loanDepot. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

71. The same day, Sunday, January 16, 2022, Bowman also resigned from loanDepot. According to his LinkedIn profile, Bowman is now "SVP of Mortgage Lending" for CrossCountry. Upon information and belief, this position is virtually identical to Bowman's position at loanDepot. According to NMLS Consumer Access, Bowman was employed by CrossCountry effective January 19, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

72. Five days later, on January 21, 2022, Bowman's Production Assistant, Baske, resigned from loanDepot. According to her LinkedIn profile, Baske is now a Production Assistant for CrossCountry in the "Greater Chicago Area." Upon information and belief, this position is

materially identical to Baske's position at loanDepot. On January 25, 2022, Baske executed an "Exit Acknowledgment," where she acknowledged that she returned and has not retained all Company Confidential Information in her possession. *See* **Ex. G.** As set forth below, Baske lied.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

73. The same day that Baske resigned, on January 21, 2022, Rizza also resigned from loanDepot, with his last day being January 31, 2022. Rizza was a Loan Processer at loanDepot who had worked for loanDepot since 2016. According to his LinkedIn profile, Rizza is now a Senior Loan Processor at CrossCountry in Chicago, Illinois. Upon information and belief, this position is virtually identical to Rizza's position at loanDepot.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

74. Six days later, on January 27, 2022, Schneider resigned from loanDepot. According to NMLS Consumer Access, Schneider was employed by CrossCountry effective January 28, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618. According to his LinkedIn profile, Schneider is now "SVP of Mortgage Lending" at CrossCountry, a position that, upon information and belief, is virtually identical to his position at loanDepot.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

75. The next day, January 28, 2022, Noyes resigned from loanDepot. Noyes was a Loan Consultant who had worked for loanDepot since 2015 out of its Illinois branches. According to his LinkedIn profile, Noyes is now "SVP of Mortgage Lending" at CrossCountry, a position that, upon

information and belief, is virtually identical to his position at loanDepot. According to NMLS Consumer Access, Noyes was employed by CrossCountry effective January 28, 2022.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

76. The coordinated nature of the group departure is evidence alone of solicitation. *See Aon PLC, et al. v. Heffernan, et al.*, No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) ("The timing and breadth of the exodus . . . suggests that Plaintiffs have a reasonable likelihood of establishing that [former employee], in violation of his contractual commitment, played some role in the moves to [competitor]."); *Aon plc v. Infinite Equity, Inc.*, 2021 WL 4192072, at *23 (N.D. Ill. 2021) (it "is reasonable to infer, based on the closely timed resignations . . . that while still employed by [former employer], the [former employees] recruited these six other . . . employees to leave [former employer] and join [competitor].").

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same.

### The Scheme

### Summary Overview

77. Unbeknownst to loanDepot, the *en masse* departure was coordinated long before the resignations took place, and was part of a scheme to steal loanDepot confidential and trade secret information, employees, and customers.

**ANSWER:** Deny.

78. Despite loanDepot's years of investment in the Former Employees, while still employed by loanDepot, CrossCountry and the Former Employees secretly negotiated new employment with CrossCountry, the terms of which contemplated:

30

- Soliciting existing loanDepot employees to separate their employment from loanDepot and join CrossCountry, all within approximately two weeks of each other;

- Misappropriating volumes of loanDepot confidential and trade secret information, including accessing, copying, and <u>transferring to CrossCountry detailed customer lists with confidential information about thousands of loanDepot customers and referral sources</u>;

- Deliberately <u>"stalling" borrowers</u> from doing business with loanDepot so that they could convert this business to CrossCountry instead; and

- Diverting existing and potential business from loanDepot to CrossCountry before and after their resignations from loanDepot, relying on loanDepot confidential, proprietary, and trade secret customer information to do so.

**ANSWER:** Deny.

79.     The scope and breadth of Defendants' misconduct is astounding, and loanDepot's investigation is continuing. The following identifies just some of the misconduct identified to date.

**ANSWER:** Deny.

**CrossCountry Coordination of Employee Departures**

80.     CrossCountry commenced its secret corporate raid on loanDepot starting in at least December 2021. The evidence loanDepot has unearthed to date demonstrates that the Former Employees directly solicited their colleagues, while they were still employed by loanDepot, and that CrossCountry assisted and encouraged them to do so.

**ANSWER:** Smolin denies that she solicited her colleagues while still employed by loanDepot. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

81. Specifically, on or about December 30, 2021, Smolin sent notes to her personal email which loanDepot believes reflect a discussion with CrossCountry, CrossCountry's offer of a $50,000 bounty to convert the entire loanDepot branch, and coordination of the group departure with CrossCountry and Bowman (or "bb"). "DG" appears to reference a loanDepot employee. Excerpts of the notes are set forth here:

> 2 yr contract
> Rob will pay $50k
> Future against his commission
>
> 2 installments
>
> PE is going
>
> Bob told DG he doesn't have an offer

**ANSWER:** Smolin admits that she sent the foregoing notes to her personal email on or about December 30, 2021, but otherwise denies the remaining allegations of this paragraph.

82. That same day, Smolin sent additional notes to her personal email address that similarly appear to reflect her collaborating with CrossCountry and Bowman in the raid, CrossCountry's offer of a $50k bounty, and "recruit[ing]" loanDepot employees "joey" (i.e., Rizza), "Daughter" (i.e., Siegel), and "david" (who loanDepot believes refers to David Hoefler ("Hoefler")), Bowman's and Smolin's Production Assistant). Excerpts from the notes are set forth here:

> I'm happy – but... Bob is good buddy/collaborate ·
> Daughter- secret weapon
>  $50k bonus
> I have joey/david but diff uw/diff closers – how does that work and could they come over. Recruit & bring over

**ANSWER:** Smolin admits that she sent the foregoing notes to her personal email on or about December 30, 2021, but otherwise denies the remaining allegations of this paragraph.

83.     The next day, December 31, 2021, Smolin sent Siegel an email entitled "WORK Updates." The "WORK Updates" were really, upon information and belief, notes from Smolin's collaboration with CrossCountry, including notes reflecting Smolin's, Siegel's, and Bowman's ("BB") impending departures, the $50,000 bounty, and the solicitation of Rizza ("Bring joey") and Hoefler ("david"). Excerpts from the notes are set forth here:

> **BB** 2 yr contract, Rob will pay $50k , Ld takes in Future against his commission, Signing bonus Paid 2 installments
> CC just retail, good jumbo, Optima rate alert, More bp & jumbo cap
>
> Per BL – don't nickel & dime. Bring joey & david.

**ANSWER:** Smolin admits that she sent the foregoing notes in an email to Siegel on or about December 31, 2021, but otherwise denies the remaining allegations of this paragraph.

84.     Then, on January 1, 2022, Smolin emailed Siegel more notes that appear to reflect further discussions with CrossCountry about the raid, CrossCountry's coordination with Smolin of the group departure, solicitation of loanDepot employees ("David," "Joey," and "SS"), and Defendants' scheme to take loanDepot customer information and upload it into CrossCountry's database for an "email blast" and "home mailer postcard" solicitation. Excerpts from the notes are set forth here:

We will have:

**David** – Rob said he will pay his salary and the 3 bp. If he's just with Cindy – he has to hustle, get the docs & signatures until approval and joey starts
**Joey** – he works 24/7 and likes being busy. Likes S – maybe bp per file – likes lots of files
SS – originates loans, gets new agents, does lots of updates ( your pay?)

Planning on 1/17 quit. When will we get computers?

Marketing for coming over – what do they have set up to happen immediately. We need email blast, at home mailer postcard for clients. Social media , email for our referral partners why we're switching, a few talking points for our referral partners why we're switching – why we're coming to CC – for us when we call our agents. Who loads our database in – and need the template so ours matches for loading in. We want a campaign social media posts every other week for 3 partners. Every month that we can send to our the referral partners -highlighting a program that we have – specific jumbo investor

S – any ? about 90 bp? (15 bp). She was making a base salary – as ILC and she does need to need ins – so more money for give joey & david more raises or other members

**ANSWER:** Smolin admits that she sent the foregoing notes in an email to Siegel on or about January 1, 2022, but otherwise denies the remaining allegations of this paragraph.

85.    A few days later, on January 4, 2022, Smolin then suspiciously emailed notes about Rizza which appear to relate to his loanDepot compensation:

**J $60k – now salary.** No more car payments.
So many file you get close ex . instead 15+ is $100 file
And - 25 files extra $3k commish.

**ANSWER:** Smolin admits that she emailed the foregoing notes on or about January 4, 2022, but otherwise denies the remaining allegations of this paragraph.

86.    Not coincidentally, a forensic examination of Smolin's loanDepot device revealed that on January 4, 2022 and again on January 9, 2022, Smolin accessed a personal Gmail account from her loanDepot computer, and navigated to a personal email with the subject line: "solicit – Joey + David."

**ANSWER:** Deny.

87.    A forensic examination of Siegel's device further revealed that on January 4, 2022, she too accessed an email in her personal email with the subject line: "solicit – Joey + David."

**ANSWER:** Deny.

34

88. The next day, on January 5, 2022, Siegel and Smolin both accessed documents in their respective personal email accounts with the subject line: "Employment Application & Background Consent for CrossCountry Mortgage, LLC."

