IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **LOANDEPOT.COM, LLC**  Plaintiff,  vs.  **STEVE SCHNEIDER, CINDY SMOLIN, SAMANTHA SIEGEL, FERNANDA BASKE, BOB BOWMAN, and CROSSCOUNTRY MORTGAGE, LLC**  Defendants. | Case No. 1:22-cv-01874 |

**MEMORANDUM IN SUPPORT OF LOANDEPOT'S MOTION TO COMPEL ARBITRATION AS TO INDIVIDUAL DEFENDANTS' COUNTERCLAIMS, OR ALTERNATIVELY, TO DISMISS UNDER RULE 12(b)(6)**

I.  **INTRODUCTION**

Individual Defendants Samantha Siegel, Steve Schneider, and Cindy Smolin ("Individual Defendants") have each filed three substantively identical counterclaims against loanDepot under the Lanham Act, 15 U.S.C. § 1051 *et seq.* (Counts I and II) and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS § 505/1 *et seq.* (Count III) (collectively, "the Counterclaims"). The Counterclaims are legally deficient and should be dismissed with prejudice, but it is an arbitrator and not the Court who must issue that ruling. Individual Defendants each signed the same clear, binding, and enforceable arbitration agreement (the "Agreement") during their employment with loanDepot, which requires that all claims for non-preliminary relief asserting violations of "any federal, state, or other government constitution, statute, ordinance or regulation" must go before JAMS and be resolved under its Employment Arbitration Rules ("JAMS Rules").

Although loanDepot's position is well-grounded in the express text of the Agreement and directly on-point authority, Individual Defendants refuse to follow their Agreements, claiming that loanDepot waived arbitration by pursuing injunctive relief against them with this Court. Individual Defendants are wrong.

*First*, and crucially, **the Agreements require an arbitrator and not this Court to determine arbitrability of the Counterclaims**. So even if Individual Defendants believe they have a basis for maintaining their Counterclaims before this Court, that threshold issue must be arbitrated and the Court's analysis need go no further. *Second*, Individual Defendants' anticipated waiver argument is meritless. Seventh Circuit law, the restrictive covenant agreements upon which loanDepot bases its claims, and the JAMS Rules incorporated into the Agreement permit loanDepot to pursue preliminary injunctive relief through this action without giving up its contractual entitlement to arbitration. In accordance with the above, loanDepot properly: (a) initiated this action against Individual Defendants and CrossCountry; (b) pursued a TRO and preliminary injunction against all Defendants in this case;

1

(c) seeks non-injunctive relief from this Court as against CrossCountry only; and (d) is pursuing non-injunctive relief against Individual Defendants in binding arbitration, JAMS Ref. No. 5340000135 (the "Arbitration"). *See* JAMS Arb. R. 24(e) ("Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate."). loanDepot adhered faithfully to the Agreement, and so must Individual Defendants.

Even if this Court were not to compel arbitration, it should dismiss the Counterclaims for failure to state claim. Individual Defendants: (a) lack statutory standing to bring the Counterclaims under both the Lanham Act and ICFA; (b) cannot bring an ICFA claim as a matter of law because they are not harmed "consumers," for whom the ICFA is expressly reserved; and (c) do not otherwise state a remotely cogent, let alone plausible, basis for relief under any legal theory. Individual Defendants premise their Lanham Act Counterclaims (and their ICFA claim, which cannot proceed as a matter of law) on unspecified damages based on a single alleged marketing e-mail they say diverted their "customer base" to loanDepot instead of to them at CrossCountry. This allegation cannot be credited on these facts and procedural posture. More broadly, the Counterclaims hinge on nothing beyond barebones elemental recitals, contradictory logic, and bald legal and factual conclusions. This alone reveals what the Counterclaims are truly about: an effort to gain some tactical leverage in an action rightly focused on loanDepot's urgent need to rectify Defendants' tortious, unlawful, and breaching conduct.

In sum, Individual Defendants' far-fetched theories should be dismissed as a matter of law. But that is a matter for Retired Judge Wayne R. Andersen to take up in the Arbitration, where the Counterclaims belong. loanDepot respectfully asks that the Court compel arbitration or alternatively dismiss the Counterclaims with prejudice.

