**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **loanDepot.com, LLC** | |
| Plaintiff, | Case No. 22-cv-1874 |
| vs. | Judge Edmond E. Chang |
| **STEVE SCHNEIDER, CINDY SMOLIN, SAMANTHA SIEGEL, FERNANDA BASKE, BOB BOWMAN, JOHN NOYES, and CROSSCOUNTRY MORTGAGE, LLC** | Magistrate Judge Sheila M. Finnegan |
| Defendants. | |

## FIRST AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR DAMAGES AGAINST CROSSCOUNTRY

Plaintiff loanDepot.com, LLC ("loanDepot"), by and through its counsel, Littler Mendelson, P.C., by way of this First Amended Verified Complaint against Defendants Steve Schneider ("Schneider"), Cindy Smolin ("Smolin"), Samantha Siegel ("Siegel"), Fernanda Baske ("Baske"), Bob Bowman ("Bowman"), and John Noyes ("Noyes") (collectively, the "Individual Defendants"), and their new employer, CrossCountry Mortgage, LLC ("CrossCountry") (collectively with the Individual Defendants, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This is an action for immediate injunctive relief and damages (as against CrossCountry) due to misappropriation of loanDepot's trade secrets, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference with loanDepot's contracts and prospective economic advantage. It arises from CrossCountry's well-honed scheme, conducted at the direction of its Chief Executive Officer ("CEO") and with the direct involvement of senior

CrossCountry managers and officers, to raid loanDepot employees and customers, using loanDepot's trade secret information to do so.

2.  loanDepot is in the business of making home mortgage, home equity, and personal loans. Individual Defendants were responsible for originating and closing loans. The Individual Defendants received years of training, customer and referral source introductions and leads, access to loanDepot's trade secret information, and thousands of dollars in expense reimbursements from loanDepot. They were handsomely compensated for their work.

3.  Despite this, the Individual Defendants schemed with CrossCountry to decimate loanDepot's Northbrook (and its satellite Chicago) branches (the "Illinois branches"). Specifically, in the days and weeks leading up to their resignations, Bowman and Smolin (key loanDepot loan originators) colluded with CrossCountry to solicit loanDepot employees to leave loanDepot and join CrossCountry. This is well documented in, among other places: (a) Smolin's contemporaneous notes memorializing calls and discussions with CrossCountry representatives; and (b) text messages between and among certain Individual Defendants and CrossCountry executives. Smolin's notes and text messages also show that she discussed with CrossCountry how she would "stall" bringing in business to loanDepot, so that she could bring loans to CrossCountry instead. On January 6, 2022, for example, Smolin texted Siegel that she had "so many" customers "wanting pre-approvals & refis" and was "trying to kick them down the road so I can [b]ring them as all new borrowers to cc."[1] Siegel responded by encouraging Smolin to refrain from putting such statements in writing: "I think that's over [the] phone." Bowman engaged in similar conduct and has openly acknowledged that he transferred millions in loanDepot customer loans to CrossCountry.

4.  CrossCountry welcomed, encouraged, and facilitated Individual Defendants' tortious and breaching conduct.

---

[1] The term "cc" refers to Defendant CrossCountry.

5.      Indeed, although unquestionably aware of Individual Defendants' confidentiality and non-solicitation obligations (among other fiduciary obligations to loanDepot), CrossCountry promised to pay Bowman and Smolin financial incentives in return for successfully soliciting and recruiting loanDepot employees to CrossCountry. Bowman acknowledged in an e-mail exchange that he received a sign-on bonus from CrossCountry in recognition of the substantial business he would transfer to CrossCountry. In point of fact, CrossCountry paid Bowman a signing bonus for well in excess of half a million dollars and paid Smolin a signing bonus for just under half a million dollars.

6.      Smolin, Siegel, and Bowman worked alongside senior CrossCountry officers to identify loanDepot employees to recruit, induce their departures from loanDepot, and facilitate their joining CrossCountry. To aid CrossCountry in identifying and targeting loanDepot employees for recruitment, Bowman sent screenshots to CrossCountry executives of loanDepot's confidential and proprietary leaderboard portal ("Leaderboard") — a non-public, internal-only site disclosing several key metrics bearing on a loanDepot loan officer's profitability. He then discussed these metrics with at least two CrossCountry corporate officers, CrossCountry Executive Vice President Ron Sampson ("Sampson") and CrossCountry Senior Vice President Beth Lewis ("Lewis").

7.      In several other instances, both while still employed by loanDepot and after joining CrossCountry, Bowman and Smolin, aided by Siegel, advised CrossCountry on the benefits and compensation that should be offered to CrossCountry's loanDepot recruitment targets. Bowman, Smolin, and Siegel also served as conduits between CrossCountry and loanDepot employees who were the subjects of Defendants' raid (*See, e.g.*, Sampson text to Bowman: "You know what [Schneider's] volume was last year?"; Bowman text to Sampson: "Yeah I have it as a screen shot one sec."). Bowman also texted CrossCountry Senior Vice President Rob Jewett with the names and contact information for and encouraging the solicitation of loanDepot underwriters. In this same message to Jewett,

Bowman notes that Smolin was "checking in" on another loanDepot underwriter and that he will "get [Jewett] that # if he seems interested."

8.     As indicated above, Smolin engaged in substantially similar conduct (as did Siegel), encouraging loanDepot employees to end their employment with loanDepot for CrossCountry while absconding with vast quantities of loanDepot trade secrets and confidential information. Much of this scheming, facilitation, solicitation, and inducement occurred while they remained loanDepot employees — something CrossCountry knew full well but encouraged (and financially incentivized) nevertheless.

9.     Defendants' solicitation efforts were successful. In rapid succession over a two-week period, the Individual Defendants and their colleagues resigned from loanDepot. First Bowman, Smolin, and Siegel, followed shortly by: Schneider, Baske, Joseph Rizza ("Rizza"), John Noyes ("Noyes"), and Megan Poulin ("Poulin"). Smolin even wrote a resignation email on Siegel's behalf— underscoring the coordinated nature of the resignations. Bowman, Smolin, and Siegel all discussed via text their coordinated departures for weeks in advance of their resignations. To highlight the devastating effect of these departures, the Illinois branches were accountable for nearly a billion dollars in closed loans in 2021 alone; the employees that left for CrossCountry were accountable for approximately 41% of those loans.

10.     loanDepot thereafter lost and continues losing significant revenues and profits as a direct and proximate result of CrossCountry's, Smolin's, Bowman's, and Siegel's unlawful solicitations. Schneider, for example, had a 2021 closed loan volume at loanDepot of over $84 million. Noyes had a 2021 closed loan volume at loanDepot of over $48 million. And Smolin had a 2021 loan volume at loanDepot of over $110 million. Coupled with Defendants' misappropriation of troves of loanDepot's confidential information and trade secrets from which Defendants will continue generating revenue

to the detriment of loanDepot, loanDepot's losses from Defendants' unlawful and breaching conduct is simply staggering.

11.     As is evident by the timing and nature of the resignations—along with the written record—CrossCountry, as puppet master, strategically orchestrated the coordinated resignations to cause maximum disruption to loanDepot. CrossCountry targeted loanDepot employees with massive books of business, which are not easily replaceable. Bowman and Smolin also fed compensation and sales data about loanDepot employees to CrossCountry, so CrossCountry could strategically target specific employees to leave loanDepot, join CrossCountry, and convert customers.

12.     Incredibly, CrossCountry's Lewis texted Bowman on December 29, 2021, while Bowman was a loanDepot employee:

> I'm just thinking about all the people you could recruit if you feel like it from ld. It could be a good thing for you.

As set forth below, Lewis's encouragement in late December, over two weeks before Bowman's and Smolin's resignations from loanDepot, was part and parcel of Defendants' collective solicitation and misappropriation scheme.

13.     Moreover, after Bowman resigned from loanDepot, but before Baske resigned, Bowman and Baske colluded to divert business from loanDepot to CrossCountry. For example, <u>Baske forwarded numerous customer business opportunities to Bowman at his CrossCountry email</u>. loanDepot has evidence that, after Bowman received one such email, Bowman then contacted the customer from his CrossCountry email. CrossCountry was, again, well-aware of these activities. As Bowman texted to CrossCountry's Lewis on January 10, 2022 (after he accepted his offer of employment from CrossCountry but before he resigned from loanDepot): "Faye is sending all our closed loan clients CDs from last year." Lewis replied "[t]hat's awesome." Bowman also absconded with highly confidential and trade secret protected confidential customer compilations inclusive of customer information, credit scores, debt-to-income ratios, mortgage percentage rates and balances

on such mortgages, and specifics on the type of lending product held by such customers. All of this information can be (and was) used by Bowman and others at CrossCountry to identify opportunities with customers and prospective customers and close loans. Since Bowman's departure from loanDepot, in fact, Bowman has closed dozens of loans for customers whose data was included in the confidential and trade secret protected customer compilations taken by Bowman from loanDepot, which loanDepot creates, stores, secures, and maintains on its proprietary systems. The same holds true for Smolin, Schneider, Siegel, and Noyes.

14.     Indeed, Individual Defendants and CrossCountry misappropriated vast sums of loanDepot's trade secrets and confidential information and leveraged that information to convert loanDepot's pre-existing and prospective business. While they were still employed by loanDepot, CrossCountry sent Individual Defendants detailed instructions to transfer their entire customer and referral lists to CrossCountry. For example, <u>at CrossCountry's bidding, and in gross violation of numerous state and federal privacy laws of which Smolin and Siegel were acutely aware as licensed loan originators, Siegel and Smolin surreptitiously accessed loanDepot's proprietary and password protected database and client relationship management ("CRM") systems, acquired detailed information about thousands of contacts (including contact information, birth dates, loan details, marital and employment information, and volumes of other personal and loan information), and transferred this information to CrossCountry.</u>

15.     As Siegel disclosed to Bowman on January 2, 2022, she and Smolin made sure to pull from loanDepot's systems "incredibl[y] detailed fields . . . " disclosing critical and valuable customer and prospective customer information. Absconding with all of this data was not easy, and Siegel (and others) expressed "concern" with "getting things out of [loanDepot's] . . . system." Attached to this Amended Verified Complaint as Exhibit I is a true and correct photo (appropriately redacted) sent by Siegel to Smolin showing the data she pulled directly from confidential customer compilations

stored in loanDepot's proprietary digital lending system, "mello." Bowman, Siegel, and Smolin also helped at least one other of the Individual Defendants, Schneider, misappropriate loanDepot's trade secrets and confidential information by coaching him on how to transfer it outside of loanDepot.

16.     In addition, while she was still employed by loanDepot and after she started talking to CrossCountry, Smolin created a personal email address ("smolincindy1@gmail.com") that she used to secretly communicate with customers she identified as "prospects" on the same spreadsheet Siegel uploaded to CrossCountry's Salesforce database. Plainly, Smolin was laying the groundwork to bring these loans with her to CrossCountry. And she did just that. For example, on January 5, 2022, Smolin sent to her secret e-mail address the social security numbers, credit scores, and debt-to-income ratio data for customers M.S. and A.K. On January 28, after joining CrossCountry, Smolin e-mailed this data to Siegel at Siegel's CrossCountry e-mail address. A loan for M.S. and A.K. closed at CrossCountry on April 12, 2022, just one day after loanDepot initiated this action. Smolin also sent an e-mail to her new e-mail address with several key lending metrics regarding customer "S.C.," which she collected as a loanDepot employee. This includes debt to income ratio information, social security numbers, their credit score, job and income information, and a list of assets. On January 18, 2022, Smolin sent this same e-mail to Siegel at her CrossCountry e-mail address.

17.     Similarly, on the eve of his departure, after being coached by Bowman, Smolin, and Seigel, Schneider accessed scores of loanDepot's highly confidential and trade secret information, including compilations of detailed customer information, with no business reason to do so other than for his use at CrossCountry. A forensic review of Schneider's loanDepot laptop reveals that he then, not coincidentally, accessed emails in his personal email with the same file names. He also inserted two USB drives into his loanDepot device for the first time on the same day he resigned, and transferred customer lists and loan information to a USB device. On January 28, Schneider also sent two confidential and proprietary customer compilations from loanDepot's systems to CrossCountry.

18.     Noyes engaged in substantially similar conduct.  Among other things, Noyes: (a) downloaded two confidential and proprietary customer compilations for thousands of customers from loanDepot's systems replete with specific loan-level details of loanDepot's customers and prospective customers; and (b) transferred them to a thumb drive.

19.     In sum, all of the Individual Defendants transferred reams of highly confidential and valuable data to CrossCountry, where they and CrossCountry later used it to generate significant revenues and profits. CrossCountry knew full well that Individual Defendants had highly valuable customer data that could and would be directly leveraged upon their joining CrossCountry. In fact, <u>CrossCountry paid Individual Defendants commissions on loans they referred to CrossCountry or stalled while they remained loanDepot employees.</u>

20.     The above is consistent with CrossCountry's well-established *modus operandi* to grow its business not through lawful, legitimate means, but by corporate raid designed to cripple the competition. As numerous lawsuits filed against CrossCountry illustrate, CrossCountry: (a) infiltrates a competitor branch, (b) secures the departure of key business originators, (c) financially incentivizes the originators to solicit the resignations of other employees, (d) instructs the former employees to take their employer's trade secrets and confidential information, and (e) deploys the new employees to use their former employer's trade secrets and confidential information to steal customers. CrossCountry knows this causes the subject employees to breach their restrictive covenants and other duties to their former employer—it just does not care. *See, e.g.*, *loanDepot.com, LLC v. CrossCountry Mortgage, LLC*, et al., Case No. 22-cv-05971 (S.D.N.Y. July 13, 2022); *loanDepot.com, LLC v. CrossCountry Mortgage, LLC, et al.*, Case No. 37-2021-00022044 (Ca. Sup. Ct., San Diego Cty. May 18, 2021); *loanDepot.com, LLC v. CrossCountry Mortgage, Inc.*, 2:18-cv-12091 (D.N.J. 2018); *Homeside Financial, LLC v. CrossCountry Mortgage, Inc.*, 8:18-cv-02639 (D. Md. 2018); *American Neighborhood Mortgage Acceptance Company, LLC dba AnnieMac Home Mortgage v. CrossCountry Mortgage, Inc.*, 2:20-cv-00874 (D.N.J. 2020);

*Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-000270 (D. Nev. 2018); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-5783 (E.D.N.Y. 2018); *Guaranteed Rate, Inc. v. Conn, et al.*, 1:17-cv-03289 (N.D. Ill. 2017); and *Homeside Financial v. CrossCountry Mortgage, LLC, et al.*, 21-cv-006488 (S.D. Ohio 2021).

21.     What's more, CrossCountry targets loanDepot. At the direction of its Chief Executive Officer ("CEO"), recruiters are incentivized by a $50,000 bounty if they convert an entire loanDepot branch. According to the CEO:  "50k for ever [sic] depot branch they get!" CrossCountry's tactics in this regard are on full display here.

22.     In fact, CrossCountry also raided yet another group of employees from loanDepot's New York branches. Not coincidentally, on the day before Smolin and Siegel resigned to join CrossCountry, Smolin emailed Siegel at her personal email address a screen shot of a loanDepot "Leaderboard" with the names, ranking, and purchase volume of some of loanDepot's biggest loan originators, four of whom were thereafter targeted in the CrossCountry New York raid. CrossCountry's conduct with respect to loanDepot's New York branches is the subject of an action pending in the Southern District of New York, Case No. 22-cv-05971 (S.D.N.Y. July 13, 2022).