**ANSWER:** Admit.

89. A few days later, on or about January 8, 2022, Smolin prepared additional notes which, upon information and belief, reflect further discussions with CrossCountry about coordination with Bowman, solicitation of loanDepot employees ("Bob has Faye [Baske]"; "get S" is Siegel; "joey" is Rizza; "Steve" is Schneider), "stalling" processing loans at loanDepot, and sharing employee compensation information with CrossCountry. Excerpts from the notes are set forth here:

**Cindy** (get S – 2 for 1 LO's, most potential to grow).  Monday 1/10 – 6 loans total  over $5.2 loans – 4 were purchases
This week – over 20 new pre-app & refi – stalling/losing business.
$50k pay back
Cap - $6,700?
Marketing – lower if needed
Cindy SVP & Sam VP

Why did you suggest 90 bp for me vs. 100bp?  (bob did $120/$150 with out of state – 80% of Bob)
Bob has Faye- $60k  + $50 on all BL team files  –

Titles - Cindy SVP & Sam VP

Joey  - $60k + if 15 loans $100/file. I had 252 loans & Steve/$85 mill - $168 loans. Need $70k and more loans from other LO
David -what do production mgrs. Make  $50k + 3bp – Rob said he would cover. Bob & I combined – $275 x 3 – $82,500 but some jumbo – maybe $70? Maybe 4 or 5 bp

Even with pre-approvals push them off

**Every processor has an opps asst** – j happy

**ANSWER:** Smolin admits that she prepared the foregoing notes on or about January 8, 2022, but otherwise denies the remaining allegations of this paragraph.

90. On January 11, 2022, Siegel accessed an email through her personal email account with the subject: "CrossCountryMortgage, LLC Offer of Employment – Samantha Siegel." That same day, Smolin's personal email similarly contained an email with the subject line:

"CrossCountry Mortgage, LLC Offer of Employment, Comp Agreement & Sign On – Cindy Smolin."

**ANSWER:** Smolin admits the allegation contained in the second sentence of this paragraph. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

91.     Then, on or around January 13, 2022, and while they were still employed by loanDepot, CrossCountry provided Smolin and Siegel with CrossCountry email addresses.

**ANSWER:** Admit.

92.     Also on January 13, Siegel accessed an email with the subject: "CrossCountry Mortgage, LLC Offer of Employment & Comp Agreement – Samantha Siegel."

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### Smolin and Siegel, As Agents of CrossCountry and At Cross Country's Direction, Misappropriate Volumes of loanDepot Trade Secret Information

93.     While clandestinely plotting with CrossCountry to solicit loanDepot employees, Smolin and Siegel also plotted, at CrossCountry's direction, to transfer voluminous loanDepot confidential and trade secret information to CrossCountry.

**ANSWER:** Deny.

94.     On January 6, 2022 and January 13, 2022, while still employed by loanDepot, Siegel accessed the weblink: "crosscountrymortgage.my.salesforce.com."

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

95. At the same time, Siegel was simultaneously accessing numerous loanDepot trade secrets, with no business reason to do so other than for Smolin's and her anti-competitive use at CrossCountry. For example:

- On January 2, 2022, after Smolin started talking to CrossCountry, Siegel downloaded and saved from loanDepot's proprietary database a document entitled "All Cindy's Contacts-2022-01-02-18-43-55.xlsx." This is an excel spreadsheet which contains detailed information about over 4,000 contacts, including the contact's name, mailing address, work phone, mobile phone, and email address. The list identifies loanDepot as the "account owner." The list identifies whether the contact is a "borrower" or a "partner."

- That same day, January 3, 2022, Siegel also accessed a document entitled "Main DB.xlsx." This is a detailed excel spreadsheet with information for 481 "borrowers" including their name, email address, cell phone number, co-borrower name, co-borrower email, co-borrower cell, loan purpose (purchase/refinance), property address, loan amount, property appraised value, <u>interest rate</u>, product name (e.g., 30 year fixed), <u>loan to value ("LTV") ratio, combined loan to value ("CLTV") ratio</u>, <u>credit score</u>, HOA fee (if any), monthly mortgage insurance (if any), <u>DTI ratio</u>, asset total, monthly hazard insurance, and property type.

- The next day, on January 4, 2022, and after Smolin started talking to CrossCountry, Siegel downloaded a document entitled "onboarding database template v1 7.27.xlsx." *See* **Ex. H**. This is an excel spreadsheet which contains, on the first tab, <u>instructions from CrossCountry about transferring contacts to CrossCountry's Salesforce database for "marketing" purposes</u>. Astoundingly, the instructions provide that detailed customer information are encouraged to be transferred. The spreadsheet contains separate tabs for

## Migrating Your Contacts into Salesforce

At CrossCountry Mortgage, your new CRM tool will be Salesforce. We realize the important of announcing to your customer and business contacts that you've joined CCM. To do this, we need your data to include some **key criteria**. Using the database templates within this document will set you up for the most success. Use the migration tips below to help us begin your migration.

**There are two types of contacts in Salesforce:**
**Customer Contacts** (Prior and Prospects, also, Personal Contacts can live here)
**Business Contacts** (Realtors, Title Agencies, Builders, etc.)
...there is a sheet in this document for each of these categories.

**The following criteria is required for all contacts:**
First Name
Last Name
Email (or phone number, if email is not available)
\*\*...contacts without at least one contact method will **not** be imported.

**We encourage the following fields to be completed for all contact types:**
Phone Number
Mailing Address (Work or Home)
Company Name
Contact Category (such as Realtor, Contractor, First Time Homebuyer, Refinance Customer, etc.)
Contact Relationship Status (such as Prospect, Past Client, Top Realtor, Prospective Partner, etc.)
...categorizing your contacts will allow for more specific marketing opportunities.

**The following fields are also available to complete based on contact type:**
Additional Contact Information (Additional emails, work phone numbers, etc.)
Coborrower Information
Past Client Information (loan type, closing date, etc.)
License Numbers
...and more.

*The only fields we require from you are those indicated above. Don't worry if your data isn't perfectly formatted; these templates are intended to set you up for success as you migrate to CCM. We will clean up your data prior to import; the more information you give us, the easier the transition will be.*
*We will give you the opportunity to review your CCM formatted database prior to upload.*

Customer Contacts" and "Business Contacts." At the time Siegel accessed the spreadsheet on January 4, these tabs were blank. A picture of the instructions are set forth below:

- On January 4, 2022 (the same day she received the CrossCountry "onboarding" spreadsheet) and again on January 6, 2022, Siegel accessed a document entitled "Marketing Ideas.docx." This is a nine-page document summarizing marketing ideas to announce Smolin's and Siegel's move to loanDepot, which was plainly being repurposed for their impending move to CrossCountry and anticipated solicitation campaign. For example, the document references "CCM," proposes sending a "[f]act sheet on CCM to send to referral partners," and suggests a "MARKETING DRIP CAMPAIGN" including a monthly email to referral partners regarding "advantages and programs at CCM that can help their business."

- Then, on January 5, 2022, the day after Siegel accessed the CrossCountry onboarding spreadsheet, Siegel accessed and saved an excel spreadsheet entitled "contacts db.xlsx." This spreadsheet contained contact information for over 4,000 contacts, including their name, mailing address, phone number, email address, account owner (listed as "loanDepot"), and status as a "borrower" or "partner."

- That same day, on January 5, 2022, Siegel also accessed and saved a different excel spreadsheet entitled "Main Funded DB.xlsx." This spreadsheet contained contact information for over 500 borrowers, including (where applicable) each borrower's name, employer, birthdate, email, phone number, co-borrower information, loan purpose (purchase/refinance), subject property, funded date, loan amount, appraised amount, interest rate, product name (e.g., 30 Year Fixed Rate), loan program, investor, loan type, LTV, CLTV, credit score, HOA fees, monthly mortgage insurance (if any), DTI, asset total, monthly hazard insurance, and property type (e.g., single family, condo, etc.).

- Also on January 5, 2022, Siegel accessed and saved documents entitled "THKG Goodies 2021 agents.xlsx" and "Holiday Gift 2020 v2.xlsx" — these are compiled lists containing mailing information for 167 different contacts.

- On January 2, 3, and 11, 2022, Siegel also accessed spreadsheets entitled "Cindy's Funded Loans Amount Product," including "Cindy's Funded Loans Amount Product--2022-01-02-17-25-05.xlsx," "Cindy's Funded Loans Amount Product-2022-01-02-18-12-59.xlsx," "Cindy's Funded Loans Amount Product-2022-01-03-08-56-41.xlsx," "Cindy's Funded Loans Amount Product-2022-01-11-13-14-49.xlsx," "Cindy's Funded Loans Amount Product-2022-01-11-13-18-59.xlsx," and "Cindy's Funded Loans Amount Product-2022-01-11-13-44-14.xlsx." These are detailed excel spreadsheets generated from loanDepot's proprietary systems containing data for 788 (or more) borrowers. The spreadsheets include varying degrees of detailed borrower information, including borrower name, subject property address, property type, loan number, loan amount, appraised value, interest rate, product name, funded date, credit score, HOA, monthly mortgage insurance, asset total, monthly hazard insurance, DTI, and LTV.