2

## II. BACKGROUND

### A. Individual Defendants Each Agreed To Arbitrate The Counterclaims They Improperly Pursue Before This Court.

In late 2018 and early 2019, Individual Defendants each executed the Agreement, through which they promised to arbitrate all "Claims" against loanDepot. (Declaration of Kyleigh Schumacher ("Schumacher Decl.") ¶ 3, Ex. 1.[1]) The Agreement defines "Claims," in pertinent part, as "all past, present, [and] future claims, including any currently pending litigation . . . against the Company" for, among other things, fraud, misrepresentation, and violation of "**any federal, state, or other government constitution, statute, ordinance or regulation** . . . ." (*Id.* Ex. 1, at ¶ 3 (emphasis added).) Individual Defendants also agreed and acknowledged that the Company is engaged in interstate commerce and that the Agreement is enforceable pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* (*Id.* Ex. 1, at ¶ 10.) The Agreement expressly cites to and incorporates the JAMS Rules as the procedures to which the parties must adhere in complying with their Agreements:

> By signing this Agreement, the Parties agree any arbitration shall be conducted before one neutral arbitrator selected by the Parties under the JAMS Employment Arbitration Rules & Procedures (the "JAMS Rules") then in effect. You may obtain a copy of the JAMS Rules by accessing the JAMS website at http://www.jamsadr.com/rules-employment-arbitration and/or by requesting a copy of the JAMS Rules from Peter Macdonald by e-mail at legal-arbitration@loandepot.com. (*Id.*)

The JAMS Rules in turn provide that "**[a]ny recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.**" (*See* JAMS ARB. R. 24(e), Declaration of Colton D. Long ("Long Decl."), Ex. B.) Further, Rule 11(b) of the JAMS Rules provides:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration

---

[1] The Court may consider evidence outside the pleadings on a motion to compel arbitration. *Armbrister v. Pushpin Holdings, LLC*, 896 F. Supp. 2d 746, 753 n.3 (N.D. Ill. 2012).

is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter. (*Id.*)

Notwithstanding the parties' mutual promises to arbitrate, Individual Defendants agreed that loanDepot may pursue injunctive relief in court. *First*, Schneider signed an Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement ("Employment Agreement"). (Verified Complaint ("Compl.") Ex. F (ECF No. 1-1).) The Employment Agreement reaffirms and incorporates the Agreement to arbitrate, but Schneider also agreed that:

> [T]he Company's rights and remedies in the event of any breach of this Agreement shall include, without limitation, the right to seek any and all provisional remedies necessary to enforce the terms of this Agreement, including a temporary restraining order or preliminary injunction . . . . **the Company may institute an action to apply for such provisional remedy in a court of competent jurisdiction [and] . . . such application shall not constitute a waiver or breach of the Mutual Arbitration Agreement**. (*Id.* § 8(b), PageID No. 154 (emphasis added).)

*Second*, Smolin and Siegel both entered into a Retail Master Incentive Plan Agreement ("Incentive Agreement") with loanDepot. (Compl. Exs. C, D (ECF No. 1-1).) Through the Incentive Agreement, they agreed that although the parties must arbitrate legal disputes, loanDepot "shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction deems appropriate . . . ." (*Id.* at § VI.C, PageID Nos. 124, 132.) The Incentive Agreement's equitable relief carve-out applies to any breaches of the confidentiality, company property, and non-solicitation provisions of the Incentive Agreement. (*Id.*)

**B.    loanDepot Honored Its Arbitration Obligations; Individual Defendants Refuse To Do The Same.**

loanDepot filed this lawsuit on April 11, 2022, exclusively seeking injunctive relief against the Individual Defendants. (*See* Compl. (ECF No. 1), PageID Nos. 55-57).) On April 12, 2022, loanDepot filed the Arbitration against Individual Defendants, seeking all other legally- and factually-supported

4

non-injunctive relief. (Long Decl. ¶ 2.) The Arbitration is currently pending before retired U.S. District Judge Wayne R. Andersen in Chicago. (*Id.*)

Individual Defendants flouted their arbitration obligations by filing the Counterclaims with this Court on May 9 and 10, 2022 (ECF Nos. 36, 37, 38 (hereinafter cited as "Counterclaims").) On May 27, 2022, loanDepot's counsel asked Individual Defendants, through counsel, to voluntarily transfer their Counterclaims to the Arbitration based on their clear contractual promises. Individual Defendants refused. (Long Decl. ¶ 3, Ex. A.) This motion followed.