23.     Defendants must be stopped immediately. On April 12, 2022, loanDepot filed a Demand for Arbitration and a Verified Statement of Claims against the Individual Defendants, pursuant to the Individual Defendants' arbitration agreements with loanDepot (and will be filing a First Amended Statement of Claims to add Noyes). But that is not enough. CrossCountry is the head of the snake that must be tamed. loanDepot was forced to bring this action to secure emergency relief in the form of a TRO and to secure expedited discovery in aid of a preliminary injunction motion. The evidence adduced to date demonstrate that the allegations in this verified pleading are just the tip of the iceberg.  The injunctive and monetary (as to CrossCountry) relief loanDepot seeks through this action is necessary to address Defendants': (a) wrongful, threatened, and inevitable disclosure, taking,

and use of loanDepot confidential, trade secret, and proprietary information; (b) wrongful solicitation of loanDepot employees; and (c) wrongful solicitation of loanDepot customers. Unchecked, CrossCountry will continue building its business by unlawfully raiding loanDepot's trade secrets, employees, and customers, stealing for itself the business that loanDepot spent years and untold dollars developing.

24.     Defendants' ongoing assault on loanDepot's business has caused, is continuing to cause, and threatens to cause, immediate, irreparable harm to loanDepot by, among other things: (a) impairing loanDepot's goodwill and reputation with its customers and referral sources; (b) destroying loanDepot's customer, referral, and employee relationships; (c) disrupting the continuity of loanDepot's workforce; and (e) threatening the continued disclosure, misuse, and misappropriation of loanDepot's confidential and trade secret information, including legally protected customer information. Defendants present a serious threat to loanDepot's customers, key employees, and valuable confidential information and trade secrets and they must be stopped. Their unlawful efforts are underway, ongoing, and continuing.

25.     To be clear, loanDepot does not seek to prevent the Individual Defendants from working for CrossCountry and never has. Rather, loanDepot seeks to maintain the *status quo* and enforce the Individual Defendants' limited and tailored confidentiality and non-solicitation covenants, and other legal obligations to loanDepot. loanDepot seeks to hold the Individual Defendants to their promises to loanDepot, and to protect its customers, referral sources, employees, confidential, proprietary, and trade secret information. Issuance of injunctive relief is necessary and appropriate in order to maintain the *status quo* and halt the irreparable harm that loanDepot has suffered, and will continue to suffer, absent an injunction.

26.     This is not an unreasonable or unprecedented demand. CrossCountry was previously enjoined for virtually identical conduct. *See, e.g., Homeside Fin.*, 8:18-cv-02639, Dkt. 27 (D. Md. 2018)

(enjoining CrossCountry from: (a) directly or indirectly using, disclosing, or storing any of plaintiff's confidential information or trade secrets, including employee compensation information, training materials, and customer information; and (b) employing any of plaintiff's employees); *loanDepot.com, LLC v. CrossCountry Mortgage, LLC, et al,* 22-cv-5971, Dkt. 91 (S.D.N.Y. Sept. 15, 2022) (enjoining CrossCountry and former employees from using or disclosing any document that was taken or derived from loanDepot's databases and systems). This Court also granted a TRO enjoining Defendants. A preliminary injunction is equally necessary to protect loanDepot upon the conclusion of expedited discovery.

## THE PARTIES

27.     Plaintiff loanDepot.com, LLC is a Delaware limited liability company with its principal place of business in Orange County, California.

28.     loanDepot is registered to do business in Illinois and operates multiple branches in Illinois, including in Chicago and Northbrook.

29.     Defendant Schneider is an adult individual who, upon information and belief, resides in Chicago, Illinois. Schneider was a Loan Consultant at loanDepot until January 27, 2022, when he voluntarily resigned to work for CrossCountry.

30.     Defendant Smolin is an adult individual who, upon information and belief, resides in Highland Park, Illinois. Smolin was a Loan Consultant at loanDepot until January 16, 2022, when she voluntarily resigned to work for CrossCountry.

31.     Defendant Siegel is an adult individual who, upon information and belief, resides in Highland Park, Illinois. Siegel was an Internal Loan Consultant at loanDepot until January 16, 2022, when she voluntarily resigned to work for CrossCountry.

32.     Defendant Baske is an adult individual who, upon information and belief, resides in Valparaiso, Indiana. Baske was a Production Assistant affiliated with loanDepot's Chicago office until January 21, 2022, when she voluntarily resigned to work for CrossCountry.

33.     Defendant Bowman is an adult individual who, upon information and belief, resides in Western Springs, Illinois. Bowman was a Loan Consultant at loanDepot until January 16, 2022, when he voluntarily resigned to work for CrossCountry.

34.     Defendant Noyes is an adult individual who, upon information and belief, resides in Evanston, Illinois. Bowman was a Loan Consultant at loanDepot until January 28, 2022, when he voluntarily resigned to work for CrossCountry.

35.     Defendant CrossCountry is a Delaware limited liability company, with its principal place of business in Brecksville, Ohio. Cross Country is registered to do business in Illinois and has offices in Illinois.

36.     CrossCountry is a direct competitor of loanDepot.

## JURISDICTION AND VENUE

37.     This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"). *See* 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other counts in this Complaint because they form part of the same case or controversy as Count I. *See* 28 U.S.C. § 1367.

38.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Northern District of Illinois because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district. *See also* 28 U.S.C. § 1391(b)(3).

39.     CrossCountry is subject to personal jurisdiction in Illinois given its maintenance of multiple office locations in Illinois, misappropriation of trade secrets in Illinois, tortious interference in Illinois, and other suit-related conduct in Illinois.

40.     The Individual Defendants are subject to personal jurisdiction in Illinois given that they reside and/or work in Illinois, maintain continuous contacts in Illinois, engaged in suit related conduct in Illinois, and otherwise purposefully avail themselves of Illinois.

## FACTUAL ALLEGATIONS

### Bob Bowman

41.     Bowman started with loanDepot in 2015. At the time of his resignation, Bowman was a Loan Consultant affiliated with loanDepot's Illinois branches. Bowman is a licensed mortgage loan originator (MLO) in twenty-five different states, including the State of Illinois. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the Illinois Department of Financial and Professional Regulation.

42.     Bowman was a highly trusted employee who owed a fiduciary duty to loanDepot.  As a Loan Consultant, Bowman was responsible for cultivating loan referrals, including through referral partners, customers, and agents. He collaborated with borrowers to determine the best loan programs to meet their individual needs and preferences, and analyzed their income, assets, credit, and property. He collected documentation from borrowers, including pay statements, bank account statements, and other highly personal and confidential protected and financial information. He would negotiate and confirm rates, fees, and lock in terms with customers. He would then lock in a loan in loanDepot's system for the customer on the agreed upon terms, and manage the locked pipeline through the funding of the loan. He was expected to communicate regularly with customers to meet their desired expectations and to further develop the customer relationship.

43.     In 2021, Bowman's total gross pay was over seven figures.

### Cindy Smolin

44.     Smolin started with loanDepot in 2017.  At the time of her resignation, Smolin was a Loan Consultant affiliated with loanDepot's Illinois branches. Smolin is a licensed MLO in five (5)

different states, including the State of Illinois. Each of her MLO licenses is regulated by the applicable state regulatory agency, including the Illinois Department of Financial and Professional Regulation.

45.     As a Loan Consultant, Smolin had the same duties and responsibilities as Bowman, noted above. Like Bowman, she had access to volumes of customer PPI and received expense reimbursements to develop customer relationships on behalf of loanDepot. Like Bowman, she was a highly trusted employee who owed a fiduciary duty to loanDepot.

46.     In 2021, Smolin's gross pay was hundreds of thousands of dollars.

## Samantha Siegel

47.     Siegel started with loanDepot in 2017. Siegel is Smolin's daughter. At the time of her resignation, Siegel was an Internal Loan Consultant ("ILC") affiliated with loanDepot's Illinois branches. Siegel holds a MLO license in the State of Illinois, regulated by the Illinois Department of Financial and Professional Regulation.

48.     As an ILC, Siegel was responsible for cultivating loans through inside referrals from interstate branches, employee loans, and departed loan consultants, among others. She was also responsible for supporting Loan Consultants, specifically Smolin. In her role, and like Bowman and Smolin, Siegel was responsible for managing the loan pipeline for loanDepot customers, meeting with borrowers to determine the best loan program for them, and collecting documentation from borrowers (including sensitive PPI, personal, and financial information). She was also responsible for analyzing potential marketing opportunities to develop future business. As an ILC, Siegel was a highly trusted employee who owed a fiduciary duty to loanDepot.

49.     In 2021, Siegel's gross pay was hundreds of thousands of dollars.

## Fernanda Baske

50.     Baske started with loanDepot in 2017. At the time of her resignation, she was a Production Assistant for Bowman.

51.     As a Production Assistant, Baske was responsible for supporting Bowman in administrative marketing and support actions related to servicing customers and business partners. Baske assisted in managing Bowman's active pipeline. She was also responsible for reviewing customer loan files for completeness. She was expected to go the "extra mile" to build trust relationships, customer loyalty, and satisfaction through the loan process. Baske was a highly trusted employee who owed a fiduciary duty to loanDepot.

52.     In 2021, Baske's gross pay was nearly six figures.

### Steven Schneider

53.     Schneider started with loanDepot in December 2017. At the time of his resignation, he was a Loan Consultant affiliated with loanDepot's Illinois branches. Schneider holds an MLO license in the State of Illinois, regulated by the Illinois Department of Financial and Professional Regulation.

54.     As a Loan Consultant, Schneider had the same duties and responsibilities as Bowman, and Smolin, described above.  Like the others, Schneider was a highly trusted employee who owed a fiduciary duty to loanDepot. According to his LinkedIn profile, "Steve has been able to create a following of loyal clients and referral sources."  He did this on loanDepot's dime.

55.     In 2021, Schneider's gross pay was hundreds of thousands of dollars.

### John Noyes

56.     Noyes started with loanDepot in November 2015. At the time of his resignation, he was a Loan Consultant affiliated with loanDepot's Illinois branches. Noyes holds a MLO license in the State of Illinois, regulated by the Illinois Department of Financial and Professional Regulation.

57.     As a Loan Consultant, Noyes had the same duties and responsibilities as Bowman, Smolin, and Schneider, described above. Noyes was also a highly trusted employee who owed a fiduciary duty to loanDepot.

58.     In 2021, Noyes's gross pay was hundreds of thousands of dollars.

**Individual Defendants' Exposure to Confidential, Proprietary, and Trade Secret Information**

59.     By virtue of their positions at loanDepot, the Individual Defendants were entrusted with volumes of non-public personal information of customers, applicants, and borrowers that is protected by federal and state laws and regulations, which may not be disclosed to third-parties, and which may only be used for narrowly prescribed purposes. This information includes compilations of customer/consumer names, addresses, personal identifying information, and financial information. The Individual Defendants also had access to loanDepot's custom-developed and proprietary training materials; job aids; and supplier, vendor, and referral source information.

60.     loanDepot takes the protection of its confidential and trade secret information, including the security of confidential, non-public consumer and customer information, extremely seriously.  loanDepot is conscientious of the fact that its customers trust it with their most private financial and personal information, and expect loanDepot to take every measure to protect that information from improper use and disclosure. Customer privacy, and the non-disclosure of confidential customer information, are vitally important to loanDepot, and loanDepot would be seriously harmed by the breach of customer privacy or unauthorized disclosure of their confidential information.

61.     In addition, as licensed mortgage loan originators, Bowman, Schneider, Smolin, Siegel, and Noyes were required to comply with the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809 ("GLBA"), which governs the treatment of confidential nonpublic information of consumers by financial institutions, along with comparable state laws and regulations governing consumer privacy.

62.     To ensure compliance with these laws and regulations, loanDepot has implemented significant controls to safeguard and secure its information and that of its valued customers. For example, loanDepot's proprietary databases that house consumer personal and loan information are

password protected, and require dual authentication. Once an employee accesses these databases with their unique credentials, they only have access to information that employee needs to perform their duties on behalf of loanDepot.

63.     In addition, to assist in safeguarding its data, information systems, and customer and employee information, loanDepot developed an Information Security Program ("ISP") which is governed by a written Information Security Policy ("ISP Policy"), updated as of July 8, 2020. Employees are required to read and acknowledge the ISP and ISP Policy. *See* **Ex. A**.

64.     According to the ISP, the following activities are strictly prohibited: (a) accessing data, a server, or an account for any purpose other than conducting Company business, even if the employee has authorized access; (b) sharing company information with non-approved parties outside the Company; and (c) storage of company information in non-Company managed locations such as personal drives, personal cloud storage, and devices.

65.     loanDepot also has an Employee Handbook. The Individual Defendants acknowledged that they received, read, and agreed to comply with the policies in the Employee Handbook. The Employee Handbook includes or incorporates by reference these pertinent policies: (a) a "Confidential and Consumer Information" policy, which states: "the Company has placed special emphasis on the appropriate collection, storage and use of customer information. Your role in privacy protection is critical"; and (b) the ISP Policy, referenced above.

## The Individual Defendants' Agreements

66.     In addition to the above policies, loanDepot requires its employees to sign written agreements containing confidentiality provisions, which are designed to protect and safeguard its confidential information, trade secrets, and company assets, including its customer information.

## The Incentive Agreement

67.     On December 17, 2018, Bowman entered into a Retail Master Incentive Plan agreement ("Incentive Agreement") with loanDepot.  See **Ex. B.**

68.     On December 17, 2018, Noyes entered into an Incentive Agreement with loanDepot. *See* **Ex. J.**

69.     On December 26, 2018, Siegel entered into an Incentive Agreement with loanDepot. *See* **Ex. C.**

70.     On January 1, 2019, Schneider entered into an Incentive Agreement with loanDepot. *See* **Ex. F.**

71.     On January 2, 2019, Smolin entered into an Incentive Agreement with loanDepot.  *See* **Ex. D.**

72.     The Incentive Agreements are identical in all material respects. In each Incentive Agreement, Bowman, Noyes, Siegel, Schneider, and Smolin are referred to as the "Participant."

73.      The Incentive Agreements protect and safeguard loanDepot's confidential, proprietary, and trade secret information:

> Participant agrees that, while employed by the Company [and] at any time thereafter, Participant will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Participant or any other person or entity any "Confidential Information," as defined below, that Participant learned, obtained or had access to in the course of or as the result of Participant's employment with Company or using Company's systems, access means or computing or mobile devices. Participant agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.
>
> "Confidential Information" means information and materials in any medium learned, obtained or accessed by Participant because of or through his or her employment with Company, or using Company's systems, access means or computing or mobile devices, about Company's business, prospects, plans and operations, products, processes, methods of doing business, systems, databases and technology, inventions and other intellectual property, loan origination and marketing practices, training, services, and Customers (as defined herein) and that is not known or readily available through proper and lawful means to the general public as well as Customer data. "Customers"

mean… visitors or registrants to Company websites, leads, callers to Company call centers, loan or prequalification or preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future….

Participant agrees that he or she will return any such Confidential Information and property to Company upon the termination of Participant's employment or at any other time promptly upon the request of Company and that Participant will not share, copy, transmit, or use such Confidential Information or property except only to the extent required solely for and in the course of Participant's employment by Company….