- On January 11, 2022, Siegel also downloaded the CrossCountry "onboarding database template v1 7.27 (1).xlsx," described above.

- In addition, also on January 11, 2022, Siegel downloaded and saved from loanDepot's database a document entitled "All Cindy's Contacts-2022-01-11-17-44-53.xlsx." This is an updated contact list from the version Siegel accessed on January 3, described above, which includes over 4,000 contacts, along with additional data concerning, for numerous contacts, the contact's date of birth. Each contact is identified as a "borrower" or "partner," and the "account owner" is identified as "loanDepot."

- Later on January 11, 2022, Siegel downloaded and saved from loanDepot's database a document entitled "All Cindy's Contacts-2022-01-11-18-03-05.xlsx." On January 11, 2022 and January 12, 2022, she also accessed a document entitled "All Cindy's Contacts-2022-01-11-18-12-37.xlsx." These are updated contact lists, like those described above, for over 3,000 contacts. These lists contain even more detailed customer and referral partner information. For example, the "All Cindy's Contacts-2022-01-11-18-12-37.xlsx" spreadsheet is generated from loanDepot's proprietary database, and contains the names, marital status, employer name, date of birth, mailing address, email address, and work/cell phone numbers for the contacts listed. The spreadsheet indicates whether the contact is a "borrower" or a "partner," and identifies the "account owner" as loanDepot.

- Three days later, on January 15, 2022, Siegel accessed and saved another spreadsheet entitled "Main Funded DB(AutoRecovered).xlsx," which contained the same information in the "Main Funded DB" spreadsheet described above.

- Then, after days of accessing detailed compilations of loanDepot customer information, on January 16, 2022, the same day she resigned from loanDepot for CrossCountry, Siegel accessed and saved an excel spreadsheet entitled "Siegel DB.xlsx." This spreadsheet contains the same "cover" tab as the CrossCountry onboarding database template, with instructions for migrating customer and business contacts to CrossCountry. The first tab of the spreadsheet, entitled "Customer Contacts," has a "CrossCountry Mortgage" logo at the top. It contains a list of over 2,000 contacts, including (where applicable), the following detailed information for each contact: name, email, contact category (e.g., "First Time Home Buyer"), relationship status (e.g., prospect, past client), lead source, mailing address, phone number, birthdate (no year), notes (for prospects), marital status, employer name,

41

closing date, co-borrower name and email, co-borrower phone, co-borrower birthdate (no year), loan amount, loan type, loan purpose (e.g., refinance, purchase), loan program (e.g., "30 Yr Fix"), loan provider name, subject property type, property value, purchase price, occupancy, interest rate, LTV, CLTV, co-borrower employer, and refi type. The spreadsheet identifies 68 contacts as "prospects" and for 60 of those "prospects" contains "notes" concerning the prospect, for example, their needs, preferences, in some cases FICO score, and other personal details. The "Siegel DB.xlsx" also contains a second tab, entitled "Business Contacts," that likewise has a "CrossCountry Mortgage" logo at the top. This spreadsheet lists nearly 900 contacts, including the contact name, email, company name, "referral partner type" (e.g., realtor, lawyer), relationship status (e.g., "prospect"), work phone, and mailing address.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

96.    A forensic examination of Siegel's loanDepot device indicates that the "Siegel DB.xlsx" spreadsheet was transferred to CrossCountry on January 16, 2022. The information taken by Smolin and Siegel is a closely guarded trade secret at loanDepot. In the hands of a competitor, this information provides CrossCountry with everything it needs to immediately compete against loanDepot and identify which prospects to target. For all intents and purposes, it's the keys to the castle.

**ANSWER:** Smolin denies that she took any information constituting a closely guarded trade secret from loanDepot. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

97. What's more, Smolin also transferred loanDepot trade secret information to her and/or Siegel's personal email while Smolin and Siegel were in discussions with CrossCountry. On January 15, 2022, a Saturday, Smolin sent Siegel at Siegel's personal email multiple screenshots of a loanDepot Retail "leaderboard," which included information regarding the performance of loanDepot's top originators, including purchase volume and units, and loan amount volume and units. The screen shots are marked "confidential" and "for internal use only." Each of the individuals identified on the "leaderboard" is a top originator. Not coincidentally, four of the individuals identified on the "leaderboard" recently resigned from loanDepot to join CrossCountry as part of the aforementioned New York departures in March. Obviously, in the hands of a competitor, this information was and could be used to target and solicit loanDepot's top loan originators. There was no reason for Smolin to send screen shots of this information to Siegel's personal email other than to use it for recruitment purposes with CrossCountry.

**ANSWER:** Smolin admits that, on or about January 15, 2022, she sent screenshots of a loanDepot Retail "leaderboard" to Siegel's personal email but denies that it was for any improper purpose and/or any purpose other than to benefit loanDepot. Smolin otherwise denies the remaining allegations of this paragraph.

98. loanDepot suspects and has reason to believe that the above is just the tip of the iceberg. For example, a forensic examination of Siegel's loanDepot device reveals that "Google Sheets" was frequently accessed from Siegel's laptop, including documents entitled "Smolin Loan Pipeline" and "Pre-Approval Tracker." "Google Sheets" is a spreadsheet program included as part of the free, web-based Google Docs Editors suite offered by Google. On January 16, 2022, and the days leading up to January 16, 2022, both the "Smolin Loan Pipeline" and "Pre-Approval Tracker" were frequently accessed, in "edit" mode, which indicates these documents were being edited in

"Google Sheets." And on several occasions, the documents "Smolin Loan Pipeline" and "Pre-Approval Tracker" were accessed from the Siegel laptop within minutes of loanDepot's Mello site being accessed. Mello is loanDepot's proprietary end-to-end digital lending platform that houses consumer information, loan applications, pre-qualification information, and scores of detailed consumer information. A forensic analysis of Siegel's device also indicates that Siegel composed emails from her personal email between January 1, 2022 and January 16, 2022, which could have attached loanDepot documents to such emails.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

99.     Similarly, a forensic analysis of Smolin's laptop reveals that in the days leading to Smolin's resignation and on the day of her resignation, "Google Sheets" was frequently accessed, including documents entitled "Smolin Loan Pipeline" and "Pre-Approval Tracker." On January 16, 2022, and the days leading up to January 16, 2022, both the "Smolin Loan Pipeline" and "Pre-Approval Tracker" were frequently accessed, in "edit" mode, indicating the user was editing these documents using "Google Sheets." On several occasions, the documents "Smolin Loan Pipeline" and "Pre-Approval Tracker" were accessed within minutes of loanDepot's Mello site being accessed. Smolin's and Siegel's activities are suspicious and significant because customers who are in the "pre-approval" stage of the loan life cycle have yet to have their loan funded. These customers are, therefore, prime customers to target to transfer their business to CrossCountry.

**ANSWER:** Smolin admits that she accessed Melo, and that she accessed "Google Sheets" in "edit" mode prior to her resignation, including documents entitled "Smolin Loan Pipeline" and "Pre-Approval Tracker," but denies it was for any improper purpose and/or any purpose other than to benefit loanDepot.  Smolin otherwise denies the remaining allegations of this paragraph.

100.     In addition, on January 16, 2022, after Smolin resigned from loanDepot, a forensic examination of Smolin's loanDepot device reveals that she continued to access loanDepot's Mello, — when she had absolutely no legitimate business reason to do so.

**ANSWER:** Deny.

### Smolin, as Agent of CrossCountry, Diverts Customers to CrossCountry

101.     In addition to the overwhelming record of improper and unauthorized access, disclosure, and use of loanDepot's trade secrets, Smolin (as an agent of CrossCountry) also laid the groundwork to divert business and employees from loanDepot to CrossCountry while she was still employed by loanDepot.

**ANSWER:** Deny.

102.     For example, on or about January 1, 2022, Smolin created a secret personal email address which, upon information and belief, she used to start communicating with loanDepot customers outside of loanDepot's email system in order to convert their business to CrossCountry.

**ANSWER:** Smolin admits that she created a personal email address on or about January 1, 2022 but denies that it was for any improper purpose and/or for any purpose other than to benefit loanDepot. Smolin otherwise denies the remaining allegations of this paragraph.

103.     A forensic examination of Smolin's loanDepot laptop reveals that, between January 1, 2022 and January 16, 2022, Smolin searched for and/or accessed emails in her secret email account associated with loanDepot customer names, including the following twenty-three (23) customers listed as "prospects" on the "Siegel DB" spreadsheet that Siegel transferred to CrossCountry: A.A., B.B., B.B., J.B., R.B., S.C., K.D., M.F., M. K., K.M., C.N., G.N., C.N., S.N.,

C.N., G.O., M.S., A.S., E.S., T.S., M.S., S.W., and C.W.[1] As set forth above, the "Siegel DB" spreadsheet contains detailed notes concerning most of these customers, including their needs and preferences, in some cases FICO scores, and other personal information.

**ANSWER:** Smolin admits that she searched for or accessed emails in her personal email between January 1, 2022, and January 16, 2022 but denies that it was for any improper purpose. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

104. On January 16, 2022, while Smolin was searching for and/or accessing customer emails, Smolin was also accessing loanDepot's Mello and the "Pre-Approval Tracker" in Google Docs. She was also accessing a "pre-approvals" folder on her loanDepot laptop.