### C. Individual Defendants' Conclusory Counterclaim Allegations.

Individual Defendants allege in support of their Counterclaims that on March 17, 2022, loanDepot sent a marketing e-mail to customers from each of their former loanDepot e-mail addresses with the subject line "Your Pot of Gold is Here . . . ." (Counterclaims, ¶ 15.) This e-mail allegedly advertised loanDepot's selection of home loan products, which Individual Defendants claim falsely gave the impression that they remained employed by loanDepot and solicited business from consumers on that basis. (*Id.* ¶ 16.) In essence, the Counterclaims implausibly posit that intentionally lying to consumers about the present employment status of its former employees (whose then current employment [status was easily accessible to anyone with the internet](#)) would be good for business and loanDepot was motivated to deceive consumers on this basis.

With no facts to support their assertion, the Counterclaims go on to contend that this e-mail "was part of a larger campaign to intentionally confuse consumers regarding the status of former loanDepot employees." (*Id.* ¶ 17.) They allege no facts to support this assertion. Indeed, the only other "fact" alleged beyond the Individual Defendants' formulaic and conclusory recitation of each theory's legal elements is that one other former loanDepot employee complained on Facebook that he "believe[d]" emails were sent from his former loanDepot email. (*Id.* ¶ 18). That's it.

5

Based alone on these legal conclusions and nonfactual suppositions, Individual Defendants contend that loanDepot violated the Lanham Act and ICFA by intentionally confusing consumers to make it appear as though Individual Defendants "endorsed" loanDepot and, as a corollary, by falsely advertising to consumers "willfully, knowingly, and wrongfully." (*Id.* ¶ 21, ¶¶ 25-31.) They claim they were "damaged" by these alleged events but go no further. (*Id.* ¶¶ 23, 30). They do not identify a single "consumer" who was "confused" or who did business with loanDepot because of the March 2022 "Pot of Gold" e-mail, let alone any consumer from whom they claim they lost business. (*See generally id.*)

## III. ARGUMENT

### A. The Counterclaims, Including Arbitrability Questions, Belong Before JAMS.

The Counterclaims are plainly arbitrable. In fact, **even if Individual Defendants dispute arbitrability, they must make their arguments before JAMS.** The FAA applies to "[a] written provision . . . evidencing a transaction involving commerce," 9 U.S.C. § 2, and its codified policy favoring arbitration means "a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance, Inc.*, No. 21-328, --- S. Ct. ---, 2022 WL 1611788, at *4 (May 23, 2022). Arbitration should be compelled when (a) there is a valid written agreement to arbitrate; and (b) the claims at issue fall within the agreement's scope. *See Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1097 (N.D. Ill. 2015). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 1097-98 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

*First*, the very issue of whether the Counterclaims must be arbitrated (i.e., "[j]urisdictional and arbitrability disputes") — **including disputes over the "formation, existence, validity, interpretation or scope" of the Agreement must "be submitted to and ruled on by the Arbitrator."** *See* JAMS EMP. ARB. R. 11(B). The Agreement expressly adopts and links to the JAMS

6

Rules, and the "Seventh Circuit has long recognized that an agreement to have any arbitration governed by a set of rules incorporates those rules into the agreement." *Atlantic Specialty Insurance Company v. Anthem, Inc.*, 2020 WL 2526000, at *6 (S.D. Ind. May 18, 2020) ("[T]he overwhelming weight of authority holds that incorporation of JAMS Rules constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability."), citing *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir. 1976) ("The agreement of the parties to have any arbitration governed by the rules of the AAA incorporated those rules into the agreement"); *Crooms v. Southwest Airlines Co.*, 459 F. Supp. 3d 1041, 1054–56 (N.D. Ill. 2020) (ordering employees to arbitrate arbitrability because "[w]here the parties agree to arbitration pursuant to the rules of the . . . [AAA] the parties incorporate [them] into the arbitration agreement" and AAA employment rules delegate arbitrability issues to the arbitrator); *In re Dealer Management Systems Antitrust Litigation*, 2020 WL 832365, at *6 (N.D. Ill. Feb 20, 2020) ("The Court finds that the [ ] Agreement incorporates the AAA Rules and that the incorporation is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to an arbitrator."); *see also Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) ("In our view, Dr. Belnap and SLRMC clearly and unmistakably agreed to arbitrate arbitrability when they incorporated the JAMS Rules into the Agreement."). Here, the Agreement specifically adopts and references the JAMS Rules, which expressly mandate that gateway issues are decided by the arbitrator. Accordingly, even this threshold dispute as to arbitrability must be submitted to JAMS.