Upon termination of Participant's employment for any reason, or upon receipt of written request from Company, Participant shall immediately deliver to Company all tangible and intangible property (including computers, computing devices, cell phones, memory devices, files, data downloads and any other tangible item), drawings, notes, memoranda, specifications, devices, notebooks, formulas and documents, together with all copies of any of the foregoing, and any other material containing, summarizing, referencing, or incorporating in any way or otherwise disclosing any work product or Company materials.

*See* **Exs. B-F; J**, Section VI (A) (1), (2), (4), and (5) (emphasis added).

74.     The Incentive Agreements protect loanDepot's investment in its employees:

Non-Solicitation. To the fullest extent permitted by applicable law, Participant agrees that he or she will not, while in the employment of Company and for a period of one (1) year after the termination of that employment regardless of reason, solicit or induce, directly or indirectly, whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity.

*See id.*, Section VI (B) (emphasis added).

75.     The Incentive Agreements provide that loanDepot may seek injunctive relief

in Court:

Remedies. Participant acknowledges that monetary damages alone will not be a sufficient remedy for Participant's breach of any provision of this Section VI of this Plan and that, in addition to other remedies available to Company, Company shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction deems appropriate. The prevailing party in any legal action arising from or relating to Section VI of this Plan shall be entitled to recover its reasonable attorneys' fees and costs including those incurred in any related appeal.

*See id.*, Section VI (C) (emphasis added).

**The Employee Agreements**

76.     On January 31, 2020, Baske entered into an Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement with loanDepot ("Employee Agreement"). *See* **Ex. E.**

77.     On January 13, 2022, and in return for, among other things, valuable incentive compensation and eligibility to receive such compensation, Schneider entered into an Employee Agreement with loanDepot. *See* **Ex. F.**

78.     On January 23, 2022, and in return for, among other things, valuable incentive compensation and eligibility to receive such compensation, Noyes entered into an Employee Agreement with loanDepot. *See* **Ex. J.**

79.     The Baske, Noyes, and Schneider Employee Agreements are identical in all material respects, unless noted below. The Employee Agreements refer to Baske, Noyes, and Schneider as "Employee" or "You."

80.     Like the Incentive Agreements, the Employee Agreements protect loanDepot's confidential, proprietary, and trade secret information:

> Employee agrees that, while employed by [loanDepot] and at any time thereafter, Employee will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Employee or any other person or entity any "Confidential Information," as defined below, that Employee learned, obtained or had access to in the course of or as the result of Employee's employment with [loanDepot] or using [loanDepot's] systems, access means or computing or mobile devices. Employee agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.
>
> "Confidential Information" means, information and materials in any medium learned, obtained or accessed by Employee because of or through [Employee's] employment with [loanDepot], or using [loanDepot's] systems, access means or computing or mobile devices, about [loanDepot's] business, prospects, plans and operations, products, processes, methods of doing business, systems, databases and technology, inventions and other intellectual property, loan origination and marketing practices,

training, services, and <u>Customers</u> (as defined herein) and that is not known or readily available through proper and lawful means to the general public. <u>"Customers" means for purposes of this Agreement visitors or registrants to [loanDepot] websites, leads, callers to [loanDepot] call centers, loan or prequalification or preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future</u>.

Employee agrees that <u>Confidential Information includes</u>, without limitation… <u>custom-developed or proprietary training methods and materials… marketing and advertising plans and strategies… Customer data</u>, regardless of how collected, including by way of example, <u>all personal data and non-public personal financial information of or regarding Customers</u>, loan applications, <u>Customer loan files and all information in them</u> (including by way of example… credit reports… employment history, names, contact information, and other data that identifies or can be used to identify a person) … <u>records of Customer purchases of [loanDepot's] products or services… and the details of any loan originated by [loanDepot]</u>… [loanDepot's] "trade secrets" as defined in California Civil Code section 3426 *et seq.* and/or as defined under the law in any applicable jurisdiction… <u>Job aids</u>… Supplier and vendor information… Proprietary or confidential information disclosed by third parties to [loanDepot] which [loanDepot] is required to treat with confidentiality… [and] Any notes, analyses, summaries, reproductions, extracts, translations, compilations, logs, records, work products and work in progress, software or other material or documents obtained, accessed, or prepared by or for the Employee which contain, reflect or are based on the Confidential Information….

<u>Employee agrees that [Employee] will return any such Confidential Information and property [including customer lists] to [loanDepot] upon the termination of Employee's employment</u> or at any other time promptly upon the request of [loanDepot] and that Employee will not share, copy, transmit, or use such Confidential Information or property except only to the extent required solely for and in the course of Employee's employment by [loanDepot]….

<u>Employee understands that Employee is not authorized to remove from the place of employment or download…</u> to unencrypted mobile devices or laptops… or to sell, distribute, transfer, share, publish or otherwise communicate publicly <u>any of the Confidential Information</u>, and may use or disclose such Confidential Information to others only as may be strictly necessary for the performance of the Employee's duties for [loanDepot] as directed by [loanDepot]….

**Exs. E, F**, **and J** Section 2 (emphasis added).

81.     In their Employment Agreements, Schneider and Noyes agreed:

[F]or a period of one (1) year following the termination of Employee's employment, regardless of reason, <u>Employee will not, under any circumstances, utilize or disclose trade secret or Confidential Information of loanDepot</u>, including non-public Confidential Information of a Customer obtained as a result of Employee's

employment with loanDepot, <u>in order to directly or indirectly call on, solicit, take away, or attempt to call on, solicit or take away any Customer</u> with whom Employee became acquainted during the term of Employee's employment, as the direct or indirect result of Employee's employment with loanDepot….

… <u>Employee will not, while in the employment of loanDepot, solicit or induce, directly or indirectly,</u> whether on Employee's own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of loanDepot to terminate that individual's employment or contractor relationship with loanDepot</u> or apply for employment or a contractor relationship with any person, business or entity.

… <u>Employee will not, for a period of one (1) year after the termination of Employee's employment</u> regardless of reason, use any unlawful or improper means, including the use or disclosure of loanDepot's Confidential Information, to <u>solicit or induce, directly or indirectly,</u> whether on Employee's own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of loanDepot to terminate that individual's employment or independent contractor relationship with loanDepot or apply for employment or a contractor relationship with any person, business or entity</u>….

**Exs. F**, **J**, Section 4 (emphasis added).

82.     In her Employee Agreement, Baske agreed that she will not:

<u>[F]or a period of one (1) year following the termination of… her employment, regardless of reason, solicit, take away, or attempt to call on, solicit or take away any Customer</u> with whom… she became acquainted during the term of… her employment, as a result of… her employment with [loanDepot].

… while in the employment of [loanDepot] and <u>for a period of one (1) year after the termination of that employment</u> regardless of reason, <u>solicit or induce, directly or indirectly,</u> whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of [loanDepot] to terminate his or her employment or contractor relationship with [loanDepot]</u> or apply for employment or a contractor relationship with any person, business or entity.

… directly or indirectly, while in the employment of LD Holdings and for a period of one (1) year after the termination of that employment regardless of reason, or as otherwise required by law, induce any employee or independent contractor of with [loanDepot] to terminate or breach an employment, contractual, or other relationship with [loanDepot].

**Ex. E**, Section 4 (emphasis added)**.**

83.     Like the Incentive Agreements, the Employee Agreements provide for injunctive relief in Court:

> Employee acknowledges that monetary damages alone will not be a sufficient remedy for Employee's breach of any provision of this Agreement and that, in addition to other remedies available to [the Company], [the Company] shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction… deems appropriate.  The prevailing party in any legal action… arising from or relating to this Agreement shall be entitled to recover its reasonable attorneys' fees and costs including those incurred in any related appeal.

**Exs. E, F**, **and J**, Section 6 (emphasis added).

### The Covenants Are Reasonable

84.     The above-referenced Incentive and Employee Agreements (collectively, the "Agreements") are narrowly tailored to protect loanDepot's legitimate business interests.  Indeed, loanDepot developed, through great expense, significant customer goodwill.  loanDepot does this, for example, by providing Loan Consultants with generous expense reimbursements to develop customer relationships on loanDepot's behalf.  As Seigel wrote to one customer, loanDepot strives to be its customer's "Lender for Life," and treats each customer not only as a highly valued customer, but also as a referral source.

85.     loanDepot also devotes substantial resources to the recruitment, training, mentoring, and compensation of its employees so that they can perform the necessary services for customers, as well as develop and nurture the close relationships necessary to keep customers satisfied. The restrictive covenants that prohibit the direct or indirect solicitation of loanDepot employees are reasonable and narrowly tailored to protect loanDepot's legitimate interests in its investment in its employees and maintaining the stability of its workforce.

86.     In addition, loanDepot has a legitimate interest in prohibiting its employees from taking, disclosing, and using its trade secret and confidential information, including its customer information. Because the mortgage loan industry is a competitive and regulated industry, information

-23-

pertaining to loanDepot's business plans, products, services, training materials, strategies, employees, and customers is confidential and proprietary information, deserving trade secret protection. loanDepot developed and marketed an extremely successful mortgage loan operation that is highly dependent upon maintaining the secrecy of this information. The disclosure of these trade secrets would put loanDepot at a competitive disadvantage, as this information is only valuable to the extent loanDepot is able to maintain its secrecy.

## Coordinated Resignations

87.    On Sunday, January 16, 2022, Smolin and Siegel resigned from loanDepot. Smolin wrote in her resignation email: "Please accept this email <u>as mine and Samantha's [Siegel's] formal resignation</u> from loanDepot effective immediately." That Smolin resigned for Siegel underscores the coordinated nature of their resignations. According to NMLS Consumer Access, Smolin was employed by CrossCountry effective January 18, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618.  Smolin is now a "SVP of Mortgage Lending" for CrossCountry. Upon information and belief, this is a position virtually identical to the position Smolin held at loanDepot. Similarly, according to NMLS Consumer Access, Siegel was employed by CrossCountry effective January 19, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618. Siegel is now "SVP of Mortgage Lending" for CrossCountry. Upon information and belief, this is a position virtually identical to the position Siegel held at loanDepot.

88.    The same day, Sunday, January 16, 2022, Bowman also resigned from loanDepot. Bowman is now "SVP of Mortgage Lending" for CrossCountry. Upon information and belief, this position is virtually identical to Bowman's position at loanDepot. Bowman was employed by CrossCountry effective January 19, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618.

89.     Five days later, on January 21, 2022, Bowman's Production Assistant, Baske, resigned from her employment with loanDepot. Baske is now a Production Assistant for CrossCountry in the "Greater Chicago Area." This position is materially identical to Baske's position at loanDepot. On January 25, 2022, Baske executed an "Exit Acknowledgment," where she acknowledged that she returned and has not retained all loanDepot Confidential Information in her possession. *See* **Ex. G**. As set forth below, Baske lied to loanDepot.

90.     The same day that Baske resigned, on January 21, 2022, Rizza also resigned from loanDepot, with his last day being January 31, 2022. Rizza was a Loan Processer at loanDepot who worked for loanDepot since 2016. Rizza is now a Senior Loan Processor at CrossCountry in Chicago, Illinois. Upon information and belief, this position is virtually identical to Rizza's position at loanDepot.

91.     Six days later, on January 27, 2022, Schneider resigned from loanDepot. According to NMLS Consumer Access, Schneider was employed by CrossCountry effective January 28, 2022 at its branch location at 2936 West Belmont Ave, Chicago, IL 60618. Schneider is now "SVP of Mortgage Lending" at CrossCountry, a position that, upon information and belief, is virtually identical to his position at loanDepot.

92.     The next day, January 28, 2022, Noyes resigned from loanDepot. Noyes was a Loan Consultant who worked for loanDepot since 2015 out of its Illinois branches. Noyes is now "SVP of Mortgage Lending" at CrossCountry, a position that, upon information and belief, is virtually identical to his position at loanDepot. According to NMLS Consumer Access, Noyes was employed by CrossCountry effective January 28, 2022. On this same day, Poulin — who worked closely and regularly with Schneider and Noyes — also confirmed her resignation from loanDepot to join CrossCountry.

93. The coordinated nature of the group departure alone is evidence of solicitation. *See Aon PLC, et al. v. Heffernan, et al.,* No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) ("The timing and breadth of the exodus . . . suggests that Plaintiffs have a reasonable likelihood of establishing that [former employee], in violation of his contractual commitment, played some role in the moves to [competitor]."); *Aon plc v. Infinite Equity, Inc.,* 2021 WL 4192072, at \*23 (N.D. Ill. 2021) (it "is reasonable to infer, based on the closely timed resignations . . . that while still employed by [former employer], the [former employees] recruited these six other . . . employees to leave [former employer] and join [competitor]."). In addition to the timing of the resignations, as set forth below, evidence adduced to date reveals that Bowman, Smolin, and Siegel actively encouraged Schneider, Noyes, Rizza, Baske, and Megan Poulin to leave loanDepot and join CrossCountry. CrossCountry Executive Vice President Rob Sampson and CrossCountry Senior Vice President Beth Lewis, among other CrossCountry representatives, likewise coordinated with Bowman, Smolin, and Siegel to raid loanDepot's Illinois office, and recruit away other loanDepot employees.

## The Scheme

## Summary Overview

94. Unbeknownst to loanDepot, the *en masse* departure was coordinated long before the resignations took place, and was part of a scheme to steal loanDepot confidential and trade secret information, employees, and customers.

95. Despite loanDepot's years of investment in the Individual Defendants, while still employed by loanDepot, CrossCountry and the Individual Defendants secretly negotiated new employment with CrossCountry, the terms of which contemplated:

- Soliciting existing loanDepot employees to separate their employment from loanDepot and join CrossCountry, all within approximately two weeks of each other;

- Misappropriating volumes of loanDepot confidential and trade secret information, including accessing, copying, taking, and transferring to CrossCountry detailed customer lists with confidential information about thousands of loanDepot customers and referral sources;

- Deliberately "stalling" borrowers from doing business with loanDepot so that they could convert this business to CrossCountry instead; and

- Diverting existing and potential business from loanDepot to CrossCountry before and after their resignations from loanDepot, relying on loanDepot confidential, proprietary, and trade secret customer information to do so.

96.     The scope and breadth of Defendants' misconduct is astounding, and loanDepot's investigation is continuing. The following identifies just some of the misconduct identified to date.

## CrossCountry Coordination of Employee Departures

97.     CrossCountry commenced its secret corporate raid on loanDepot starting in at least December 2021. The evidence loanDepot has unearthed to date demonstrates that the Individual Defendants directly solicited their colleagues, while they were still employed by loanDepot, and that CrossCountry directly induced, assisted, and encouraged them to do so.

98.     On or about December 20, 2021, Bowman informed a friend that CrossCountry "reached out" to him. Bowman thereafter commenced discussions with CrossCountry's Sampson and Lewis regarding employment with CrossCountry. On December 21, 2021, Lewis asked Bowman if he could talk by phone and told Bowman he was "going to like the offer" from CrossCountry. By this point, loanDepot believes Bowman had already begun recruiting Smolin and Siegel (or sometime shortly thereafter).  In fact, in later communications, Bowman admitted that he was ultimately "responsible for" Smolin's recruitment to CrossCountry. Bowman facilitated and induced Smolin to resign from loanDepot and join CrossCountry, texting Smolin: "why wouldn't we go to cc," coaching

Smolin on her and Siegel's conversations with CrossCountry, facilitating those discussions, and working through Smolin's stated concerns with respect to leaving loanDepot.