**ANSWER:** Smolin admits that she searched for and/or accessed Mello, the "Pre-Approval Tracker" Google Doc, and the "pre-approvals" folder on or about January 16, 2022 but denies that it was for any improper purpose and/or for any purpose other than to benefit loanDepot.

105. On January 15, 2022, another customer, A.C., emailed Smolin about refinancing. Instead of forwarding this opportunity to loanDepot, Smolin stalled (as she discussed with CrossCountry) and responded that she would "call [the client] this coming week" (i.e., after she joined CrossCountry). A forensic analysis of Smolin's loanDepot laptop reveals that on January 16, 2022, Smolin searched in her secret personal email for this same customer's name. Then, on January 20, 2022, the customer emailed Smolin and Siegel at their CrossCountry email stating: "Cindy, just realized you sent an email from a different company. Wanted to follow-up on this."

---

[1] For privacy reasons, customers referenced in this Verified Complaint will be referred to only by the initials of their first and last names.

This is direct evidence that Siegel, Smolin, and CrossCountry schemed to convert this customer to CrossCountry. This customer is on the "customer contacts" tab of the "Siegel DB" spreadsheet.

**ANSWER:** Smolin admits that she communicated with a customer on or about January 15, 2022; that she searched her personal email for a customer's name on or about January 16, 2022; and that she received an email from a customer on or about January 20, 2022 via her CrossCountry email, but denies that it was for any improper purpose. Smolin otherwise denies the remaining allegations of this paragraph.

106.     The subject line of additional emails in Smolin's secret email, which Smolin searched for and/or accessed on January 16, 2022 (the date she resigned from loanDepot), further indicate that Smolin was setting up calls with customers for after she started with CrossCountry. For example, emails with the following subject lines were identified in Smolin's secret email:

- "[B.] – K McC – talk Jan 20th."

- "[S.W.] – call Jan 18 – 2:30 pm."

**ANSWER:** Smolin admits that her personal email contained emails with the foregoing subject lines, which she searched for and/or accessed on or about January 16, 2022, but denies the remaining allegations of this paragraph.

107.     Another email located in Smolin's secret email, dated January 16, 2022, bears the subject line: "Email to current pre-approved borrowers + Realtors." This email was accessed minutes after Smolin accessed Mello. Upon information and belief, Smolin was preparing to email current pre-approved borrowers and realtors to transition their business to CrossCountry.

**ANSWER:** Smolin admits that her personal email contained an email with the foregoing subject line, dated January 16, 2022, and that she accessed it after accessing Mello, but denies the remaining allegations of this paragraph.

108.    Further, between January 25 and 26, 2022—after Smolin and Siegel commenced employment at CrossCountry—Rizza acted as Smolin's, Siegel's, and CrossCountry's double-agent, forwarding confidential customer information to them. For example:

- Rizza emailed a Closing Disclosure for customers A.M. and P.M. to Smolin's and Siegel's personal emails. The Closing Disclosure detailed the features, terms, and costs associated with the customer's mortgage loan. The Closing Disclosure also contained a cover letter, dated January 19, 2022, signed by Smolin even though Smolin resigned from loanDepot on January 16, 2022.

- Rizza also emailed Smolin at her personal email address, attaching a closing disclosure and payoff statement for customers D.K. and S.K, containing detailed information about the features, terms, and costs associated with the customer's mortgage loan.

These documents contain personal financial information of customers, which could be used in the future to solicit the customers and undercut loanDepot on costs.

**ANSWER:** Smolin admits that Rizza sent the emails described above to Smolin's personal email but denies the remaining allegations of this paragraph.

109.    Finally, on January 28, 2022, loanDepot received an email from customer, B.C., with the subject "2021 W2," where the customer sent his W-2 form to Smolin at her CrossCountry email. In 2021 and early January 2022, Smolin sent the same customer instructions to submit an application to be pre-approved for a loan through loanDepot. Upon information and belief, Smolin

is now soliciting and servicing this customer at CrossCountry utilizing confidential and trade secret information she learned at loanDepot. Indeed, B.C. is listed on the "onboarding" spreadsheet that Siegel transferred to CrossCountry as a "prospect" with notes about this customer, including to "send new online link."

**ANSWER:** Smolin admits she sent a customer instructions to apply to be pre-approved for a loan through loanDepot in 2021 and early January 2022. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### Baske and Bowman, as Agents of CrossCountry, Collude To Take LoanDepot Confidential/Trade Secret Information and Convert Customers

110. Like Siegel and Smolin, Bowman and Baske also worked as agents of CrossCountry to misappropriate loanDepot's confidential and trade secret information and other property, and to solicit loanDepot customers.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

111. For example, on December 28, 2021, Baske sent from her loanDepot email to her personal email a series of documents including customer lists (excel spreadsheets) containing the customer's name, home address, and (in some cases) loan number.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

112. On January 3, 2022, Baske sent additional documents from her loanDepot email to her personal email, including a compilation of information (including template emails/scripts) used for servicing customers.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

113.    On January 5 and 7, 2022, Baske forwarded from her loanDepot email to her personal email even more documents, including template emails to service customers.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

114.    On January 14, 2022, Baske emailed from her loanDepot email to her personal email customer lists from <u>2020 and 2019</u>, including customer mailing addresses.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

115.    On January 16, 2022, after Bowman resigned from loanDepot, loanDepot customers (D.F. and H.L.) (who had been working with loanDepot) emailed Bowman at Bowman's loanDepot email requesting a pre-approval letter. The customer's email was forwarded from Bowman's loanDepot email to Baske's loanDepot email. Then, on January 17, 2022, Bowman sent an email from <u>his CrossCountry email address</u> to D.F. and H.L. The customer, D.F., responded the next day. The email messages are encrypted, but upon information and belief, Bowman was contacting D.F. and H.L. to provide them with a pre-approval letter from CrossCountry, using information provided to him by Baske.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

116.    On January 17, 2022, customer B.K. emailed Bowman at his loanDepot email. On January 18, 2022, Baske forwarded B.K.'s email to Bowman at his personal email. The customer wrote: "Just checking in to see how the rates and of it made sense to refi" [sic].

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

117.    Between January 18, 2022 and January 20, 2022, Baske also forwarded to Bowman, at his personal and CrossCountry email, a number other customer emails.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

118.    On January 18, 2022, customer T.S. emailed Bowman at his loanDepot email. The same day, Baske forwarded T.S.'s email to Bowman at his personal email, and on January 20, 2022, Baske again forwarded T.S.'s email to Bowman at his CrossCountry email. The customer wrote: "I'd love to grab a few minutes to connect with you – what does your schedule look like this week." According to the email chain, this pertained to the customer's interest in refinancing her loan on her condo in Chicago.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

119.    On January 18, 2022, customer S.E. emailed Bowman at his loanDepot email, regarding the customer "putting in an offer in [a] house," and inquiring about an anticipated "monthly payment." This was a customer who Bowman had prepared several pre-approval letters for, starting in November 2021. The same day, Baske forwarded S.E.'s email to Bowman at his personal email. Then, on January 19, 2022, S.E. emailed Bowman at his loanDepot email, stating

that he signed a contract for the house. The next day, Baske forwarded S.E.'s email to Bowman at his CrossCountry email. loanDepot has not funded any loan for this customer in 2022, indicating the customer is now working with Bowman and CrossCountry.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

120.     On January 18, 2022, customer S.C. emailed Bowman at his loanDepot email about the customer's home mortgage. The next day, Baske forwarded S.C.'s email to Bowman at his personal email. On January 20, 2022, Baske forwarded S.C.'s email again to Bowman, this time at his CrossCountry email.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

121.     On January 19, 2022, Baske also worked with a vendor to send a replacement gift to a customer, on Bowman's behalf, from her loanDepot email—even though Bowman was no longer employed by loanDepot. Baske was essentially using loanDepot to build goodwill for Bowman (and his new employer, CrossCountry) with the customer. The note accompanying the gift said: "Thank you so much for doing business with me. I look forward to working with you again in the future… - Bob Bowman."

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

122.     On January 20, 2022, the day before she resigned from loanDepot, Baske continued to forward customer emails to Bowman <u>at his CrossCountry email</u>. For example:

- On December 19, 2021, almost a month before Bowman resigned, a customer, K.C., emailed Bowman requesting a pre-approval letter before December 22nd. On January 2, 2022, K.C. emailed Bowman again stating that she submitted her "application before the holidays, but haven't seen anything come back." Upon information and belief, Bowman was intentionally stalling this customer so he could bring the loan to CrossCountry. Then, on January 18, 2022, K.C. again emailed Bowman at his loanDepot address, inquiring about a loan. On January 20, 2022, Baske forwarded the customer's email to Bowman at his CrossCountry address. Upon information and belief, Bowman is now servicing this customer at CrossCountry.