*Second*, setting aside for purposes of this motion that the Court may stop its analysis now and immediately compel arbitration of the Counterclaims based on the Agreement's express terms, loanDepot notes that the Agreement *is* plainly enforceable and the Counterclaims fall within its scope.

Under Illinois law, a valid and enforceable arbitration agreement must satisfy the "basic ingredients" for contract formation —"an offer, an acceptance and consideration." *Melena v. Anheuser-*

7

*Busch, Inc.*, 847 N.E. 2d 99, 109 (Ill. 2006). Here, these basic ingredients are easily satisfied. All three Individual Defendants received the Agreement along with a cover memo and list of frequently asked questions (the "offer") and they all voluntarily executed the Agreements (the "acceptance"). (Schumacher Decl. Ex. 1.) The consideration for the Agreement is more than adequate —(a) Individual Defendants remained employed with the loanDepot for over three (3) years after signing, *see Tinder v. Pinkerton Sec.*, 305 F.3d 728, 734 (7th Cir. 2002) (continued employment is sufficient consideration); and (b) loanDepot also agreed to arbitrate pursuant to and consistent with the terms of the Agreement. *See Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 368 (7th Cir. 1999) (an arbitration agreement is supported by adequate consideration where both parties agree to arbitrate).

In addition, the Counterclaims plainly fall within the scope of the Agreement. The Agreement requires arbitration, subject to exceptions not applicable to the Counterclaims, of "all past, present, [and] future claims, including any currently pending litigation . . . against the Company" for, among other things, claimed violations of "any federal, state, or other government constitution, statute, ordinance or regulation." (Schumacher Decl. Ex. 1.) The Individual Defendants allege that loanDepot violated the federal Lanham Act and the state ICFA. (*See, e.g.*, Counterclaims, ¶¶ 19-37.) The Counterclaims assert that loanDepot violated state and federal statutes. The Agreement requires arbitration of claims based on state and federal statutes and, thus, the Counterclaims belong in the Arbitration.

### B. loanDepot Did Not Waive Arbitration.

Even if Individual Defendants' anticipated waiver argument could be credited, and it cannot, it too must go before Judge Andersen at JAMS for the reasons noted above. And regardless, the waiver argument is meritless. A waiver can be either express or implied and the ultimate question, which Individual Defendants bear the burden of showing, is whether loanDepot "has acted inconsistently with the right to arbitrate." *St. Mary's Med. Ctr. Of Evansville, Inc. v. Disco Aluminum Prods. Co*, 969 F.2d

8

585, 588 (7th Cir. 1992). loanDepot has not acted inconsistently with its arbitration rights in any way; it responded to the Counterclaims within the time stipulated by the parties and approved by the Court. It timely sent out notice to counsel for Individual Defendants of the need to arbitrate the Counterclaims, and now makes this motion to compel.

Nor does loanDepot's decision to pursue injunctive relief against Individual Defendants in this Court waive loanDepot's right to compel arbitration of the Counterclaims. Both the Employment Agreement applicable to Schneider and the Incentive Agreements applicable to Siegel and Smolin authorize preliminary and injunctive remedies in Court. So do the JAMS Rules, which are expressly adopted and incorporated into the Agreement and make clear that "**[a]ny recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.**" (*See* JAMS ARB. R. 24(e).) This language means what it says. *See, e.g.*, *Fort Dearborn Life Insurance Co. v. Medical Mutual of Ohio*, 2008 WL 11380154, at *4 (N.D. Ohio, 2008) (injunctive proceedings may stay with court based on identical language in AAA rules; stating that "several courts have held that district courts retain equitable jurisdiction to consider preliminary injunctive relief, pending arbitration"). Moreover, it is well-established in the Seventh Circuit that "[e]ven when a claim filed in court is subject to arbitration, a court retains the authority to enter a preliminary injunction to preserve the *status quo ante* and prevent irreparable harm . . . ." *Popovich v. McDonald's Corp.*, 189 F. Supp. 2d 772, 775–76 (N.D. Ill. 2002); *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994) (same).