99.     On December 29, 2021, Bowman texted Sampson that he "gave Cindy Smolin [Sampson's] number and she will be reaching out." He then gave Sampson information on how to best target Smolin and induce her employment: "[s]o you know, she doesn't know my signing bonus details and those will remain between us. She will be thrilled with 400k area I would think. She did $130m and $50m purchase this year." Upon information and belief, EVP Sampson was well-aware that Bowman was legally and contractually restricted from soliciting loanDepot employees.  Despite this, he responded: "Perfect. Thanks bud."

100.    It was not just Sampson who helped orchestrate CrossCountry's and Individual Defendants' solicitation campaign. Lewis (a CrossCountry Senior Vice President) and Bowman actively discussed solicitation of loanDepot employees and directly encouraged and incentivized Bowman's, Smolin's, and Siegel's efforts. For example, on December 29, 2021, Lewis expressly encouraged Bowman to recruit loanDepot employees, highlighting "all the people [Bowman] could recruit," which she said could "be a good thing" for him.

101.    That same day, Bowman and Lewis discussed potential targets.  They also had a telephone conversation in which, according to Lewis, Bowman "read off" the names of potential targets. Bowman confided in this same exchange that he was "scared to think" of all the loanDepot employees he could solicit. But Lewis pushed Bowman, responding: "Let's do it." They did just that. Bowman informed Lewis that "Cindy [Smolin] is communicating with Rob [Sampson]."  Lewis responded — "I heard." Bowman also asked whether he should recruit Noyes. SVP Lewis responded "[y]es and the Ohio guy[.] Ohio should be a slam dunk CCM is huge in OH." Bowman also told Lewis he could "easily get" a loanDepot senior loan officer based in California, because "she loves" him and they "talk often." In this same exchange and to facilitate their conversation, Bowman sent Lewis a

screenshot of loanDepot's internal-only "Leaderboard" originator portal that, among other things, discloses the year-to-date loan volume for each loanDepot loan officer nationwide.

102.    One day later, on December 30, 2021, Bowman updated Lewis with the news that he "spoke to Noyes," who was "interested," but "hesita[nt] i[n] making a move" given "things that are being done for him" by loanDepot. Bowman's text goes on to describe his efforts to persuade Noyes to join CrossCountry, concluding that Noyes is "a nice guy like I am" and leaving loanDepot is "something he needs to get over mentally." Lewis and Bowman also discussed the best way to approach Baske to effectively recruit her to CrossCountry (SVP Lewis to Bowman: "And Faye – do you want us to talk to / hire her now or wait until you are here."). Bowman sent Lewis Baske's contact information in response.  Bowman also later spoke to Baske directly to secure her employment with CrossCountry and, as later discussed, coordinate Baske's sending of confidential customer information to Bowman at CrossCountry.

103.    CrossCountry not only encouraged this sort of activity; it provided direct financial incentives for doing so. Bowman asked Lewis if he would "get an override," if he "get[s] some of the L[oan] O[fficers] from LD," informing Lewis that he "pretty much [has] Cindy ready to come over" and that she "spoke to Rob [Sampson] today but she is 100% in." An "override" refers to Bowman receiving compensation in return for inducing loanDepot employees to join CrossCountry. Lewis responded one-minute later: "yes sir you will get an override," confirming that CrossCountry would pay Bowman enhanced compensation for recruiting loanDepot employees (she later reiterated that Bowman would "100% . . . get an override" for successfully recruiting loanDepot employees).

104.    A short time later, Lewis asked Bowman for Smolin's contact information; text exchanges indicate that Bowman then talked with Lewis by phone regarding how to incentivize Smolin (and Siegel) to leave loanDepot and structure a team for them that would result in their resignations.

105. From December 30, 2021 forward, Bowman, Lewis, Smolin, Siegel, and Sampson had several conversations regarding the recruitment of loanDepot employees to CrossCountry, both inside and outside Chicago. On January 15, 2022, for instance, Lewis told Bowman "[w]e should go after Schneider" and that he (Bowman) "could get an override on Steve [Schneider]. I told Rob [Sampson] you wanted it on Cindy [Smolin]." Bowman, aided by Smolin and Siegel, assisted CrossCountry in "go[ing] after" Schneider from that point forward. After informing Schneider of his move to CrossCountry and clearly engaging in several conversations with Schneider to entice his departure from loanDepot, Bowman operated as a go-between with CrossCountry to facilitate Schneider's move. On January 22, 2022, for instance, Bowman texted Sampson to inform him that "Schneider is worried" loanDepot will try to retain his employment. Sampson responded "[j]ust texted him to set up time to talk. Thanks for your help bud." At Sampson's request, Bowman then sent him a screenshot of loanDepot's proprietary and non-public "Leaderboard" portal disclosing Schneider's loan volume, which Sampson then used to craft employment offer terms for Schneider. On January 23, 2022, Bowman informed Lewis that "Noyes 100%" and "Schneider sounds 95% he has to hustle to get things set up."

106. CrossCountry made good on its promise to pay Bowman money in return for his recruitment of loanDepot employees. On March 17, 2022, Bowman messaged Sampson thanking him "for sending the override." Bowman then asked whether he would receive an "override" for recruiting Schneider: "[f]or Steve Schneider, is he also considered. I didn't want to put that in an email but not sure how that works." Sampson responded "[h]onestly wasn't sure if that one was yours or Cindys? I am good with either one," to which Bowman replied "yeah, I was the one that roped it in[.]" Sampson confirmed he'd resolve the issue and pay Bowman an "override" in return for "roping" Schneider in. Bowman received and continues to receive significant compensation for his recruitment efforts. Specifically, CrossCountry awarded Bowman a generous number of basis points (or "bps") for every

loan closed by Smolin and appears to have done the same for Schneider's closed loans, per the above exchange and based on additional express communications on this topic. This is significant — Smolin alone closed at least $110 million in loans at loanDepot in her final year. Based on the number of basis points CrossCountry awarded/incentivized Bowman for his recruitment efforts, Bowman can easily net well into the six figures annually. Further, e-mails show that CrossCountry sought and secured approval to award Bowman basis points for loans closed by Schneider and Smolin, specifically in return for Bowman's recruitment efforts, <u>from the CEO of CrossCountry himself, Ron Leonhardt</u>.

107.     Smolin and Siegel also heavily participated and aided in CrossCountry's recruitment efforts of loanDepot employees. On December 30, 2021, Smolin sent  notes to her personal email reflecting a discussion with CrossCountry and coordination of the group departure with CrossCountry and Bowman (or "bb").  "DG" references a loanDepot employee. Excerpts of the notes are set forth here:

> 2 yr contract
> Rob will pay $50k
> Future against his commission
>
> 2 installments
>
> PE is going
>
> Bob told DG he doesn't have an offer

108.     That same day, Smolin sent additional notes to her personal email address that similarly appear to reflect her collaborating with CrossCountry and Bowman in the raid, and "recruit[ing]" loanDepot employees "joey" (i.e., Rizza), "Daughter" (i.e., Siegel), and "david" (who loanDepot believes refers to David Hoefler ("Hoefler")), Bowman's and Smolin's Production Assistant). Excerpts from the notes are set forth here:

> I'm happy – but... Bob is good buddy/collaborate
>
> ***
>
> Daughter- secret weapon
>
> ***

$50k bonus

\*\*\*

I have joey/david but diff uw/diff closers – how does that work and could they come over. Recruit & bring over

109.     The next day, December 31, 2021, Smolin sent Siegel an email entitled "WORK Updates." The "WORK Updates" were really notes from Smolin's collaboration with CrossCountry, including notes reflecting Smolin's, Siegel's, and Bowman's ("BB") impending departures, and the solicitation of Rizza ("Bring joey") and Hoefler ("david"). Excerpts from the notes are set forth here:

BB 2 yr contract, Rob will pay $50k , Ld takes in Future against his commission, Signing bonus Paid 2 installments
CC just retail, good jumbo, Optima rate alert, More bp & jumbo cap

\*\*\*

Per BL – don't nickel & dime. Bring joey & david.

110.     "BL" appears to be in reference to CrossCountry Senior Vice President Beth Lewis. These notes therefore again show Lewis directly encouraging current loanDepot employees to recruit other current loanDepot employees to CrossCountry.

111.     Then, on January 1, 2022, Smolin emailed Siegel more notes that appear to reflect further discussions with CrossCountry about the raid, CrossCountry's coordination with Smolin of the group departure, solicitation of loanDepot employees ("David," "Joey," and "SS"), and Defendants' scheme to take loanDepot customer information and upload it into CrossCountry's database for an "email blast" and "home mailer postcard" solicitation.  Excerpts from the notes are set forth here:

We will have:
**David** – Rob said he will pay his salary and the 3 bp.  If he's just with Cindy – he has to hustle, get the docs & signatures until approval and joey starts
**Joey** – he works 24/7 and likes being busy. Likes $ - maybe bp per file – likes lots of files
SS – originates loans, gets new agents,  does lots of updates ( your pay?)

Planning on 1/17 quit. When will we get computers?

\*\*\*

Marketing for coming over – what do they have set up to happen immediately. We need email blast, at home mailer postcard for clients. Social media , email for our referral partners why we're switching, a few talking points for our referral partners why we're switching – why we're coming to CC – for us when we call our agents. Who loads our database in – and need the template so ours matches for loading in. We want a campaign social media posts every other week for 3 partners. Every month that we can send to our the referral partners -highlighting a program that we have – specific jumbo investor

*\*\**

S – any ? about 90 bp? (15 bp). She was making a base salary – as ILC and she does need to need ins – so more money for give joey & david more raises  or other members

112.     A few days later, on January 4, 2022, Smolin then suspiciously emailed notes about Rizza which appear to relate to his loanDepot compensation:

> **J $60k – now salary.** No more car payments.
> So many file you get close ex . instead 15+ is $100 file
> And - 25 files extra $3k commish.

113.     Not coincidentally, a forensic examination of Smolin's loanDepot device revealed that on January 4, 2022 and again on January 9, 2022, Smolin accessed a personal Gmail account from her loanDepot computer, and navigated to a personal email with the subject line: "solicit – Joey + David." Also unsurprisingly, Smolin, on behalf of herself and Siegel, exchanged several text messages and appears to have held multiple phone conversations between January 1 and January 9 with Sampson, Lewis, and other CrossCountry representatives to discuss Smolin's and Siegel's joining CrossCountry and recruiting loanDepot employees to join them.

114.     A forensic examination of Siegel's device further reveals that on January 4, 2022, she too accessed an email in her personal email account with the subject line: "solicit – Joey + David." Smolin's, Siegel's, and Bowman's conduct robustly evidences their solicitation efforts. In the ensuing weeks, Siegel, Smolin, Bowman, and CrossCountry representatives continued discussing Rizza, Hoefler, and Schneider, their conversations with them, and their plans to depart loanDepot to join CrossCountry.

115.     On January 5, 2022, Siegel and Smolin both received and accessed documents in their respective personal email accounts with the subject line: "Employment Application & Background Consent for CrossCountry Mortgage, LLC." On January 7, Sampson texted Smolin stated that he would call her "later today to discuss contract to make sure I have titles and numbers all correct before I send it over." Sampson's response was at least partially prompted by Bowman, who (according to

Smolin) said he planned to call Sampson on January 6 to "say [loanDepot] will be all over [C]indy," that she "need[s] a contract" from CrossCountry to proceed, and "to [sic] bad" she's "not a[] Black woman." Smolin also asked Siegel if she should mention to Sampson that she was "getting a lot of calls for pre app & refi and trying to stall them." Siegel responded, "you shouldn't be texting this stuff" and proceeded to coach Smolin on coordinating her and Smolin's resignation with Bowman's.

116.     On or about January 8, 2022, Smolin prepared additional notes which reflect further discussions with CrossCountry about coordination with Bowman, solicitation of loanDepot employees ("Bob has Faye [Baske]"; "get S" is Siegel; "joey" is Rizza; "Steve" is Schneider), "stalling" processing loans at loanDepot, and sharing employee compensation information with CrossCountry. Excerpts from the notes are set forth here:

**Cindy** (get S – 2 for 1 LO's, most potential to grow).  Monday 1/10 – 6 loans total  over $5.2 loans – 4 were purchases
This week – over 20 new pre-app & refi – stalling/losing business.
$50k pay back
Cap - $6,700?
Marketing – lower if needed
Cindy SVP & Sam VP

Why did you suggest 90 bp for me vs. 100bp?  (bob did $120/$150 with out of state – 80% of Bob)
Bob has Faye- $60k  + $50 on all BL team files  –

***

Titles - Cindy SVP & Sam VP

***

Joey  - $60k +  if 15 loans $100/file. I had 252 loans & Steve/$85 mil - $168 loans. Need $70k and more loans from other LO
David -what do production mgrs. Make  $50k + 3bp – Rob said he would cover. Bob & I combined = $275 x 3 = $82,500 but some jumbo – maybe $70? Maybe 4 or 5 bp
***
Even with pre-approvals push them off
***
**Every processor has an opps asst** – j happy

117.     On January 13, 2022, Smolin and Siegel received formal offers of employment with CrossCountry. Also on or about January 13, while they were still employed by loanDepot, CrossCountry provided Smolin and Siegel with CrossCountry email addresses.

118.     Thereafter, Smolin and Siegel began even more aggressively soliciting loanDepot employees to come work at CrossCountry. On January 18, for example, Smolin told Siegel that she wanted to direct CrossCountry to "reach out to Joey [Rizza] & David [Hoefler] today and cc rob," referring to Rob Sampson. Again recognizing that what they were doing was wrong, and anticipating that they would be sued for their conduct, Siegel encouraged Smolin to call CrossCountry rather than sending a message, questioning whether Smolin "need[s] to be careful putting this in writing too. In case anything was ever su[b]po[e]naed." Also on January 18, Smolin texted Bowman to "let [her] know after you've talked to David."  On January 19, Smolin texted Sampson updating him on her efforts recruiting Rizza: "Just talked to Joey (my processor) he sounds like he's close to pulling plug and coming over here." "Here," of course, refers to CrossCountry.

119.     On January 23, Smolin also texted Sampson to update him on her and Bowman's efforts recruiting Schneider: "Steve called me this am. Definitely sounds interested. I told him how much I'm enjoying working with Jeffs team too . . . . Steve asked if he could call [Siegel] today to figure out getting his database. Sam told me he just texted her to talk." Again, Sampson could have ended what CrossCountry started right there. But he, an Executive Vice President for CrossCountry, expressed appreciation, not concern: "Nice. Thanks. Felt like he was leaning towards us."

120.     Smolin also asked Bowman on January 24 if Bowman planned to call a loanDepot underwriter CrossCountry was targeting for recruitment ("R U calling [employee]?"). Bowman responded that he had already spoken to her and wanted to speak with CrossCountry's lead underwriter and Sampson next. Bowman also told Smolin to reach out to another loanDepot lead underwriter and solicit him while ensuring secrecy:

> Def reach out to [underwriter] tomorrow. Mention for him to keep it discreet but that you and I and Joey [Rizza] are there and he's uw for our group. I wonder what he makes and what wood [sic] make him move ??