- On January 19, 2022, a customer, C.D., emailed Bowman at his loanDepot address inquiring about the "wonderful world of home improvements." That same day, Baske forwarded C.D.'s email to Bowman's personal email, and on January 20, 2022, Baske forwarded C.D.'s email to Bowman at his CrossCountry email.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

123.    On January 20, 2022, Baske also forwarded to Bowman at his CrossCountry email transaction documents for customers M.M. and B.M., including a controlled business disclosure (by a producer of title insurance business), initial fee quote, and related title insurance documents. Bowman previously issued a preapproval letter to these customers on January 3, 2022 for a condo; and the customer's offer was accepted with a loan contingency date of February 22, 2022. loanDepot never funded this loan, however. Upon information and belief, Baske was forwarding

documents to Bowman at his CrossCountry email so that he could close on the loan for these customers at CrossCountry, instead.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

124. Also on January 20, 2022 (the day before she resigned from loanDepot and the same day she was taking customer documents relating to a condo transaction), Baske forwarded from her loanDepot email to her personal email <u>fourteen PDF documents containing a number of loanDepot training materials, job aides, quick reference guides, and templates, some of which are copyrighted to loanDepot, have a "confidential and proprietary" designation at the bottom, and state that they are for "internal use only</u>." Significantly, some of these loanDepot training documents relate to condo transactions.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

125. Then, on the day Baske resigned (January 21, 2022) she emailed documents regarding customer Y.Z. to her personal email, including mortgage account statements with detailed financial information concerning Y.Z.'s loan and interest rate and several other crucial data points for three different properties. Unsurprisingly, loanDepot's systems signaled that customer Y.Z. was "actively shopping with another lender" just one day before this, on January 20, 2022. Upon information and belief, that other lender is CrossCountry.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

**Schneider Unlawful Activities As Agent of CrossCountry**

126.    Schneider also improperly accessed, used, and disclosed loanDepot trade secrets, acting as an agent of CrossCountry.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

127.    For example, on January 23, 2022, four days before he resigned to join CrossCountry, Schneider accessed several documents, including:

- Excel spreadsheets entitled "Contacts-2022.xlsx" and "All My Contacts-2022-01-23-14-11-06.xlsx." These spreadsheets contain a compilation of information downloaded from loanDepot's proprietary database. The spreadsheets contain a list of contact information for over 3,300 borrowers and partners, including contact name, email address, mailing address, work phone, mobile phone, employer name, and employer address. Upon information and belief, Schneider had no legitimate business reason to download and access these documents but to use them at CrossCountry.

- Excel spreadsheets entitled "Funded Version 1.xlsx" and "LO DB – Funded YTD-2022-01-23-16-03-33.xlsx," which also contain a list of hundreds of borrowers with funded loans, including borrower name, loan number, email address, phone numbers, loan amount, mortgage applied for (e.g., conventional), and funded date. The "LO DB – Funded YTD-2022-01-23-16-03-33.xlsx" spreadsheet also contains detailed information about the loan purpose (e.g. refinance/purchase), occupancy (e.g., owner occupied/second home), subject property street address, referral name (e.g. "Refi Target"), and buying agent. The list contains 582 rows of data. Critically, this spreadsheet also shows which borrowers are

repeat customers, including detailed information about their past loans, providing critical information that would allow Schneider to target these customers at CrossCountry.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

128.    On January 24, 2022, Schneider accessed in his personal email account emails with the following subject lines: "Funded Version 1," "Funded Version 2," "Contacts," and "DB." The email subjects are strikingly similar to the names of the documents that Schneider accessed the day before, referenced in Paragraph 127, above.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

129.    Also on January 24, 2022, Schneider accessed an email in his personal email with the subject line "CrossCountry Mortgage, LLC Offer, Comp Agreement & Sign On - Steve Schneider."

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

130.    Also on January 24, 2022, after 10:00 PM at night, Schneider forwarded to his personal email: (a) an email containing a list of Schneider's and Rizza's existing loans, including customer information, such as borrower name, closing date, and other loan deadlines; and (b) an email from a customer, J.J., along with a BOA appraisal report for the customer. The customer's email is from October 2021. Upon information and belief, Schneider had no business purpose to forward this information to his personal email other than to transition this client to CrossCountry.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

131.     The next day, January 25, 2022, Schneider accessed his personal email account, including emails with the subjects: "CCM Intro Call with Steve Schneider & Onboarding Team" and "CCM Onboarding Intro."

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

132.     The day he resigned from loanDepot (January 27, 2022), Schneider accessed Mello and navigated to "Pipeline," "Scenarios," and "Overview." Schneider also frequently accessed his personal e-mail, strongly indicating that he was misappropriating valuable loanDepot data on his way out the door and converting it for his and CrossCountry's benefit. Schneider also accessed the following documents:

- Excel spreadsheets entitled "LO DB – Funded YTD – 2022-01-26-22-03-46.xlsx" and "LO DB – Funded YTD – 2022-01-26-22-04-40.xlsx," which like the spreadsheets described above, contained detailed information with 584 rows of data for borrowers. The spreadsheets contain borrower name, email address, contact phone number, loan amount, interest rate, appraised value, LTV, product name (e.g., Conv Fixed 30 Year), funded date, loan purpose (e.g., purchase/refinance), occupancy (e.g., owner occupied/second home), subject property street address, and buying agent. Schneider had no legitimate business reason to access this spreadsheet on the day he resigned from loanDepot, and the day before he started with CrossCountry.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

133.     And that isn't all. For the very first time—and on his last day at loanDepot (January 27, 2022)—Schneider plugged a USB drive into his loanDepot computer and copied several confidential and valuable loanDepot documents to that device, including:

- An excel spreadsheet entitled "Clients 7-26-2021.xlsx," which contains names for nearly 400 contacts, along with their loan amount, interest rate, funded date, product name (e.g., "30 Year Fixed Rate"), and LTV.

- An excel spreadsheet entitled "Copy of Funded 2018 to Present with Cont-2019-05-31-07-05-34.xlsx" and "Copy of Funded 2018 to Present with Cont-2019-09-10-05-21-52.xlsx," which contain the names of over 150 borrowers, along with contact name, email address, phone number, loan funded date, loan amount, interest rate, and product name.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

**CrossCountry Considers Customer Information
To Warrant Trade Secret Protection**

134.     The detailed client information described above is unquestionably a trade secret in the highly competitive mortgage loan industry. Indeed, CrossCountry admits as much. In *CrossCountry Mortgage, Inc. v. Messina et al*, No. 1:19-cv-01021 (N.D. Ohio May 7, 2019), for example, CrossCountry sued two former employees for breach of contract, breach of fiduciary duty, conspiracy, and misappropriation of trade secrets under the DTSA. (Dkt. 1, ¶ 1). CrossCountry alleged that the employees and competitor coordinated a group resignation, diverted loan customers to the competitor, and stole CrossCountry confidential information regarding

customers. (*Id.*, ¶ 2). CrossCountry alleged that "CrossCountry's customer data, including the names and other information of CrossCountry's loan customers and potential customers, including credit information, constitute trade secrets…" and "CrossCountry's customer data constitute trade secrets…" (*Id.*, ¶¶ 55, 66).

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

135. Similarly, just last month, in *CrossCountry Mortgage, LLC v. American Neighborhood Mortgage Acceptance Co., LLC, d/b/a AnnieMac Home Mortgage*, No. 2:22-cv-01119 (D.N.J. Mar. 1, 2022), CrossCountry alleged that "CrossCountry's non-public prospective borrower information and pricing information constitute trade secrets under federal law." (Dkt. 1, ¶¶ 22, 23, 74).

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

136. In fact, CrossCountry's own employment agreements restrict the use and disclosure of confidential material, and specifically state that "non-public personal information... provided to [CrossCountry] by any actual or potential customer" is "in the nature of a trade secret." (*Id.*, ¶¶ 22, 23). CrossCountry's employment agreements also prohibit their own employees from directly or indirectly <u>soliciting or hiring CrossCountry employees</u> for two years following the cessation of their employment. (Messina, Dkt. 1, ¶ 17). The CrossCountry employment agreement also states

that contact with, calling on, or soliciting customers and prospective customers and referral sources "constitutes improper interference with [CrossCountry's] legitimate, actual and prospective business expectations and contractual relations with its customers, prospects and referral sources; constitutes misappropriation of [CrossCountry's] goodwill, and unfairly and unjustifiably harms [CrossCountry]." (Id., ¶ 20).

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### CrossCountry Still Possess loanDepot's Information and Former Employees Ignore Cease and Desist Letters

137.     On February 2, 2022, loanDepot sent Bowman, Baske, Siegel, and Schneider letters reminding them of their obligations to loanDepot, and attaching their respective agreements. On February 11, 2022, loanDepot sent a similar letter to Smolin, reminding her of her obligations to loanDepot, and attaching her agreement. CrossCountry was copied on each of these letters.

**ANSWER:** Smolin admits that, on or about February 11, 2022, loanDepot sent her a letter, purporting to remind her of certain obligations and attaching her respective agreements with loanDepot. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

138.     At the time it sent these letters, loanDepot was not aware of the vast scope of the above-referenced misappropriations, misconduct, and unlawful solicitations.

**ANSWER:** Smolin lacks sufficient information to form a belief as to what loanDepot was or was not aware of and therefore denis same.  Smolin denies the remaining allegations.