In sum, Individual Defendants have no basis for opposing what the law and clear contractual provisions require. The Court should dismiss Individual Defendants' Counterclaims and order that they proceed before JAMS.

### C. Alternatively, The Court Should Dismiss The Lanham Act Counterclaims Under Rule 12(b)(6).

The Counterclaims are also legally deficient as a matter of law and should be dismissed under Rule 12(b)(6) if not compelled to the Arbitration. Counts I and II allege violations of the Lanham Act, 15 U.S.C. § 1125. The Lanham Act creates two distinct forms of liability: false association/endorsement under § 1125(a)(1)(A) and false advertising under § 1125(a)(1)(B). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Section 1125(a) claims must also meet the heightened pleading standard of Rule 9(b) where, as here, allegations of fraud and misrepresentation form the basis for the statutory theory. *See AAVN, Inc. v. WestPoint Home, Inc.*, 2019 WL 1168102, at *2 (N.D. Ill. Mar. 13, 2019). Individual Defendants must also plausibly plead that they have statutory standing to pursue a Lanham Act claim and facts supporting the essential elements of each articulated theory. But they do not and cannot (a) plausibly plead standing; nor (b) state any allegations supporting the gravamen of their Lanham Act theories.

#### 1. Individual Defendants Flunk The *Lexmark* Standing Test.

The Supreme Court in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014) articulated a two-part test for pleading (and thereafter establishing) statutory standing and resulting entitlement to relief under the Lanham Act: (a) the existence of a commercial interest in reputation or sales to protect; and (b) the plaintiff suffered an actual economic or reputational injury as a direct and proximate result of the alleged deception, which "occurs when deception of consumers causes them to withhold trade" from the Lanham Act plaintiff. *Id.* at 132-33.[2] Counts I and II fall woefully short of the *Lexmark* test.

*First*, Individual Defendants **cannot** plausibly plead a reputational injury that could be proximately injured by a false association/endorsement or false advertisement with or from

---

[2] Courts apply the two-part *Lexmark* test to standing for false association/endorsement claims too. *See, e.g.*, *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 932 n.4 (N.D. Ill. 2016) (collecting cases).

10

loanDepot. Indeed, the whole premise of Individual Defendants' Counterclaims is that they had some measure of reputation or goodwill fostered **while working at loanDepot**, and it is facially implausible that this goodwill or reputation would be harmed by one e-mail purportedly suggesting they still worked **at the same place where they developed that reputation and goodwill.** Individual Defendants' Lanham Act theories are even more implausible considering that anyone with e-mail also has internet access and [can easily see their new affiliation with CrossCountry](). Likewise, to the extent any consumer actually contacted loanDepot as a result of the alleged marketing e-mail—and the Counterclaims allege nothing of the sort—that only shows that the Individual Defendants' reputations were intact and unharmed by any false association or advertisement described by the Counterclaims.

*Second*, any purported connection between one e-mail and an economic injury vis-à-vis lost business/sales is inherently and irretrievably far too attenuated to meet the *Lexmark* proximate causation requirement. It isn't as if this alleged e-mail could have automatically resulted in a consumer transacting business with loanDepot instead of Individual Defendants. Individual Defendants do not, because they cannot, allege that the March 2022 e-mail at issue was selling an off-the-shelf product that could immediately result in a customer making a purchasing decision believing an Individual Defendant remained affiliated with loanDepot. On the contrary, it is objectively true that the mortgage business requires direct customer interaction paired with lengthy underwriting and administrative procedures. If a customer responded to this alleged e-mail and wished to work with one of the Individual Defendants, they would have immediately learned that the Individual Defendants were no longer with loanDepot and inquired and learned where they worked. Then, they would have taken their business to Individual Defendants and there would be no harm to Individual Defendants. Alternatively, if they did not do this, then it was not an e-mail that "diverted" business; the customer chose to work with loanDepot because they preferred to do so and it was not any purported false

11

advertising or association that proximately resulted in a loanDepot transaction with the customer. Furthermore, Individual Defendants allege this e-mail is false only because it allegedly reflects that the Individual Defendants remain employed with loanDepot and support working with loanDepot; they cannot and do not claim that any fact about loanDepot's services or products were false. Bottom line: Individual Defendants cannot plausibly plead that they have a commercial interest in their name, reputation, or sales/revenues that could be proximately injured based on anything relating to the Counterclaim allegations.