121.    On January 28, Rizza texted Smolin regarding Schneider's recruitment to CrossCountry. Smolin encouraged Rizza to take loanDepot's information on his way out the door and retain contact information for any loanDepot employees he may wish to recruit:

> Go thru your emails now and make sure you have the scripts you like to send to borrowers and any other info that will help you Even Uw guideline tricks etc. And phone # and em for [loanDepot employee] and anyone else u like. Just be prepared!

She also ordered Rizza to take a loanDepot customer's closing disclosure data and send it to her for use at CrossCountry:

> Can you send me his final cd. Just copy & paste in word doc and send to your gmail so we don't take the actual CD. Don't want u to get into trouble. But want his stuff for the future.

As discussed above and detailed more fully below, Smolin's actions in both taking highly confidential personal and financial information belonging to a loanDepot customer, absconding with other confidential loanDepot business information, and encouraging the solicitation of loanDepot employees is par for the course for both the Individual Defendants and CrossCountry, who direct evidence shows explicitly encouraged and incentivized such actions. Indeed, as Individual Defendants and CrossCountry were conspiring to raid loanDepot of its employees (in Illinois and elsewhere), they also actively worked together to steal loanDepot's trade secrets and confidential information — not just those summarized above as a part of the solicitation scheme, but highly confidential data compilations of customers generated, stored, and maintained by loanDepot in confidence through substantial investment; documents which, indisputably, mortgage businesses rely upon to identify business opportunities and generate millions in revenue dollars. Using this information, Defendants went after loanDepot's valued customers and unlawfully usurped established loanDepot business opportunities and economic advantage.  Examples are set forth below.

**Smolin and Siegel, As Agents of CrossCountry and At CrossCountry's Direction,
Misappropriate Volumes of loanDepot Trade Secret Information**

122.    While clandestinely plotting with CrossCountry to solicit loanDepot employees, Smolin and Siegel plotted, at CrossCountry's direction, to transfer voluminous loanDepot confidential and trade secret information to CrossCountry. They knew what they were doing was wrong and tried hiding it. In one early January message, Smolin asked Siegel: "[i]f I send email from my gmail w a few docs to my new gmail can they see it ? I understand No outlook."

123.    On January 6, 2022 and January 13, 2022, while still employed by loanDepot, Siegel accessed the weblink: "crosscountrymortgage.my.salesforce.com."

124.    At the same time, Siegel was simultaneously accessing numerous loanDepot trade secrets, with no business reason to do so other than for Smolin's and her anti-competitive use at CrossCountry.  For example:

- On January 2, 2022, after Smolin started talking to CrossCountry, Siegel downloaded and saved from loanDepot's proprietary database a document entitled "All Cindy's Contacts-2022-01-02-18-43-55.xlsx." This is an excel spreadsheet which contains a detailed compilation of information about over 4,000 contacts, including the contact's name, mailing address, work phone, mobile phone, and email address. The list identifies loanDepot as the "account owner." The list identifies whether the contact is a "borrower" or a "partner." There is no question that Siegel and Smolin took this highly valuable and confidential data. Siegel informed Smolin that same day that she [j]ust downloaded our main funded database . . . ." That same day, Siegel messaged Bowman with Smolin on copy soliciting advice on how best to pull proprietary metrics and fields from loanDepot's proprietary and confidential CRM tools: "Hi Bob! Losing my mind w crm. I have incredible detailed fields in my database like [debt-to-

income ("DTI") ratios] etc. But I cannot for life of me find out how to pull in borrowers emails and phones. Have you done yours yet?"

- Also on January 3, 2022, Siegel accessed a document entitled "Main DB.xlsx." This is a detailed excel spreadsheet with information for 481 "borrowers" including their name, email address, cell phone number, co-borrower name, co-borrower email, co-borrower cell, loan purpose (purchase/refinance), property address, loan amount, property appraised value, <u>interest rate</u>, product name (e.g., 30 year fixed), <u>loan to value ("LTV") ratio</u>, <u>combined loan to value ("CLTV") ratio</u>, <u>credit score</u>, HOA fee (if any), monthly mortgage insurance (if any), <u>DTI ratio</u>, asset total, monthly hazard insurance, and property type.

- Siegel then (again on January 3 and, it appears, shortly after the above file access) texted Smolin providing an update on her misappropriation efforts: "I have 2 databases so far in our pre approval google . . . [d]oc [o]ne is ld funded database one is ld contact database Bc I wasn't able to figure out how to get contact info into their funded report . . . . I feel more confident w funded database but will do more next two weeks to make them complete and bring them together . . . . The concern is getting things out of ld . . . ." Touting the value of this database, Siegel noted in a later exchange on January 6 that "it's 482 [customers] . . . some ppl we did 5x." Smolin responded "Wow."

- The next day, on January 4, 2022, and after Smolin started talking to CrossCountry, Siegel downloaded a document entitled "onboarding database template v1 7.27.xlsx." *See* **Ex. H.** This is an excel spreadsheet which contains, on the first tab, <u>instructions from CrossCountry about transferring contacts to CrossCountry's Salesforce database for "marketing" purposes</u>. Astoundingly, the instructions provide that detailed customer information are encouraged to be transferred. Indeed, CrossCountry <u>encourages</u> employees, according to the below, to provide loan and transaction information and makes no apparent effort to confirm the

information employees provide is not a trade secret or contractually protected confidential information belonging to a competitor.

- The spreadsheet contains separate tabs for "Customer Contacts" and "Business Contacts." At the time Siegel accessed the spreadsheet on January 4, these tabs were blank. A picture of the instructions are set forth below:

## Migrating Your Contacts into Salesforce

At CrossCountry Mortgage, your new CRM tool will be Salesforce. We realize the important of announcing to your customer and business contacts that you've joined CCM. To do this, we need your data to include some **key criteria**. Using the database templates within this document will set you up for the most success. Use the migration tips below to help us begin your migration.

### There are two types of contacts in Salesforce:
**Customer Contacts** (Prior and Prospects, also, Personal Contacts can live here)
**Business Contacts** (Realtors, Title Agencies, Builders, etc.)
*...there is a sheet in this document for each of these categories.*

### The following criteria is required for all contacts:
First Name
Last Name
Email (or phone number, if email is not available)
**\*\*...contacts without at least one contact method will not be imported.**

### We encourage the following fields to be completed for all contact types:
Phone Number
Mailing Address (Work or Home)
Company Name
Contact Category (such as Realtor, Contractor, First Time Hombuyer, Refinance Customer, etc.)
Contact Relationship Status (such as Prospect, Past Client, Top Realtor, Prospective Partner, etc.)
*...categorizing your contacts will allow for more specific marketing opportunities.*

### The following fields are also available to complete based on contact type:
Additional Contact Information (Additional emails, work phone numbers, etc.)
Coborrower Information
Past Client Information (loan type, closing date, etc.)
License Numbers
*...and more.*

*The only fields we require from you are those indicated above. Don't worry if your data isn't perfectly formatted: these templates are intended to set you up for success as you migrate to CCM. We will clean up your data prior to import; the more information you give us, the easier the transition will be.*
*We will give you the opportunity to review your CCM formatted database prior to upload.*

- On January 4, 2022 (the same day she received the CrossCountry "onboarding" spreadsheet) and again on January 6, 2022, Siegel accessed a document entitled "Marketing Ideas.docx." This is a nine-page document summarizing marketing ideas to announce Smolin's and Siegel's move to loanDepot, which was plainly being repurposed for their impending move to CrossCountry and anticipated solicitation campaign. For example, the document references "CCM," proposes sending a "[f]act sheet on CCM to send to referral partners," and suggests a "MARKETING DRIP CAMPAIGN" including a monthly email to referral partners regarding "advantages and programs at CCM that can help their business."

- Then, on January 5, 2022, the day after Siegel accessed the CrossCountry onboarding spreadsheet, Siegel accessed and saved an excel spreadsheet entitled "contacts db.xlsx." This spreadsheet contained contact information for over 4,000 contacts, including their name, mailing address, phone number, email address, account owner (listed as "loanDepot"), and status as a "borrower" or "partner."

- That same day, on January 5, 2022, Siegel also accessed and saved a different excel spreadsheet entitled "Main Funded DB.xlsx." This spreadsheet contained contact information for over 500 borrowers, including (where applicable) each borrower's name, employer, birthdate, email, phone number, co-borrower information, loan purpose (purchase/refinance), subject property, funded date, loan amount, appraised amount, interest rate, product name (e.g., 30 Year Fixed Rate), loan program, investor, loan type, LTV, CLTV, credit score, HOA fees,

monthly mortgage insurance (if any), <u>DTI</u>, asset total, monthly hazard insurance, and property type (e.g., single family, condo, etc.).

- Also on January 5, 2022, Siegel accessed and saved documents entitled "THKG Goodies 2021 agents.xlsx" and "Holiday Gift 2020 v2.xlsx" — these are compiled lists containing mailing information for 167 different contacts.

- On January 2, 3, and 11, 2022, Siegel also accessed spreadsheets entitled "Cindy's Funded Loans Amount Product," including "Cindy's Funded Loans Amount Product--2022-01-02-17-25-05.xlsx," "Cindy's Funded Loans Amount Product-2022-01-02-18-12-59.xlsx," "Cindy's Funded Loans Amount Product-2022-01-03-08-56-41.xlsx," "Cindy's Funded Loans Amount Product-2022-01-11-13-14-49.xlsx," "Cindy's Funded Loans Amount Product-2022-01-11-13-18-59.xlsx," and "Cindy's Funded Loans Amount Product-2022-01-11-13-44-14.xlsx." These are detailed excel spreadsheets generated from loanDepot's proprietary systems containing data for 788 (or more) borrowers. The spreadsheets include varying degrees of detailed borrower information, including borrower name, subject property address, property type, loan number, loan amount, appraised value, interest rate, product name, funded date, credit score, HOA, monthly mortgage insurance, asset total, monthly hazard insurance, DTI, and LTV.

- On January 5, 2022, Smolin texted Siegel the following: "You have no idea how many new people I've been talking to. Mostly refis and not amazing but.... <u>Trying to stall and adding them to pre-approval tracker</u>." (Emphasis added.). Siegel "liked" this message through iChat. The next day, Smolin told Bowman that "<u>we're spending a lot of time getting database ready</u>." (Emphasis added.).

- On January 10, 2022, Bowman texted Smolin encouragement on leaving loanDepot and working to take loanDepot's confidential information and trade secrets: "Don't Stress. Just

keep doing what you need to do with database." In this same exchange, Smolin expressed frustration that she received loanDepot customer agreements for two customers she'd planned on diverting to CrossCountry: "Crap sent someone a pre-approval letter this wkd and just got her contract. Got another contract in early this am. Crap & in Fl[orida]."

- On January 11, 2022, Siegel also downloaded the CrossCountry "onboarding database template v1 7.27 (1).xlsx," described above.

- In addition, also on January 11, 2022, Siegel downloaded and saved from loanDepot's database a document entitled "All Cindy's Contacts-2022-01-11-17-44-53.xlsx." This is an updated contact list from the version Siegel accessed on January 3, described above, which includes over 4,000 contacts, along with additional data concerning, for numerous contacts, the contact's <u>date of birth</u>. Each contact is identified as a "borrower" or "partner," and the "account owner" is identified as "loanDepot."

- Later on January 11, 2022, Siegel downloaded and saved from loanDepot's database a document entitled "All Cindy's Contacts-2022-01-11-18-03-05.xlsx." On January 11, 2022 and January 12, 2022, she also accessed a document entitled "All Cindy's Contacts-2022-01-11-18-12-37.xlsx." These are updated contact lists, like those described above, for over 3,000 contacts. These lists contain even more detailed customer and referral partner information. For example, the "All Cindy's Contacts-2022-01-11-18-12-37.xlsx" spreadsheet is generated from loanDepot's proprietary database, and contains the names, <u>marital status</u>, <u>employer name</u>, <u>date of birth</u>, mailing address, email address, and work/cell phone numbers for the contacts listed. The spreadsheet indicates whether the contact is a "borrower" or a "partner," and identifies the "account owner" as loanDepot.

- Three days later, on January 15, 2022, Siegel accessed and saved another spreadsheet entitled "Main Funded DB(AutoRecovered).xlsx," which contained the same information in the "Main Funded DB" spreadsheet described above.

- Then, after days of accessing detailed compilations of loanDepot customer information, on January 16, 2022, <u>the same day she resigned from loanDepot for CrossCountry</u>, Siegel accessed and saved an excel spreadsheet entitled "Siegel DB.xlsx." This spreadsheet contains the same "cover" tab as the CrossCountry onboarding database template, with instructions for migrating customer and business contacts to CrossCountry. The first tab of the spreadsheet, entitled "Customer Contacts," has a "CrossCountry Mortgage" logo at the top. It contains a list of over 2,000 contacts, including (where applicable), the following detailed information for each contact: name, email, contact category (e.g., "First Time Home Buyer"), relationship status (e.g., prospect, past client), lead source, mailing address, phone number, birthdate (no year), notes (for prospects), marital status, employer name, closing date, co-borrower name and email, co-borrower phone, co-borrower birthdate (no year), loan amount, loan type, loan purpose (e.g., refinance, purchase), loan program (e.g., "30 Yr Fix"), loan provider name, subject property type, property value, purchase price, occupancy, <u>interest rate, LTV, CLTV</u>, co-borrower employer, and refi type. The spreadsheet identifies 68 contacts as "prospects" and for 60 of those "prospects" contains "notes" concerning the prospect, for example, their needs, preferences, in some cases <u>FICO score</u>, and other personal details. The "Siegel DB.xlsx" also contains a second tab, entitled "Business Contacts," that likewise has a "CrossCountry Mortgage" logo at the top. This spreadsheet lists nearly 900 contacts, including the contact name, email, company name, "referral partner type" (e.g., realtor, lawyer), relationship status (e.g., "prospect"), work phone, and mailing address.

125.     On January 17, Siegel sent an e-mail from her personal Gmail account to Smolin's CrossCountry e-mail account attaching the "Siegel DB" spreadsheet. Exactly one hour after receiving the "Siegel DB" spreadsheet (the customer compilation Siegel stole from loanDepot), Smolin forwarded it to a CrossCountry marketing manager. The information taken by Smolin and Siegel is a closely guarded trade secret at loanDepot. In the hands of a competitor, this information provides CrossCountry with everything it needs to immediately compete against loanDepot and identify which prospects to target. For all intents and purposes, it's the keys to the castle.

126.     What's more, after Smolin and Siegel has already received formal offers from CrossCountry, they transferred loanDepot trade secret and confidential information into their personal possession to leverage as CrossCountry employees.  On January 15, 2022, a Saturday, Smolin sent Siegel at Siegel's personal email multiple screenshots of the loanDepot proprietary Retail "Leaderboard," which included information regarding the performance of loanDepot's top originators, including purchase volume and units, and loan amount volume and units. The screen shots are marked "confidential" and "for internal use only." Each of the individuals identified on the "Leaderboard" is a top originator. Not coincidentally, four of the individuals identified on the "Leaderboard" resigned from loanDepot to join CrossCountry as part of the aforementioned New York departures in March 2022. Obviously, in the hands of a competitor, this information was and could be used to target and solicit loanDepot's top loan originators. As noted earlier, Bowman sent similar data to CrossCountry on multiple occasions in late December and early January, allowing CrossCountry to quickly outbid loanDepot on retaining top employees, causing losses in the several millions in loan volume annually. There was no reason for Smolin to send screen shots of this information to Siegel's personal email other than to use it for recruitment purposes with CrossCountry.