60

139.    In the reminder letters, loanDepot demanded that the Former Employees cease and desist from any unfair competition and unlawful conduct. loanDepot also demanded that the Former Employees abide by the post-employment restrictive covenants in his/her Agreements, including but not limited to the covenant not to solicit loanDepot employees to end their employment relationship with loanDepot. loanDepot demanded written assurances that the Former Employees understood and would comply with their contractual obligations. Written assurances were never provided.

**ANSWER:** Smolin admits that she received the February 11, 2022, letter, which speaks for itself, and that she did not provide the requested written assurances in response. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

## COUNT I
## FEDERAL DEFEND TRADE SECRETS ACT
## (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES AGAINST CROSSCOUNTRY)

140.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Smolin restates her answers to Paragraphs 1 through 139 as and for her answer to this paragraph.

141.    The actions of CrossCountry and the Former Employees, as described above, constitute violations of one or more provisions of the DTSA.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same.

142.    The DTSA applies because loanDepot's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, which are provided to customers across the United States.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same.

143.    By engaging in the above conduct, CrossCountry and the Former Employees have misappropriated, threaten to misappropriate, or inevitably will misappropriate loanDepot's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

**ANSWER:** Deny.

144.    In particular, the loanDepot information described above, including the identities of customers that utilize loanDepot services, customer information provided by customer's to loanDepot, the identities of prospective customers, the compilations of customer information, employee sales information, the identities and volume of business of loanDepot "leaders," loanDepot customized job aids and training materials, and customer information obtained by the Former Employees by virtue of their employment with loanDepot, are trade secrets. loanDepot expended substantial time, energy, money, and ingenuity in collecting and compiling this information. loanDepot invests significant time, effort, and financial resources in developing and maintaining its customer relationships, including by, among other things, employing individuals, such as the Former Employees, whose job it is to exclusively develop such relationships, and by allowing employees to expense customer gifts and entertainment in order to develop such relationships, among other things.

**ANSWER:** Deny.

145.    loanDepot has taken reasonable measures to keep the trade secret information secret by, among other things: (1) requiring employees who have access to such information to sign confidentiality agreements; (2) promulgating confidentiality and information security policies, and training employees on confidentiality; (3) limiting the disclosure and distribution of such information to only employees on a need to know basis, and/or (4) requiring that such information be saved on password protected networks, devices, and servers.

**ANSWER:** Smolin lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

146.    loanDepot's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use, such as loanDepot's competitors like CrossCountry. A competitor with access to loanDepot's aforementioned trade secrets could use that information to target loanDepot's customers, employees, and referral sources, just as CrossCountry has done here. Indeed, loanDepot derives significant economic value from maintaining the secrecy of the non-public personal information of borrowers and prospective borrowers, as such information is necessary to process and close home mortgage loans (and refinancing loans)—which is the life blood of loanDepot's business.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

147.    Without authorization, CrossCountry and the Former Employees misappropriated, threaten to misappropriate, or inevitably will misappropriate these trade secrets in a willful manner

and with a deliberate intent to injure loanDepot and improve CrossCountry for their own financial gain by, among other things: (a) transferring loanDepot customer lists from loanDepot's database to CrossCountry; (b) emailing loanDepot trade secret information to their personal email addresses, as described above, including customer lists, training materials, and customer opportunities; (c) targeting customers who they learned were searching for loans by virtue of their employment with loanDepot; (d) accepting employment at CrossCountry, a direct competitor of loanDepot, and performing identical services to those previously provided to loanDepot, including servicing, attempting to service, or threatening to service the same customers, and by using and disclosing, or threatening to use or disclose, or inevitably using or disclosing, without loanDepot's consent, loanDepot's trade secret information in doing so; and (e) by acquiring, receiving, or possessing, or inevitably acquiring, receiving, or possessing the trade secrets, knowing same to have been misappropriated without loanDepot's authorization, and using same (including insider information they acquired about loanDepot customers) to convert customers from loanDepot to CrossCountry.

**ANSWER:** Deny.

148.     The Former Employees owed duties to loanDepot to maintain the secrecy of the trade secrets and to limit the use of the trade secrets. CrossCountry and the Former Employees acquired the trade secrets by improper means and/or disclosed and utilized the trade secrets, or inevitably will disclose and utilize the trade secrets, without loanDepot's consent, to perform competitive services and poach loanDepot customers and employees.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise lacks sufficient

information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

149.     The Former Employees are agents of CrossCountry, and are using loanDepot's trade secrets in the course and scope of their employment with, and for the benefit of, CrossCountry.

**ANSWER:** Deny.

150.     loanDepot communicated the trade secrets to the Former Employees in confidence. At the time of disclosure, the Former Employees (and CrossCountry) knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

**ANSWER:** Deny.

151.     Defendants can obtain economic value for the disclosure and use of loanDepot's trade secrets, for example, by avoiding the years, and millions of dollars in investment, that it took loanDepot to develop the trade secrets, and to convert loanDepot customers and employees to CrossCountry for their own financial gain.

**ANSWER:** Deny.

152.     As a consequence of the foregoing, loanDepot has suffered and will continue to suffer irreparable harm, injury, and loss. Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined. Unless enjoined, Defendants will continue to use loanDepot's trade secret information to unfairly compete and loanDepot will continue to suffer irreparable harm that cannot be remedied through monetary damages.

**ANSWER:** Deny.

153.     As a direct and proximate result of the conduct of Defendants, loanDepot is entitled to actual damages in an amount to be determined at trial. The acts and conduct of Defendants were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

**ANSWER:** Deny.

**COUNT II**
**ILLINOIS TRADE SECRET ACT ("ITSA")**
**(FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS,**
**AND FOR DAMAGES AGAINST CROSSCOUNTRY)**

154.     loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Smolin restates her answers to Paragraphs 1 through 153 as and for her answer to this paragraph.

155.     By the conduct alleged herein and described above, Defendants improperly acquired and misappropriated, or threaten to acquire and misappropriate, or inevitably will acquire and misappropriate, loanDepot's trade secret information.

**ANSWER:** Deny.

156.     loanDepot's trade secret information is sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

**ANSWER:** Deny.

157.     As set forth above, loanDepot has taken reasonable efforts and measures to keep and maintain the secrecy and confidentiality of these trade secrets. The Former Employees obtained loanDepot's trade secrets under circumstances giving rise to a duty owed by them to loanDepot to maintain their secrecy and limit their use.

**ANSWER:** Deny.

158.    As set forth above, by the conduct alleged herein, Defendants misappropriated or threaten to misappropriate the trade secrets by, among other things, using and disclosing, or threatening to use and disclose, and inevitably using and disclosing the trade secrets without loanDepot's consent, and/or acquiring, threatening to acquire, and inevitably acquiring the trade secrets while knowing or having reason to know that they were doing so by improper means.

**ANSWER:** Deny.

159.    Defendants breached, inevitably will breach, and/or induced the breach of the Former Employees' duty to maintain the secrecy of said trade secrets. CrossCountry has derived loanDepot's trade secret information from or through Former Employees knowing same to have been misappropriated without loanDepot's authorization.

**ANSWER:** Deny.

160.    Defendants intended to, or inevitably will, convert the trade secrets to their economic benefit, without loanDepot's consent, for anti-competitive use and to convert loanDepot customers and employees and know-how to CrossCountry.

**ANSWER:** Deny.

161.    As a direct and proximate result of the foregoing, loanDepot has suffered and will continue to suffer immediate irreparable harm, injury and loss. Pursuant to the ITSA, actual or threatened misappropriation may be enjoined. Unless enjoined by this Court, Defendants will continue to use loanDepot's trade secret information to unfairly compete and enjoy commercial advantage that they would not otherwise have.

**ANSWER:** Deny.

162.    As a direct and proximate result of Defendants' conduct, loanDepot is entitled to damages in an amount to be determined at trial. Defendants' conduct was willful and malicious, justifying an award of exemplary damages and attorneys' fees.

**ANSWER:** Deny.

**COUNT III**
**BREACH OF CONTRACT**
**(FOR INJUNCTIVE RELIEF AGAINST FORMER EMPLOYEES)**

This Count is subject to a Motion to Dismiss.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(FOR INJUNCTIVE RELIEF AGAINST FORMER EMPLOYEES)**

172. loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Smolin restates her answers to Paragraphs 1 through 162 as and for her answer to this paragraph. Smolin makes no answer to Paragraphs 163 through 171 since the counts contained therein are the subject of a motion to dismiss.

173. As employees of loanDepot, the Former Employees owed fiduciary duties to loanDepot, including the duties of loyalty and good faith.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same.

174. The Former Employees breached their fiduciary duties of loyalty to loanDepot by knowingly and intentionally acting adverse to loanDepot's interests during their employment with loanDepot by: (a) soliciting loanDepot employees to leave loanDepot and join CrossCountry; (b) using loanDepot information for the benefit of CrossCountry; (c) planning a group departure designed to harm loanDepot; (d) diverting business opportunities to CrossCountry; and/or (e) using

68

loanDepot resources to promote the Former Employees with customers even after the Former Employees joined CrossCountry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Smolin denies the same. Smolin otherwise denies the remaining allegations of this paragraph.

175. Because of the Former Employees' actions, loanDepot has suffered, and will continue to suffer, damages and loss, in an amount to be determined at trial.