*Second*, even if Individual Defendants could plausibly plead a proximately-caused reputational or economic injury to a commercial interest under the Lanham Act, they don't. They claim only that they have "been damaged" and suffered "actual injury in the form of lost revenue and profits" due to a single alleged e-mail but cite no facts at all to support any claimed damage. (Counterclaims, ¶¶ 23, 37.) This is fatal, as merely "[s]tating that there will be harm does not make it so." *AAVN, Inc. v. WestPoint Home, Inc.*, 2019 WL 1168102, at *3 (N.D. Ill. 2019) (granting motion to dismiss on Lanham Act claims where allegations of harm were based solely on conclusory statements). A plaintiff must allege sufficient facts to show actual "economic or reputational injury flowing directly from the deception wrought by the defendant's [false representations] . . . ." *Alan Ross Machinery Corporation v. Machinio Corporation*, 2018 WL 6018603, at *3 (N.D. Ill. 2018) (dismissing Lanham Act claim with prejudice under *Lexmark* for, in pertinent part, failure to state anything beyond a boilerplate statement of harm based on purported consumer confusion and because claimed injury could not logically or plausibly flow from allegations). Threadbare recitals of direct and proximate harm do not meet this requirement. *See, e.g.*, *Avalos v. IAC/Interactivecorp.*, 2014 WL 5493242, at *3-5 (S.D.N.Y. 2014) (dismissing Lanham Act claim based on website's suggestion that plaintiff was affiliated with website, as allegation that statements "caused 'consumer confusion for thousands if not millions, resulting in devaluation of intellectual property . . ." was pleaded with no non-conclusory factual support and there

was no "plausible causal connection between" the claimed harm and "Defendants' actions."). Indeed, "noticeably absent from [the Counterclaims] . . . are any allegations that [Individual Defendants] suffered a financial loss or reputational injury of any kind as a result of [loanDepot's alleged] unauthorized use of [their] image and likeness," beyond "one conclusory allegation" of harm. *Miller v. Easy Day Studios Pty Ltd.*, 2021 WL 4209205, at *9 (S.D. Cal. Sept. 16, 2021) (dismissing Lanham Act claims based on pleading nothing more than Miller was "injured" and that the defendant's actions "will continue to injure [Miller]"). It is "insufficient to plead proximate causation to support a Lanham Act claim" with "no more specific allegations" than conclusions. *Bobbleheads.com, LLC v. Wright Brothers, Inc.*, 259 F. Supp. 3d 1087, 1097 (S.D. Cal. 2017) (dismissing Lanham Act claim on statutory standing grounds where complaint alleged the defendant's "false advertising has caused it to suffer damages and that [plaintiff] is entitled to recover . . . profits from sales stemming from [Defendants'] wrongful conduct.").

To establish standing, Individual Defendants must provide facts illustrating that consumers actually "with[e]ld trade" (i.e., mortgage business) from them at their new employer because the consumers received one e-mail indicating the Individual Defendants still worked at loanDepot. If Individual Defendants' Counterclaims were anything more than tactical — and loanDepot posits that they are not — they could certainly point to some customer/consumer who they claim to have lost based on this one e-mail. But they do not come close and, as stated both above and below, any attempted connection is facially illogical and implausible.