127. Further, a forensic examination of Siegel's loanDepot device reveals that "Google Sheets" was frequently accessed from Siegel's laptop, including documents entitled "Smolin Loan Pipeline" and "Pre-Approval Tracker." "Google Sheets" is a spreadsheet program included as part of the free, web-based Google Docs Editors suite offered by Google. On January 16, 2022, and the days leading up to January 16, 2022, both the "Smolin Loan Pipeline" and "Pre-Approval Tracker" were frequently accessed, in "edit" mode, which indicates these documents were being edited in "Google Sheets." And on several occasions, the documents "Smolin Loan Pipeline" and "Pre-Approval Tracker" were accessed from the Siegel laptop within minutes of loanDepot's mello site being accessed. "mello," referred to throughout this First Amended Verified Complaint, is loanDepot's proprietary end-to-end digital lending platform that houses customer information, loan applications, pre-qualification information, and scores of detailed customer information. A forensic analysis of Siegel's device also indicates that Siegel composed emails from her personal email between January 1, 2022 and January 16, 2022, which could have attached loanDepot documents to such emails.

128. Similarly, a forensic analysis of Smolin's laptop reveals that in the days leading to Smolin's resignation and on the day of her resignation, "Google Sheets" was frequently accessed, including documents entitled "Smolin Loan Pipeline" and "Pre-Approval Tracker." On January 16, 2022, and the days leading up to January 16, 2022, both the "Smolin Loan Pipeline" and "Pre-Approval Tracker" were frequently accessed, in "edit" mode, indicating the user was editing these documents using "Google Sheets." On several occasions, the documents "Smolin Loan Pipeline" and "Pre-Approval Tracker" were accessed within minutes of loanDepot's mello site being accessed. Smolin and Siegel regularly exchanged messages about updating the "pipeline" and "pre-approval tracker" and Siegel and Smolin admit through their text exchanges that they stored such information in Google. Smolin's and Siegel's activities are especially troubling given that customers who are in the

"pre-approval" stage of the loan life cycle have yet to have their loan funded. These customers are, therefore, prime customers to target to transfer their business to CrossCountry.

129.    In addition, on January 16, 2022, after Smolin resigned from loanDepot, a forensic examination of Smolin's loanDepot device reveals that she continued accessing mello—when she had absolutely no legitimate business reason to do so.

**Smolin, as Agent of CrossCountry, Diverts Customers to CrossCountry**

130.    In addition to the overwhelming record of improper and unauthorized access, disclosure, and use of loanDepot's confidential information and trade secrets, Smolin (as an agent of CrossCountry) also laid the groundwork to divert business and employees from loanDepot to CrossCountry while she was still employed by loanDepot.

131.    For example, on or about January 1, 2022, Smolin created a secret personal email address which, upon information and belief, she used to start communicating with loanDepot customers outside of loanDepot's email system in order to convert their business to CrossCountry.

132.    A forensic examination of Smolin's loanDepot laptop reveals that, between January 1, 2022 and January 16, 2022, Smolin searched for and/or accessed emails in her secret email account associated with loanDepot customer names, including the following twenty-three (23) customers listed as "prospects" on the "Siegel DB" spreadsheet that Siegel transferred to CrossCountry: A.A., B.B., B.B., J.B., R.B., S.C., K.D., M.F., M. K., K.M., C.N., G.N., C.N., S.N., C.N., G.O., M.S., A.S., E.S., T.S., M.S., S.W., and C.W.[2]  As set forth above, the "Siegel DB" spreadsheet contains detailed notes concerning most of these customers, including their needs and preferences, in some cases FICO scores, and other personal information.

---

[2] For privacy reasons, customers referenced in this First Amended Verified Complaint will be referred to only by the initials of their first and last names.

133.    On January 16, 2022, while Smolin was searching for and/or accessing customer emails, Smolin was also accessing loanDepot's mello and the "Pre-Approval Tracker" in Google Docs. She was also accessing a "pre-approvals" folder on her loanDepot laptop.

134.    On January 15, 2022, another customer, A.C., emailed Smolin about refinancing. Instead of forwarding this opportunity to loanDepot, Smolin stalled (as she discussed with CrossCountry) and responded that she would "call [the client] this coming week" (i.e., after she joined CrossCountry). A forensic analysis of Smolin's loanDepot laptop reveals that on January 16, 2022, Smolin searched in her secret personal email for this same customer's name. Then, on January 20, 2022, the customer emailed Smolin and Siegel at their CrossCountry email stating: "Cindy, just realized you sent an email from a different company. Wanted to follow-up on this." This is direct evidence that Siegel, Smolin, and CrossCountry schemed to convert this customer to CrossCountry. This customer is on the "customer contacts" tab of the "Siegel DB" spreadsheet.

135.    The subject line of additional emails in Smolin's secret email, which Smolin searched for and/or accessed on January 16, 2022 (the date she resigned from loanDepot), further indicate that Smolin was setting up calls with customers for after she started with CrossCountry. For example, emails with the following subject lines were identified in Smolin's secret email:

- "[B.] – K McC – talk Jan 20th."

- "[S.W.] – call Jan 18 – 2:30 pm."

136.    Another email located in Smolin's secret email, dated January 16, 2022, bears the subject line: "Email to current pre-approved borrowers + Realtors." This email was accessed minutes after Smolin accessed mello. Upon information and belief, Smolin was preparing to email current pre-approved borrowers and realtors to transition their business to CrossCountry.

137.     Further, between January 25 and 26, 2022—after Smolin and Siegel commenced employment at CrossCountry—Rizza acted as Smolin's, Siegel's, and CrossCountry's double-agent, forwarding confidential customer information to them.  For example:

- Rizza emailed a Closing Disclosure for customers A.M. and P.M. to Smolin's and Siegel's personal emails. The Closing Disclosure detailed the features, terms, and costs associated with the customer's mortgage loan. The Closing Disclosure also contained a cover letter, dated January 19, 2022, signed by Smolin even though Smolin resigned from loanDepot on January 16, 2022.

- Rizza also emailed Smolin at her personal email address, attaching a closing disclosure and payoff statement for customers D.K. and S.K, containing detailed information about the features, terms, and costs associated with the customer's mortgage loan.

These documents contain personal financial information of customers, which could be used in the future to solicit the customers and undercut loanDepot on costs.

138.     In addition, on January 28, 2022, loanDepot received an email from customer, B.C., with the subject "2021 W2," where the customer sent his W-2 form to Smolin at her CrossCountry email. In 2021 and early January 2022, Smolin sent the same customer instructions to submit an application to be pre-approved for a loan through loanDepot. Upon information and belief, Smolin is now soliciting and servicing this customer at CrossCountry utilizing confidential and trade secret information she learned at loanDepot. Indeed, B.C. is listed on the "onboarding" spreadsheet that Siegel transferred to CrossCountry as a "prospect" with notes about this customer, including to "send new online link." As mentioned above, Smolin e-mailed highly confidential customer data, inclusive of loan-to-value ratios, social security numbers, and financial metrics from her secret Gmail address to Siegel at Siegel's CrossCountry e-mail address. Smolin engaged in the same conduct with other customers as well.

139.    Smolin and Siegel, along with CrossCountry, directly profited from their misappropriation efforts. On June 8, 2022, for instance, Smolin closed on a loan on behalf of customer B.W., whose data and information Smolin and Siegel transferred directly to CrossCountry, inclusive of all contact information and prior loan details (such as interest rate, loan to value ratios, and loan type). According to CrossCountry's records, Smolin began processing this loan on April 26, 2022, eleven days *after* this Court's entry of a TRO.

140.    All told, loanDepot's investigation thus far reveals that between January and June alone, Smolin and Siegel diverted, leveraging loanDepot's trade secrets and confidential information, well over $10 million in customer loans from loanDepot to CrossCountry.

### Baske and Bowman, as Agents of CrossCountry, Collude To Take LoanDepot Confidential/Trade Secret Information and Convert Customers

141.    Like Siegel and Smolin, Bowman and Baske also worked as agents of CrossCountry to misappropriate loanDepot's confidential and trade secret information and other property, and to solicit loanDepot customers.

142.    For example, on December 28, 2021, Baske sent from her loanDepot email to her personal email a series of documents including customer lists (excel spreadsheets) containing the customer's name, home address, and (in some cases) loan number.

143.    On January 3, 2022, Baske sent additional documents from her loanDepot email to her personal email, including a compilation of information (including template emails/scripts) used for servicing customers.

144.    On January 5 and 7, 2022, Baske forwarded from her loanDepot email to her personal email even more documents, including template emails to service customers.

145.    On January 14, 2022, Baske emailed from her loanDepot email to her personal email customer lists from 2020 and 2019, including customer mailing addresses.

146.     On January 17, 2022, Bowman forwarded to CrossCountry his entire database of funded loans, inclusive of interest rates, loan-to-value ratios, loan products, percentage rates, credit scores, and the date the customer previously took out a loan with loanDepot.

147.     On January 17, 2022, customer B.K. emailed Bowman at his loanDepot email.  On January 18, 2022, Baske forwarded B.K.'s email to Bowman at his personal email. The customer wrote: "Just checking in to see how the rates and of it made sense to refi" [sic].

148.     Between January 18, 2022 and January 20, 2022, Baske also forwarded to Bowman, at his personal and CrossCountry email, a number of other customer emails.

149.     On January 18, 2022, customer T.S. emailed Bowman at his loanDepot email. The same day, Baske forwarded T.S.'s email to Bowman at his personal email, and on January 20, 2022, Baske again forwarded T.S.'s email to Bowman at his CrossCountry email.  The customer wrote: "I'd love to grab a few minutes to connect with you – what does your schedule look like this week." According to the email chain, this pertained to the customer's interest in refinancing her loan on her condo in Chicago.

150.     On January 18, 2022, customer S.E. emailed Bowman at his loanDepot email, regarding the customer "putting in an offer in [a] house," and inquiring about an anticipated "monthly payment." This was a customer who Bowman had prepared several pre-approval letters for at loanDepot, starting in November 2021. The same day, Baske forwarded S.E.'s email to Bowman at his personal email. Then, on January 19, 2022, S.E. emailed Bowman at his loanDepot email, stating that he signed a contract for the house. The next day, Baske forwarded S.E.'s email to Bowman at his CrossCountry email. loanDepot has not funded any loan for this customer in 2022, indicating the customer is now working with Bowman and CrossCountry.  Indeed, Bowman transferred S.E.'s file to CrossCountry, began working on the file on or about January 26, 2022, and thereafter closed on a loan for S.E. for a seven-figure amount at CrossCountry.

151.    On January 18, 2022, customer S.C. emailed Bowman at his loanDepot email about the customer's home mortgage. The next day, Baske forwarded S.C.'s email to Bowman at his personal email.  On January 20, 2022, Baske forwarded S.C.'s email again to Bowman, this time at his CrossCountry email.

152.    On January 19, 2022, Baske also worked with a vendor to send a replacement gift to a customer, on Bowman's behalf, from her loanDepot email—even though Bowman was no longer employed by loanDepot. Baske was essentially using loanDepot to build goodwill for Bowman (and his new employer, CrossCountry) with the customer.  The note accompanying the gift said: "Thank you so much for doing business with me. I look forward to working with you again in the future… -Bob Bowman."

153.    On January 20, 2022, the day before she resigned from loanDepot, Baske continued to forward customer emails to Bowman <u>at his CrossCountry email</u>.  For example:

- On December 19, 2021, almost a month before Bowman resigned, a customer, K.C., emailed Bowman requesting a pre-approval letter before December 22nd. On January 2, 2022, K.C. emailed Bowman again stating that she submitted her "application before the holidays, but haven't seen anything come back." Upon information and belief, Bowman was intentionally stalling this customer so he could bring the loan to CrossCountry.  Then, on January 18, 2022, K.C. again emailed Bowman at his loanDepot address, inquiring about a loan. On January 20, 2022, Baske forwarded the customer's email to Bowman at his CrossCountry address.

- On January 19, 2022, a customer, C.D., emailed Bowman at his loanDepot address inquiring about the "wonderful world of home improvements." That same day, Baske forwarded C.D.'s email to Bowman's personal email, and on January 20, 2022, Baske forwarded C.D.'s email to Bowman at his CrossCountry email.

154. On January 20, 2022, Baske also forwarded to Bowman at his CrossCountry email transaction documents for customers M.M. and B.M., including a controlled business disclosure (by a producer of title insurance business), initial fee quote, and related title insurance documents. Bowman previously issued a preapproval letter to these customers on January 3, 2022 for a condo; and the customer's offer was accepted with a loan contingency date of February 22, 2022. loanDepot never funded this loan, however. CrossCountry did. Baske was forwarding documents to Bowman at his CrossCountry email so that he could close on the loan for these customers at CrossCountry instead.

155. Also on January 20, 2022 (the day before she resigned from loanDepot and the same day she was taking customer documents relating to a condo transaction), Baske forwarded from her loanDepot email to her personal email <u>fourteen PDF documents containing a number of loanDepot</u> <u>training materials, job aides, quick reference guides, and templates, some of which are copyrighted to</u> <u>loanDepot, have a "confidential and proprietary" designation at the bottom, and state that they are</u> <u>for "internal use only</u>." Significantly, some of these loanDepot training documents relate to <u>condo</u> transactions.

156. Then, on the day Baske resigned (January 21, 2022), Bowman texted Baske asking if she could email documents regarding customer Y.Z. to her personal email and then to his CrossCountry e-mail. Baske sent troves of such documents, including mortgage account statements with detailed financial information concerning Y.Z.'s loan and interest rate and several other crucial data points for three different properties. Bowman went on to close **eight** loans with Y.Z. and/or an affiliated trust of Y.Z. at CrossCountry, totaling over $3 million.

157. Much like Smolin, loanDepot also has evidence that Bowman intentionally stalled processing customer loan opportunities at loanDepot so he and CrossCountry could later profit from them. Clearly, Bowman (and CrossCountry) benefitted directly from his and Baske's coordinated misappropriation efforts. He for instance closed several loans with loanDepot customers contained

on the confidential and proprietary lists and documents he and Baske misappropriated. In addition to the examples set forth above, Bowman began processing and later closed a loan with customer M.M. (a different "M.M." from the customer described earlier), whose prior data and information he misappropriated and later sent to CrossCountry on or about January 17, 2022.

158.     All told, loanDepot's investigation thus far reveals that between January and June of 2022, and despite the TRO in place in this case, Bowman leveraged loanDepot's trade secrets and confidential information to divert at least $15 million in customer loans from loanDepot to CrossCountry. loanDepot's losses continue to mount and the harm is and will be irreparable if Individual Defendants and CrossCountry are permitted to continue unlawfully leveraging loanDepot's confidential, proprietary, and trade secret data and information.

## Schneider's Unlawful Activities As Agent of CrossCountry

159.     Schneider also improperly accessed, used, and disclosed loanDepot trade secrets, acting as an agent of CrossCountry.

160.     For example, on January 23, 2022, four days before he resigned to join CrossCountry, Schneider accessed several documents, including:

- Excel spreadsheets entitled "Contacts-2022.xlsx" and "All My Contacts-2022-01-23-14-11-06.xlsx." These spreadsheets contain a compilation of information downloaded from loanDepot's proprietary database. The spreadsheets contain a list of contact information for over 3,300 borrowers and partners, including contact name, email address, mailing address, work phone, mobile phone, employer name, and employer address. Upon information and belief, Schneider had no legitimate business reason to download and access these documents but to use them at CrossCountry.