**ANSWER:** Deny.

176. The Former Employees' actions were intentional, willful, outrageous, and malicious, and justify the imposition of punitive damages.

**ANSWER:** Deny.

177. loanDepot has also suffered, and will continue to suffer, immediate and irreparable harm as a result of such breaches, and if Defendants are not enjoined, loanDepot will continue to suffer such injury. Injunctive relief is necessary as loanDepot is without an adequate remedy at law to prevent this harm to loanDepot. loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Deny.

**COUNT V**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR DAMAGES AGAINST CROSSCOUNTRY)**

178. loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Smolin restates her answers to Paragraphs 1 through 162, and Paragraphs 172 through 177, as and for her answer to this paragraph. Smolin makes no answer to Paragraphs 163 through 171 since the counts contained therein are the subject of a motion to dismiss.

179. The Former Employees and CrossCountry knew that their conduct breached the Former Employees' and other loanDepot employees' duty of loyalty to loanDepot.

**ANSWER:** Deny.

180. The Former Employees and CrossCountry gave each other substantial assistance or encouragement to breach the Former Employees' and other loanDepot employees' respective fiduciary duties.

**ANSWER:** Deny.

181. Because of the Former Employees' and CrossCountry's conduct, loanDepot has suffered damages and loss, in an amount to be determined at trial.

**ANSWER:** Deny.

182. loanDepot has also suffered, and will continue to suffer, immediate and irreparable harm as a result of such aiding and abetting of breaches of fiduciary duty, and if Defendants are not enjoined, loanDepot will continue to suffer such injury. Injunctive relief is necessary as loanDepot is without an adequate remedy at law to prevent this harm to loanDepot.

**ANSWER:** Deny.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST CROSS COUNTRY)

This Count is not alleged against Smolin or any other individual Defendant and thus Smolin makes no answer to this Count.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR DAMAGES
## AGAINST CROSSCOUNTRY)

189.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Smolin restates her answers to Paragraphs 1 through 162, and Paragraphs 172 through 182, as and for her answer to this paragraph. Smolin makes no answer to Paragraphs 163 through 171, or Paragraphs 183 through 188, since the counts contained therein are the subject of a motion to dismiss or are not alleged against Smolin.

190.    loanDepot has and had protectable business relationships with all of the loanDepot employees that left loanDepot for CrossCountry, as well as the customers that CrossCountry and the Former Employees solicited/induced or attempted to solicit/induce to leave loanDepot (the "Prospective Business Relationships").

**ANSWER:** Deny.

191.    loanDepot had a reasonable expectation that: (1) its employees will continue their employment with loanDepot; and (2) its customers will continue utilizing loanDepot for its services.

**ANSWER:** Deny.

192.    loanDepot would have had greater prospective business advantage with the Prospective Business Relationships, absent improper interference.

71

**ANSWER:** Deny.

193.    At all relevant times, CrossCountry and the Former Employees had knowledge of the Prospective Business Relationships.

**ANSWER:** Deny.

194.    CrossCountry and the Former Employees permitted and/or encouraged the Breaches, induced the Breaches, and/or induced loanDepot's customers/employees to leave loanDepot by their acts described above, and have thereby interfered with loanDepot's prospective business advantage.

**ANSWER:** Deny.

195.    CrossCountry's and the Former Employees' actions, described herein, were done purposefully and with malicious and unjustifiable intent, through improper means, and for an improper purpose.

**ANSWER:** Deny.

196.    As a direct and proximate result of the above activities, loanDepot has suffered and will continue to incur actual damages, including, but not limited to, lost business, lost profits, damage to goodwill, and the costs of hiring and retaining former and new employees, among other things.

**ANSWER:** Deny.

197.    CrossCountry and the Former Employees succeeded in ending loanDepot's relationship with its employees and customers, and interfering with loanDepot's expectancy in those Prospective Business Relationships, causing damage to loanDepot.

**ANSWER:** Deny.

198.    loanDepot has suffered and will continue to suffer immediate irreparable harm until CrossCountry and the Former Employees are enjoined. Injunctive relief is necessary as loanDepot is without an adequate remedy at law to prevent this harm to loanDepot.

**ANSWER:** Deny.

199.    Punitive damages and attorneys' fees are warranted due to the malicious nature of the above conduct.

**ANSWER:** Deny.

## CINDY SMOLIN'S AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

#### Equitable Estoppel

1. When Smolin first began her employment at loanDepot, she was explicitly instructed to upload, to loanDepot's systems, contact and other customer information which she brought with her from her previous employer.

2. loanDepot provided Smolin with the "Marketing Get Started Checklist," attached as Exhibit A hereto. The "Marketing Get Started Checklist!" explicitly instructed Smolin to send her "[d]atabase," including "[p]ast/[c]urrent [c]lients, [and] B2B/[r]eferral [c]ontacts," to loanDepot's marketing department. *See* Ex. A at 1.

3. That was not the only way that loanDepot took advantage of Smolin's preexisting customer database. Smolin was also instructed to send an announcement to her preexisting clients, informing them of her new employment at loanDepot; providing her updated loanDepot contact information; and instructing them to ask about finance options available through loanDepot. *See* Exhibit B ("I've Joined #TeamloanDepot" announcement templates).

4. Clearly, loanDepot did not consider the contact and other customer information which Smolin brought with her from her previous employer as confidential information and/or a trade secret belonging to Smolin's former employer. Otherwise, loanDepot would not have specifically instructed Smolin to upload such information onto its systems and utilize it to market its products and services.

5. Now, however, loanDepot seeks to claim that the exact same contact and other customer information *is* confidential and/or a trade secret belonging to loanDepot, in direct contradiction to its previous actions and instructions to its employees.

74

6.    loanDepot is not only claiming that the preexisting customer information which Smolin gave loanDepot when she first started her employment there as confidential information and/or a trade secret.

7.    loanDepot also claims that the new contacts that Smolin developed, while at loanDepot *at her own expense*, also belong to loanDepot. However, loanDepot never paid Smolin to develop any new contacts or clients during her employment.

8.    When Smolin resigned from loanDepot, she was aware of loanDepot's prior position on contact and other customer information, and she reasonably relied on that knowledge when departing loanDepot and joining CrossCountry.

9.    Despite that, loanDepot now seeks to impose liability against Smolin for her reasonable reliance on her knowledge of loanDepot's previous position on contact and other customer information—namely, that such information is *not* confidential and/or a trade secret.

10.    Smolin had a right to reasonably rely on loanDepot's previous position that contact and other customer information is *not* confidential and/or a trade secret, and loanDepot should be equitably estopped from pursuing any claims against Smolin related to her purported use of any contact and other customer information.

## SECOND AFFIRMATIVE DEFENSE

### Unclean Hands

11.    Smolin reasserts and re-alleges Paragraphs 1 through 10 of her Affirmative Defenses as though set forth fully herein.

12.    If Smolin is found liable for her purported use of contact and other customer information following her departure from loanDepot, loanDepot must be held to the same standard.

13.     loanDepot actively instructed new employees, including Smolin, to upload preexisting contact and other customer information, stemming from the new employees' previous employers, to loanDepot systems.

14.     According to the logic of loanDepot's Complaint, loanDepot also misappropriated and induced Smolin to misappropriate trade secrets, and tortiously interfered with the prospective economic advantage of protectable business relationships, thereby violating, at least, the Federal Defend Trade Secrets Act ("DTSA") and the Illinois Trade Secret Act ("ITSA").

15.     To the extent that loanDepot seeks equitable relief, its unclean hands bar it from doing so.

### THIRD AFFIRMATIVE DEFENSE

#### *In Pari Delicto*

16.     Smolin reasserts and re-alleges Paragraphs 1 through 15 of her Affirmative Defenses as though set forth fully herein.

17.     To the extent that loanDepot seeks equitable relief, the doctrine of *in pari delicto* bars it from doing so.

### FOURTH AFFIRMATIVE DEFENSE

#### Overbreadth of the Non-Solicit

18.     Smolin reasserts and re-alleges Paragraphs 1 through 17 of her Affirmative Defenses as though set forth fully herein.

19.     The Non-Solicitation provision ("Non-Solicit") contained in Smolin's Employment Agreement, attached as Exhibit D to the Complaint, is overly broad and therefore unenforceable.

20.     The Non-Solicit provides, in pertinent part:

Non-Solicitation. To the fullest extent permitted by applicable law, Participant agrees that he or she will not, while in the employment of Company and for a period

of one (1) year after the termination of that employment regardless of reason, solicit or induce, directly or indirectly, whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity.

(Ex. D to Complaint at Section 4(B)).

21.     The Non-Solicit contains no geographical limitation; it applies to any business venture, including those that do not compete with loanDepot and those that exist in areas where loanDepot does not do business; and it includes all employees, regardless of what role they occupied at loanDepot or what role they were hired to perform.

22.     The Non-Solicit includes employees with whom Smolin had no contact with while at loanDepot; employees hired even years after Smolin resigned; employees who left loanDepot at any time in the history of the company; and employees with whom Smolin had no contact with until after they resigned or were fired from loanDepot.

25.     The Non-Solicit is not justified by any protectable interest in maintaining a stable work force.

26.     loanDepot's work force is not stable. To the contrary, there is high turnover, and the departure of individual employees, teams, and loan officer/assistant pairs is common within loanDepot.