### 2. Beyond Failing The *Lexmark* Test, The Lanham Act Counterclaims Are Wholly Implausible And Illogical.

On a broader level, Individual Defendants' allegations taken together are both conclusory and contradictory. They fail Rule 8 and 9(b) and cannot proceed regardless of *Lexmark* standing. *First*, the Lanham Act allegations simply do not make sense. Individual Defendants allege they each have a "loyal customer base." (Counterclaims (ECF Nos. 36-38) ¶ 20.) But in the same breath their allegations

13

superficially assume consumers obtained mortgages through loanDepot because they thought Individual Defendants "remained employed there and/or endorsed loanDepot." (*Id.* at ¶ 23.) As stated in Part III.C.1, it is implausible to believe that a customer would go all the way through the mortgage-loan process with some other loanDepot employee, when the only reason they would have contacted loanDepot in the first place—according to the Individual Defendants—was in response to a single e-mail giving the false impression they would be dealing with one of the Individual Defendants. This is facially contradictory and certainly not enough to state a claim under the Lanham Act. Indeed, Individual Defendants provide no details about any consumers who even received the e-mail—let alone acted upon it.

*Second*, Individual Defendants plainly do not plead the "who, what, where, and when" of the alleged intentional misrepresentations set forth in the Counterclaims and they cannot given the incoherent purported motivations at play. Why would loanDepot want to lie to consumers about Individual Defendants' employment status when there is no question the consumers/customers would learn about this alleged lie immediately upon contacting loanDepot or putting an Individual Defendant's name through any search engine? Again, the theory's illogic evidences its purely strategic purpose.

### D. The ICFA Counterclaims Should Also Be Dismissed Under Rule 12(b)(6) If Not Compelled To Arbitration.

Individual Defendants' ICFA claims also cannot go beyond the pleading stage.

*First*, ICFA claims are analyzed under the same criteria as the Lanham Act claims and therefore should be dismissed for the same reasons discussed above. *See, e.g.*, *AAVN*, 2019 WL 1168102 at *4.

*Second*, the Individual Defendants have no basis for suing under the ICFA. The ICFA provides a remedy for **consumers** who are the victims of unfair or deceptive business practices and courts rarely, only in well-delineated and inapplicable circumstances, authorize ICFA claims from non-consumers. *See, e.g.*, *Patel v. Zillow, Inc.*, No. 17 C 4008, 2018 WL 2096453, at *8-9 (N.D. Ill. May 7,

2018), *aff'd*, 915 F.3d 446 (7th Cir. 2019). Non-consumers such as the Individual Defendants may bring an ICFA claim only if a nexus exists between the objectionable conduct and **consumer** injury or harm, including, among other things, a plausible allegation about how the requested relief would serve the interests of consumers. *Id.* Here, the consumers in question are the alleged recipients of the March 2022 e-mail who might procure a mortgage, not the Individual Defendants. And the Individual Defendants' requested relief (their own lost commissions and other profits) would facially not serve consumers' interests (nor do Individual Defendants even attempt to plead it would). *See id.* at *9 Indeed, the ICFA allegations focus exclusively on harm to Individual Defendants' bottom line alone based on their claim that they *could* have lost business. (Counterclaims, ¶¶ 32-37). "Simply put, [the Individual Defendants'] allegations do not adequately state how [loanDepot's] alleged unfair business practices harm consumers." *Patel*, 2018 WL 2096453, at *9.

*Third*, to the extent the Individual Defendants bring a claim for deceptive business practices (the precise theory of the claim is unclear), that fails because they were not deceived. An ICFA "plaintiff who knows the truth does not have a valid ICFA deceptive practices claim." *Patel*, 2018 WL 2096453 at *9 (citation omitted).

## IV.    CONCLUSION

The Counterclaims belong before Judge Andersen at JAMS. And in any event, devoid of allegations supporting a plausible claim for relief, they cannot proceed as a matter of law. loanDepot respectfully asks that this Court compel arbitration and dismiss the Counterclaims from these proceedings altogether. Alternatively, the Court should dismiss the Counterclaims with prejudce under Rule 12(b)(6) for the reasons stated above.

Dated: June 13, 2022

Respectfully Submitted,

/s/ *James M. Witz*

James M. Witz
*jwitz@littler.com*
Colton D. Long
*clong@littler.com*
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1100
Chicago, Illinois 60654
(312) 372-5520

Jessica F. Pizzutelli
*jpizzutelli@littler.com*
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York 14450
(585) 203-3400

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2022, I caused a true and correct copy of the foregoing to be filed electronically with the Clerk of Court using the Court's CM/ECF system, which served this motion on counsel of record for all parties to this action.

*/s/ Colton D. Long*
Colton D. Long