- Excel spreadsheets entitled "Funded Version 1.xlsx" and "LO DB – Funded YTD-2022-01-23-16-03-33.xlsx," which also contain a list of hundreds of borrowers with funded loans,

including borrower name, loan number, email address, phone numbers, loan amount, mortgage applied for (e.g., conventional), and funded date. The "LO DB – Funded YTD-2022-01-23-16-03-33.xlsx" spreadsheet also contains detailed information about the loan purpose (e.g. refinance/purchase), occupancy (e.g., owner occupied/second home), subject property street address, referral name (e.g. "Refi Target"), and buying agent. The list contains 582 rows of data. Critically, this spreadsheet also shows which borrowers are repeat customers, including detailed information about their past loans, providing critical information that would allow Schneider to target these customers at CrossCountry.

161.    On January 24, 2022, Schneider accessed in his personal email account emails with the following subject lines: "Funded Version 1," "Funded Version 2," "Contacts," and "DB." The email subjects are strikingly similar to the names of the documents that Schneider accessed the day before, referenced in the Paragraphs, above.

162.    Also on January 24, 2022, Schneider received a formal offer of employment from CrossCountry. After 10:00 PM that night, Schneider forwarded to his personal email: (a) an email containing a list of Schneider's and Rizza's existing loans, including customer information, such as borrower name, closing date, and other loan deadlines; and (b) an email from a customer, J.J., along with a BOA appraisal report for the customer. The customer's email is from October 2021. Schneider had no business purpose to forward this information to his personal email other than to transition this client to CrossCountry.

163.    Just one day later, January 25, 2022, Smolin mentioned to Bowman by text that "Steve called Sam [Siegel] today to ask how to get database out." Bowman responded that he directed Schneider to ask Siegel for help on transferring loanDepot's confidential data off of loanDepot's systems.

-54-

164.    The next day, January 25, 2022, Schneider accessed his personal email account, including emails with the subjects: "CCM Intro Call with Steve Schneider & Onboarding Team" and "CCM Onboarding Intro."

165.    The day he resigned from loanDepot (January 27, 2022), Schneider also accessed mello and navigated to "Pipeline," "Scenarios," and "Overview."   Schneider also frequently accessed his personal e-mail, strongly indicating that he was misappropriating valuable loanDepot data on his way out the door and converting it for his and CrossCountry's benefit.   Schneider also accessed the following documents:

- Excel spreadsheets entitled "LO DB – Funded YTD – 2022-01-26-22-03-46.xlsx" and "LO DB – Funded YTD – 2022-01-26-22-04-40.xlsx," which like the spreadsheets described above, contained detailed information with 584 rows of data for borrowers. The spreadsheets contain borrower name, email address, contact phone number, loan amount, interest rate, appraised value, LTV, product name (e.g., Conv Fixed 30 Year), funded date, loan purpose (e.g., purchase/refinance), occupancy (e.g., owner occupied/second home), subject property street address, and buying agent. Schneider had no legitimate business reason to access this spreadsheet on the day he resigned from loanDepot, and the day before he started with CrossCountry.

166.    And that isn't all. For the very first time—and on his last day at loanDepot (January 27, 2022)—Schneider plugged a USB drive into his loanDepot computer and copied several confidential and valuable loanDepot documents to that device, including:

- An excel spreadsheet entitled "Clients 7-26-2021.xlsx," which contains names for nearly 400 contacts, along with their loan amount, interest rate, funded date, product name (e.g., "30 Year Fixed Rate"), and LTV.

- An excel spreadsheet entitled "Copy of Funded 2018 to Present with Cont-2019-05-31-07-05-34.xlsx" and "Copy of Funded 2018 to Present with Cont-2019-09-10-05-21-52.xlsx," which contain the names of over 150 borrowers, along with contact name, email address, phone number, loan funded date, loan amount, interest rate, and product name.

167.    On January 28, 2022, the same day he started at CrossCountry, Schneider e-mailed two confidential customer compilations to CrossCountry, one substantially identical to the "LO DB – Funded YTD – 2022-01-26-22-03-46.xlsx" spreadsheet and another entitled "all my contacts." Both were pulled directly from loanDepot's proprietary systems. Schneider (and CrossCountry) profited directly from his misappropriation. For example, as an agent of CrossCountry, he closed on a loan with customer L.V. in March 2022. L.V. is a customer listed on the spreadsheets Schneider misappropriated. He similarly closed on a loan with customer G.K. on behalf of CrossCountry. G.K. is also contained on one of the two lists Schneider misappropriated from loanDepot. Indeed, on January 28, 2022, Schneider's first day at CrossCountry, Schneider e-mailed CrossCountry representatives regarding pre-approval letters for both G.K. and L.V.

168.    Schneider, using the goodwill, substantial investment, and confidential information developed with and about customers on loanDepot's dime, thereafter diverted at least $10 million in loans to CrossCountry as of June 2022.

**Noyes's Unlawful Activities As Agent of CrossCountry**

169.    On January 27, 2022, the day before his resignation and three days after receiving a formal offer of employment from CrossCountry, Noyes sent at least 40 files to loanDepot's printers. Every printing event coincides with Noyes, often just minutes or seconds beforehand, (a) accessing data on loanDepot's mello portal; (b) downloading or accessing loanDepot customer pre-approval letters and "cash to close" worksheets for customers (which itemize, among other things, customer property values, customer loan amounts, and closing fees), and/or (c) accessing or downloading

loanDepot customer lists. loanDepot's analysis did not locate any printing events initiated by Noyes in the month of January 2022 before January 26, just two days before his resignation from loanDepot. Moreover, Noyes accessed and interacted with mello and its repositories of confidential customer data over 800 times in a five-day period between January 24 and January 29, indicating that Noyes was accessing this information for his use at CrossCountry. In the **entire month** of October 2021 (more relevant than November and December 2021 due to the holidays) loanDepot's analysis shows that Noyes accessed and interacted with mello 991 times.

170.     Noyes's brazen theft of the Company's data is best exemplified by his actions one day prior to his loanDepot resignation and departure. On January 27, Noyes inserted a USB thumb drive into his loanDepot-issued laptop and, among dozens of other documents, transferred the following confidential data compilations from loanDepot's systems:

- **Funded YTD-2022-01-23-16-36-28.xlsx**. This file contains loan information for 597 customers amounting to nearly **$192 million** in customer loans, and includes full customer names, e-mails, physical addresses, and telephone numbers for each customer. It also itemizes (a) each loan product secured for each customer (such as "30 Year Fixed Rate," "5/1 Year LIBOR ARM," "HELOC"); (b) each customer's interest rate for every loan product secured through loanDepot; (c) the purpose for each customer's securing the loan product (such as "Refi" and "Real Estate Purchase"); (d) the credit scores for each customer; (e) the loan-to-value and consolidated loan-to-value ratios for each customer's loan(s); and (f) the funding/loan amount. Noyes generated and downloaded this spreadsheet from loanDepot's CRM systems on January 23, 2022. In addition to Noyes's transfer of this document to a USB device, he interacted with this file one minute and six seconds before initiating a printing event.

- **All Contacts - Contact Info-2022-01-23-16-28-55.xlsx**. This is a compilation of over 2,500 loanDepot borrowers, prospects, and business partners, which Noyes also generated and

downloaded from Saleforce on January 23, 2022 — about six minutes prior to downloading and transferring the "Funded YTD" file discussed above.

171.    On January 31, 2022, Noyes sent "All Contacts - Contact Info-2022-01-23-16-28-55.xlsx" from his personal e-mail inbox to his CrossCountry e-mail inbox through a message with the subject line "stuff." On February 8, 2022, Noyes sent a slightly edited version of this compilation (inclusive of the same categories and customers) to CrossCountry under the file name "MasterContactData.xlsx."

172.    Noyes (and CrossCountry) directly profited from his misappropriation. For example, Noyes began processing loans with customers T.D., K.M., and K.L. almost immediately, if not before, commencing employment at CrossCountry. He in fact began processing these loans so quickly that his Illinois loan officer's license had not yet transferred to CrossCountry. Noyes therefore had these customers apply under Lewis's name which, upon information and belief, evidences Noyes coordinating directly with Lewis to divert business opportunities to CrossCountry from loanDepot before Noyes even began at CrossCountry. On January 31, Noyes e-mailed another CrossCountry representative informing her he would "need to pull a few loans over from [Lewis's] pipeline" in light of his license officially transferring to CrossCountry, and he listed T.D., K.M., and K.L. as customers whose loans should be transferred. Further, during his final week of employment at loanDepot, Noyes accessed loanDepot's proprietary mello systems and accessed K.L.'s customer data. He also closed a loan for customer J.M., whose information is also contained in one of the confidential and proprietary customer compilations he misappropriated.

### CrossCountry Considers Customer Information To Warrant Trade Secret Protection

173.    The detailed client information described above is unquestionably a trade secret in the highly competitive mortgage loan industry. Indeed, CrossCountry admits as much. In *CrossCountry Mortgage, Inc. v. Messina et al,* No. 1:19-cv-01021 (N.D. Ohio May 7, 2019), for example, CrossCountry

sued two former employees for breach of contract, breach of fiduciary duty, conspiracy, and misappropriation of trade secrets under the DTSA. (Dkt. 1, ¶ 1). CrossCountry alleged that the employees and competitor coordinated a group resignation, diverted loan customers to the competitor, and stole CrossCountry confidential information regarding customers. (*Id.*, ¶ 2). CrossCountry alleged that "CrossCountry's customer data, including the names and other information of CrossCountry's loan customers and potential customers, including credit information, constitute trade secrets…" and "CrossCountry's customer data constitute trade secrets…" (*Id.*, ¶¶ 55, 66).

174.     Similarly, in *CrossCountry Mortgage, LLC v. American Neighborhood Mortgage Acceptance Co., LLC, d/b/a AnnieMac Home Mortgage,* No. 2:22-cv-01119 (D.N.J. Mar. 1, 2022), CrossCountry alleged that "CrossCountry's non-public prospective borrower information and pricing information constitute trade secrets under federal law." (Dkt. 1, ¶¶ 22, 23, 74).

175.     In fact, CrossCountry's own employment agreements restrict the use and disclosure of confidential material, and specifically state that "non-public personal information… provided to [CrossCountry] by any actual or potential customer" is "in the nature of a trade secret." (*Id.*, ¶¶ 22, 23). CrossCountry's employment agreements also define "Intellectual Property" to include "customer lists," which its agreements state are "extremely valuable to the Company." The agreements also define "Confidential Material" to include information "provided to Company by any actual or potential customer, or third party." Moreover, CrossCountry's  employment agreements prohibit their own employees from directly or indirectly soliciting or hiring CrossCountry employees for two years following the cessation of their employment and is far broader in several other substantive respects than loanDepot's agreements with the Individual Defendants. (*Messina,* Dkt. 1, ¶ 17). The CrossCountry employment agreement also states that contact with, calling on, or soliciting customers and prospective customers and referral sources "constitutes improper interference with [CrossCountry's] legitimate, actual and prospective business expectations and contractual relations

with its customers, prospects and referral sources; constitutes misappropriation of [CrossCountry's] goodwill, and unfairly and unjustifiably harms [CrossCountry]." (*Id.*, ¶ 20).

### Defendants Ignore loanDepot's Cease and Desist Letters

176.    On February 2, 2022, loanDepot sent Bowman, Baske, Siegel, Noyes, and Schneider letters reminding them of their obligations to loanDepot, and attaching their respective agreements. On February 11, 2022, loanDepot sent a similar letter to Smolin, reminding her of her obligations to loanDepot, and attaching her agreement. CrossCountry was copied on each of these letters.

177.    At the time it sent these letters, loanDepot was not aware of the vast scope of the above-referenced misappropriations, misconduct, and unlawful solicitations.

178.    In the reminder letters, loanDepot demanded that the Individual Defendants cease and desist from any unfair competition and unlawful conduct. loanDepot also demanded that the Individual Defendants abide by the post-employment restrictive covenants in his/her Agreements, including but not limited to the covenant not to solicit loanDepot employees to end their employment relationship with loanDepot. Further, loanDepot sought written assurances that the Individual Defendants understood and would comply with their contractual obligations. Written assurances never came.

179.    In fact, CrossCountry encouraged Individual Defendants to blow off their contractual commitments to loanDepot. For example, Bowman learned loanDepot was investigating his and the other Defendants' conduct prior to loanDepot sending its letters. In text exchanges, CrossCountry's Executive Vice President, Sampson, minimized the issue, calling it "legal bullshit" and telling Bowman "we got your back regardless." The day after loanDepot sent the reminder letters and sought an acknowledgement from Individual Defendants that they had returned loanDepot's property and confidential information, Sampson told Smolin "I wouldn't sign anything" and reiterated this to all Individual Defendants in later exchanges. Sampson also assured Individual Defendants that

CrossCountry would pay for "anything that comes up." And even with this exceedingly troubling series of facts, CrossCountry apparently entered into indemnification agreements with the Individual Defendants and appears to be continuing to foot the bill for their defense. Perhaps this has to do with the fact that it was certainly not just Individual Defendants who engaged in this unlawful conduct; CrossCountry was at the helm, provided financial incentives to induce such conduct, and expressly encouraged and facilitated it.

**COUNT I**
**FEDERAL DEFEND TRADE SECRETS ACT**
**(FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND**
**MONETARY DAMAGES AGAINST CROSSCOUNTRY)**

180.    loanDepot incorporates the preceding allegations as if fully set forth herein.

181.    The actions of CrossCountry and the Individual Defendants, as described above, constitute violations of one or more provisions of the DTSA.

182.    The DTSA applies because loanDepot's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, which are provided to customers across the United States.

183.    By engaging in the above conduct, CrossCountry and the Individual Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate loanDepot's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

184.    In particular, the loanDepot information described above, including the compilations of identities of customers that utilize loanDepot services, customer information provided by customer's to loanDepot, the identities of prospective customers, the compilations of customer information, employee sales information, the identities and volume of business of loanDepot "leaders," loanDepot customized job aids and training materials, and customer information obtained by the Individual Defendants by virtue of their employment with loanDepot, are trade secrets. loanDepot expended substantial time, energy, money, and ingenuity in collecting and compiling this

information. loanDepot invests significant time, effort, and financial resources in developing and maintaining its customer relationships, including by, among other things, employing individuals, such as the Individual Defendants, whose job it is to exclusively develop such relationships, and by allowing employees to expense customer gifts and entertainment in order to develop such relationships, among other things.

185.    loanDepot has taken reasonable measures to keep the trade secret information secret by, among other things: (1) requiring employees who have access to such information to sign confidentiality agreements; (2) promulgating confidentiality and information security policies, and training employees on confidentiality; (3) limiting the disclosure and distribution of such information to only employees on a need to know basis; and/or (4) requiring that such information be saved on password protected networks, devices, and servers.

186.    loanDepot's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use, such as loanDepot's competitors like CrossCountry. A competitor with access to loanDepot's aforementioned trade secrets could use that information to target loanDepot's customers, employees, and referral sources, just as CrossCountry has done here. Indeed, loanDepot derives significant economic value from maintaining the secrecy of the non-public personal information of borrowers and prospective borrowers, as such information is necessary to process and close home mortgage loans (and refinancing loans)—which is the life blood of loanDepot's business.