27.     The Non-Solicit is also unenforceable because the one-year restriction contained therein is overly broad in duration.

28.     As the Non-Solicit is patently overboard in geographic scope, applicability, and duration, it is unenforceable.

## CINDY SMOLIN'S COUNTERCLAIM

Cindy Smolin ("Smolin" or "Counter-plaintiff"), by her attorneys, states the following as her Counterclaims against Counter-defendant loanDepot.com, LLC ("loanDepot" or "Counter-defendant"):

## INTRODUCTION

1.      This is an action for violations of the Lanham Act and Illinois' Consumer Fraud and Deceptive Business Practices Act.

2.      Smolin worked at loanDepot as a Loan Consultant until January 16, 2022, when she resigned her position. Smolin subsequently took up employment at another mortgage lender, CrossCountry Mortgage, LLC ("CrossCountry").

3.      After Smolin resigned, loanDepot intentionally used Smolin's name, likeness, and contact information to create confusion and mislead customers into believing Smolin remained employed at loanDepot.

4.      This activity included, at least, sending out an advertisement from Smolin's former loanDepot email address, directly to consumers on March 17, 2022, after Smolin's resignation from loanDepot, thereby creating the false impression that Smolin was still employed at loanDepot.

5.      As a direct result of loanDepot's campaign, consumers were tricked into believing Smolin remained associated with and/or employed by loanDepot.

6.      This was not an isolated incident or innocent mistake, but a systematic campaign to mislead consumers regarding the status of former loanDepot employees.

7.      Indeed, loanDepot did the same thing, to the same effect, with respect to at least two other employees, Steve Schneider and Samantha Siegel.

## PARTIES

8.      Smolin resides in Highland Park, Illinois and is a citizen of that state.

9.      loanDepot is a Delaware limited liability company with its principal place of business in Orange County, California.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 because this action arises in part under the Lanham Act, 15 U.S.C. 1051 § *et seq*., and as provided for in 28 U.S.C. § 1367, this Court shall exercise supplemental jurisdiction over the state law claims asserted herein.

11.     Pursuant to 28 U.S.C. § 1391(b)(2), venue in this Court is proper because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.

## BACKGROUND FACTS

12.     Smolin resigned from loanDepot on January 16, 2022.

13.     At the time of her resignation from loanDepot, Smolin was a Loan Consultant affiliated with loanDepot's Illinois branches.

14.     Following her resignation, Smolin began employment with another mortgage lender, CrossCountry.

15.     However, on March 17, 2022, several months after Smolin's departure, loanDepot sent a marketing email to customers, from Smolin's former loanDepot email address, with the subject line "Your Pot of Gold Is Here…" (the "March 2022 email").

16.     The March 2022 email advertised loanDepot's selection of home loan products. Moreover, it falsely gave off the impression that Smolin remained employed at loanDepot and solicited business from consumers on that basis.

17.     The March 2022 email was part of a larger campaign to intentionally confuse consumers regarding the status of former loanDepot employees.  As mentioned above, loanDepot sent an identical "Your Pot of Gold Is Here…" email, on March 17, 2022, from both Samantha Siegel's and Steve Schneider's loanDepot email addresses.

18.     loanDepot has also sent other marketing emails to consumers, from the loanDepot email addresses of other former employees, thereby misleading consumers. *See* Exhibit C (Facebook post of former loanDepot employee, Kevin Luchko, stating "[d]espite the fact that I've not been with loanDepot since January 7, 2022, I believe emails have continued to be generated and sent from my former loan email address at loanDepot (using my name, image and likeness)").

## COUNT I- FALSE ENDORSEMENT – LANHAM ACT, 15 U.S.C. §1125 (A)(1)(A)

19.     Smolin restates and realleges the allegations set forth in Paragraphs 1 through 18 as though set forth fully herein.

20.     Smolin is well known in the Illinois real estate market and recognized as a superior mortgage broker. There is clear commercial value in her identity and reputation as reflected by her loyal customer base.

21.     By sending the March 2022 Email, loanDepot willfully, knowingly, and wrongfully used Smolin's name, likeness, and contact information to intentionally confuse consumers into believing she endorsed loanDepot and remained employed there, several months after her departure.

22.     loanDepot's conduct has created a likelihood of confusion with consumers who are looking to obtain mortgages.

23.     As a result of loanDepot's conduct, Smolin has been damaged by actual consumer reliance on the misleading statements and has suffered actual injury in the form of lost revenue

and profits from consumers who obtained mortgages through loanDepot, thinking that Smolin remained employed there and/or endorsed loanDepot.

24.     As a result of loanDepot's conduct, loanDepot has unjustly enriched itself by closing on – and earning commissions from - mortgage loans while consumers mistakenly thought that Smolin was still employed at loanDepot, and thereby benefiting from the goodwill associated with Smolin's name.

**WHEREFORE**, Counter-plaintiff respectfully requests that this Court enter an Order (a) awarding Smolin treble the amount of her damages, as determined at trial; (b) ordering loanDepot to disgorge any funds obtained through its use of Smolin's name, likeness, voice recording, or image; (c) ordering loanDepot to perform corrective advertising; and (d) awarding Smolin the costs of this action, including but not limited to attorney fees.

## COUNT II: FALSE ADVERTISEMENT – LANHAM ACT, 15 U.S.C. §1125(A)(1)(B)

25.     Smolin restates and realleges the allegations set forth in Paragraphs 1 through 24 as though set forth herein.

26.     Smolin is well known in the Illinois real estate market and recognized as a superior mortgage broker. There is clear commercial value in her identity and reputation as reflected by her loyal customer base.

27.     By sending the March 2022 email, loanDepot willfully, knowingly, and wrongfully used Smolin's name, likeness, and contact information to intentionally confuse consumers into believing she endorsed loanDepot and remained employed there several months after her departure.

28.     loanDepot's March 2022 e-mail was a commercial advertisement for its products and services and contained Smolin's likeness, name, and contact information in an effort to create a likelihood of confusion with consumers looking to purchase mortgages.

29.     loanDepot's March 2022 e-mail deceived or had the tendency to deceive each consumer of mortgages that received the e-mail, by suggesting that Smolin remained employed with loanDepot.

30.     As a result of loanDepot's conduct, Smolin has been damaged by actual consumer reliance on the misleading statements and has suffered actual injury in the form of lost revenue and profits from consumers who purchased mortgages through loanDepot, thinking that Smolin remained employed there.

31.     As a result of loanDepot's conduct, loanDepot has unjustly enriched itself by closing on – and earning commissions from - mortgage loans while consumers mistakenly thought that Smolin was still employed at loanDepot.

**WHEREFORE**, Counter-plaintiff respectfully requests that this Court enter an Order (a) awarding Smolin treble the amount of her damages, as determined at trial; (b) ordering loanDepot to disgorge any funds obtained through its use of Smolin's name, likeness, voice recording, or image; (c) ordering loanDepot to perform corrective advertising; and (d) awarding Smolin the costs of this action, including but not limited to attorney fees.

### COUNT III: VIOLATION OF ILLINOIS' CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 et seq.

32.     Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 31 as though set forth fully herein.

33.     loanDepot's March 2022 e-mail was sent from Smolin's former loanDepot email address, thereby identifying her by name and providing her contact information as at loanDepot.

34.     loanDepot's e-mail was sent without Smolin's written consent.

35.     At the time loanDepot sent the e-mail, Smolin was no longer working at loanDepot. Despite that, loanDepot tried to capitalize on Smolin's excellent reputation and goodwill with consumers and sent the mass email out, with the hope that consumers would purchase a mortgage through loanDepot due to its supposed affiliation with Smolin.

36.     loanDepot sent the e-mail with the intent to deceive consumers into believing that Smolin remained affiliated with loanDepot, knowing full well that she had resigned prior to the mass email being sent.

37.     As a result of loanDepot's fraud on consumers, Smolin lost commissions on mortgages that loanDepot closed as a result of the confusion loanDepot intentionally caused in the mortgage marketplace.

**WHEREFORE**, Counter-plaintiff respectfully requests that this Court enter an Order awarding Counter-plaintiff the following relief:

a.     Counter-plaintiff's actual damages in an amount to be determined at trial;

b.     Punitive damages;

c.     Attorneys' fees and costs; and

d.     Any other relief deemed appropriate pursuant to 815 ILCS 505/10a.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

May 10, 2022                                Respectfully submitted,

                                            CINDY SMOLIN

                                            By:   */s/ Jeffrey L. Widman*
                                            _____
                                                    One of her Attorneys

Jeffrey L. Widman (#6226367)
Martin L. Martos (#6303908)

83

Alexandria Rhoades (#037024)
Gabrielle Winslow (#6330644)
Fox Rothschild LLP
321 North Clark Street, Suite 800
Chicago, Illinois  60654
(312) 517-9200
JWidman@foxrothschild.com
MMartos@foxrothschild.com
ARhoades@foxrothschild.com
GWinslow@foxrothschild.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, states that on May 10, 2022, he caused a copy of the foregoing to be served on all counsel of record via the Court's ECF system.

*/s/ Jeffrey L. Widman*