187.    Without authorization, CrossCountry and the Individual Defendants misappropriated, threaten to misappropriate, or inevitably will misappropriate these trade secrets in a willful manner and with a deliberate intent to injure loanDepot and improve CrossCountry for their own financial gain by, among other things: (a) transferring loanDepot customer lists from loanDepot's database to

CrossCountry; (b) emailing loanDepot trade secret information to their personal email addresses, as described above, including customer lists, training materials, and customer opportunities; (c) targeting customers who they learned were searching for loans by virtue of their employment with loanDepot; (d) accepting employment at CrossCountry, a direct competitor of loanDepot, and performing identical services to those previously provided to loanDepot, including servicing, attempting to service, or threatening to service the same customers, and by using and disclosing, or threatening to use or disclose, or inevitably using or disclosing, without loanDepot's consent, loanDepot's trade secret information in doing so; and (e) by acquiring, receiving, or possessing, or inevitably acquiring, receiving, or possessing the trade secrets, knowing same to have been misappropriated without loanDepot's authorization, and using same (including insider information they acquired about loanDepot customers) to convert customers from loanDepot to CrossCountry.

188.    The Individual Defendants owed duties to loanDepot to maintain the secrecy of the trade secrets and to limit the use of the trade secrets. CrossCountry and the Individual Defendants acquired the trade secrets by improper means and/or disclosed and utilized the trade secrets, or inevitably will disclose and utilize the trade secrets, without loanDepot's consent, to perform competitive services and poach loanDepot customers and employees.

189.    The Individual Defendants are agents of CrossCountry, and are using loanDepot's trade secrets in the course and scope of their employment with, and for the benefit of, CrossCountry.

190.    loanDepot communicated the trade secrets to the Individual Defendants in confidence.  At the time of disclosure, the Individual Defendants (and CrossCountry) knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

191.    Defendants can obtain economic value from the disclosure and use of loanDepot's trade secrets, for example, by avoiding the years, and millions of dollars in investment, that it took

loanDepot to develop the trade secrets, and to convert loanDepot customers and employees to CrossCountry for their own financial gain.

192.     As a consequence of the foregoing, loanDepot has suffered and will continue to suffer irreparable harm, injury, and loss. Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined. Unless enjoined, Defendants will continue to use loanDepot's trade secret information to unfairly compete and loanDepot will continue to suffer irreparable harm that cannot be remedied solely through monetary damages.

193.     As a direct and proximate result of the conduct of Defendant CrossCountry, loanDepot is entitled to actual damages in an amount to be determined at trial. The acts and conduct of Defendant CrossCountry were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

**COUNT II**
**ILLINOS TRADE SECRET ACT ("ITSA")**
**(FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR**
**DAMAGES AGAINST CROSSCOUNTRY)**

194.     loanDepot incorporates the preceding allegations as if fully set forth herein.

195.     By the conduct alleged herein and described above, Defendants improperly acquired and misappropriated, or threaten to acquire and misappropriate, or inevitably will acquire and misappropriate, loanDepot's trade secret information.

196.     loanDepot's trade secret information is sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

197.     As set forth above, loanDepot has taken reasonable efforts and measures to keep and maintain the secrecy and confidentiality of these trade secrets. The Individual Defendants obtained loanDepot's trade secrets under circumstances giving rise to a duty owed by them to loanDepot to maintain their secrecy and limit their use.

198.    As set forth above, by the conduct alleged herein, Defendants misappropriated or threaten to misappropriate the trade secrets by, among other things, using and disclosing, or threatening to use and disclose, and inevitably using and disclosing the trade secrets without loanDepot's consent, and/or acquiring, threatening to acquire, and inevitably acquiring the trade secrets while knowing or having reason to know that they were doing so by improper means.

199.    Defendants breached, inevitably will breach, and/or induced the breach of the Individual Defendants' duty to maintain the secrecy of said trade secrets. CrossCountry derived loanDepot's trade secret information from or through Individual Defendants knowing same to have been misappropriated without loanDepot's authorization.

200.    Defendants intended to, or inevitably will, convert the trade secrets to their economic benefit, without loanDepot's consent, for anti-competitive use and to convert loanDepot customers and employees and know-how to CrossCountry.

201.    As a direct and proximate result of the foregoing, loanDepot has suffered and will continue to suffer immediate irreparable harm, injury and loss. Pursuant to the ITSA, actual or threatened misappropriation may be enjoined. Unless enjoined by this Court, Defendants will continue to use loanDepot's trade secret information to unfairly compete and enjoy commercial advantage that they would not otherwise have.

202.    As a direct and proximate result of Defendant CrossCountry's conduct, loanDepot is entitled to damages in an amount to be determined at trial. Defendant CrossCountry's conduct was willful and malicious, justifying an award of exemplary damages and attorneys' fees.

### COUNT III
### BREACH OF CONTRACT
### (FOR INJUNCTIVE RELIEF AGAINST INDIVIDUAL DEFENDANTS)

203.    loanDepot incorporates the preceding allegations as if fully set forth herein.

204.     loanDepot and Schneider entered into valid and enforceable Incentive and Employee Agreements. *See* **Ex. F**. loanDepot performed all duties and obligations under Schneider's Incentive and Employee Agreements.

205.     loanDepot and Bowman entered into a valid and enforceable Incentive Agreement. *See* **Ex. B**. loanDepot has performed all duties and obligations under Bowman's Incentive Agreement.

206.     loanDepot and Smolin entered into a valid and enforceable Incentive Agreement. *See* **Ex. D** loanDepot has performed all duties and obligations under Smolin's Incentive Agreement.

207.     loanDepot and Baske entered into a valid and enforceable Employee Agreement. *See* **Ex. E**. loanDepot has performed all duties and obligations under Baske's Employee Agreement.

208.     loanDepot and Siegel entered into a valid and enforceable Incentive Agreement. *See* **Ex. C.** loanDepot has performed all duties and obligations under Siegel's Incentive Agreement.

209.     loanDepot and Noyes entered into a valid and enforceable Employee Agreement. *See* **Ex. J.**  loanDepot has performed all duties and obligations under Noyes's Employee Agreement. loanDepot and Noyes also entered into a valid and enforceable Incentive Agreement, and loanDepot has also performed all duties and obligations under the Incentive Agreement, as well.

210.     As set forth above, the Individual Defendants breached (and threaten to breach) their Agreements by, among other things: (1) using and disclosing loanDepot's Confidential Information; (2) removing Confidential Information from loanDepot; and (3) failing to return loanDepot's Confidential Information to loanDepot upon the termination of their respective employments. Bowman, Smolin, and Siegel also plainly engaged in unlawful conduct and breached their Agreements by soliciting and inducing loanDepot employees to terminate their employment with loanDepot, and Baske plainly breached her agreement by soliciting loanDepot customers.

211.     As a direct and proximate result of the above-referenced breaches, among others known and to be discovered, loanDepot suffers and continues to suffer damages, including, but not

limited to, lost business, lost profits, costs of hiring and retaining former and new employees, and costs of retaining customers, among other things.

212. Pursuant to the above-referenced Agreements, loanDepot is entitled to injunctive relief.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(FOR INJUNCTIVE RELIEF AGAINST INDIVIDUAL DEFENDANTS)**

213. loanDepot incorporates the preceding allegations as if fully set forth herein.

214. As employees of loanDepot, the Individual Defendants owed fiduciary duties to loanDepot, including the duties of loyalty and good faith.

215. The Individual Defendants breached their fiduciary duties of loyalty to loanDepot by knowingly and intentionally acting adverse to loanDepot's interests during their employment with loanDepot by: (a) soliciting loanDepot employees to leave loanDepot and join CrossCountry; (b) using loanDepot information for the benefit of CrossCountry; (c) planning a group departure designed to harm loanDepot; (d) diverting business opportunities to CrossCountry; and/or (e) using loanDepot resources to promote the Individual Defendants with customers even after the Individual Defendants joined CrossCountry.

216. Because of the Individual Defendants' actions, loanDepot has suffered, and will continue to suffer, damages and loss.

217. The Individual Defendants' actions were intentional, willful, outrageous, and malicious.

218. loanDepot has also suffered, and will continue to suffer, immediate and irreparable harm as a result of such breaches, and if Defendants are not enjoined, loanDepot will continue to suffer such injury. Injunctive relief is necessary as loanDepot is without an adequate remedy at law to prevent this harm to loanDepot.

**COUNT V**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR DAMAGES**
**AGAINST CROSSCOUNTRY)**

219.     loanDepot incorporates the preceding allegations as if fully set forth herein.

220.     The Individual Defendants and CrossCountry knew that their conduct breached the Individual Defendants' and other loanDepot employees' duty of loyalty to loanDepot.

221.     The Individual Defendants and CrossCountry gave each other substantial assistance, incentives, and/or encouragement to breach the Individual Defendants' and other loanDepot employees' respective fiduciary duties.

222.     Because of the Individual Defendants' and CrossCountry's conduct, loanDepot has suffered damages and loss, in an amount to be determined at trial (with respect to CrossCountry).

223.     loanDepot has also suffered, and will continue to suffer, immediate and irreparable harm as a result of such aiding and abetting of breaches of fiduciary duty, and if Defendants are not enjoined, loanDepot will continue to suffer such injury. Injunctive relief is necessary as loanDepot is without an adequate remedy at law to prevent this harm to loanDepot.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(AGAINST CROSS COUNTRY)**

224.     loanDepot incorporates the preceding allegations as if fully set forth herein.

225.     loanDepot is a party to valid Agreements with the Individual Defendants.

226.     Upon information and belief, CrossCountry was aware of the Agreements from times preceding the breaches thereof.

227.     CrossCountry permitted and/or encouraged the breaches of the Agreements (the "Breaches"), and intentionally and without justification induced the Breaches with malicious intent, through improper means, and for an improper purpose.

228.     loanDepot suffered actual damages as a result of the Breaches.

229. loanDepot suffered and will continue to suffer immediate and irreparable harm as a direct result of the above conduct. If not enjoined, CrossCountry will induce further breaches of the Agreements and other loanDepot employee agreements, which will result in additional damages and irreparable harm to loanDepot. Injunctive relief is necessary as loanDepot is without an adequate remedy of law to prevent this harm to loanDepot.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR DAMAGES**
**AGAINST CROSSCOUNTRY)**

230. loanDepot incorporates the preceding allegations as if fully set forth herein.

231. loanDepot has and had protectable business relationships with all of the loanDepot employees that left loanDepot for CrossCountry, as well as the customers that CrossCountry and the Individual Defendants solicited/induced or attempted to solicit/induce to leave loanDepot (the "Prospective Business Relationships").

232. loanDepot had a reasonable expectation that: (1) its employees will continue their employment with loanDepot; and (2) its customers will continue utilizing loanDepot for its services.

233. loanDepot would have had greater prospective business advantage with the Prospective Business Relationships, absent improper interference.

234. At all relevant times, CrossCountry and the Individual Defendants had knowledge of the Prospective Business Relationships.

235. CrossCountry and the Individual Defendants permitted and/or encouraged the Breaches, induced the Breaches, and/or induced loanDepot's customers/employees to leave loanDepot by their acts described above, and have thereby interfered with loanDepot's prospective business advantage.

236.    CrossCountry's and the Individual Defendants' actions, described herein, were done purposefully and with malicious and unjustifiable intent, through improper means, and for an improper purpose.

237.    As a direct and proximate result of the above activities, loanDepot has suffered and will continue to incur actual damages, including, but not limited to, lost business, lost profits, and the costs of hiring and retaining former and new employees, among other things.

238.    CrossCountry and the Individual Defendants succeeded in ending loanDepot's relationship with its employees and customers, and interfering with loanDepot's expectancy in those Prospective Business Relationships, causing damage to loanDepot.

239.    loanDepot has suffered and will continue to suffer immediate irreparable harm unless CrossCountry and the Individual Defendants are enjoined. Injunctive relief is necessary as loanDepot is without an adequate remedy at law to prevent this harm to loanDepot.

240.    Punitive damages and attorneys' fees are warranted (with respect to CrossCountry in this action) due to the malicious nature of the above conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** loanDepot demands judgment against Defendants as follows:

1.    A temporary and preliminary injunction, enjoining and restraining: (a) the Individual Defendants, and anyone acting in concert with them, including CrossCountry, from violating, or participating in the violation of, any of the terms of their respective Agreements; (b) CrossCountry, and anyone acting in concert with it, from interfering with any of the Individual Defendants' Agreements with loanDepot; (c) Defendants, and anyone acting in concert with them, from (i) contacting, soliciting, or servicing any customer, prospective customer, or referral source about whom the Individual Defendants possessed or learned confidential information about while employed at loanDepot, including but not limited to any person listed on any document misappropriated by the

Individual Defendants from loanDepot; and (ii) from soliciting or employing any employee of loanDepot; (d) Defendants, and anyone acting in concert with Defendants, from utilizing, divulging, disclosing, or misusing any loanDepot Confidential Information (as defined by the Individual Defendants' Agreements with loanDepot) and trade secrets;

2.     An Order requiring Defendants to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Amended Verified Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between the Individual Defendants (or any of the other loanDepot employees that joined CrossCountry); between CrossCountry and the Individual Defendants (or any of the other loanDepot employees that joined CrossCountry); between Defendants and any loanDepot employee; and between Defendants and any loanDepot customer, prospective customer, or referral source;

3.     An Order granting preliminary and (with respect to CrossCountry) permanent injunctive relief in accord with Paragraph 1 above, and as separately may be requested at a preliminary injunction hearing and any trial;

4.     An Order (with respect to CrossCountry) awarding loanDepot its actual and exemplary damages (including, for willful and malicious misappropriation, double actual and unjust enrichment damages under 765 ILCS § 1065/4 and 18 U.S.C § 1836(b)(3)(C)), in an amount to be determined at trial;

5.     An Order (with respect to CrossCountry) awarding loanDepot its pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs for this action (including attorneys' fees and costs under 765 ILCS § 1065/5 and 18 U.S.C § 1836(b)(3)(C) for willful and malicious misappropriation); and

6.     An Order (with respect to CrossCountry) awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

/s/ James M. Witz

James M. Witz
*jwitz@littler.com*
Colton D. Long
clong@littler.com
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1000
Chicago, Illinois 60654
(312) 372-5520

Jessica F. Pizzutelli (*admitted pro hac vice*)
*jpizzutelli@littler.com*
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York 14450
(585) 203-3400
**Attorneys for Plaintiff**

Dated: September 26, 2022

## VERIFICATION

Under penalty of perjury, pursuant to 28 U.S.C. § 1746, the undersigned, Tom Fiddler, hereby verifies that he is a Senior Vice President, Production at loanDepot.com, LLC, and as such is authorized to make this Verification on behalf of Plaintiff; that he has read the foregoing First Amended Verified Complaint and knows the contents thereof; and that the statements set forth in the First Amended Verified Complaint are true and correct, except as to matters therein stated to be on information and belief, which are true to the best of his knowledge and belief.

Tom Fiddler

Date: 9/26/22

## <u>CERTIFICATE OF SERVICE</u>

James M. Witz, an attorney, hereby certifies that, on September 26, 2022, he caused the foregoing ***First Amended Verified Complaint*** to be filed electronically with the Clerk of the Court, using the court's CM/ECF system, which sent a true and correct copy to all counsel of record, including counsel for Noyes, who is represented by existing counsel of record.


*/s/ James M. Witz*
James M. Witz