## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

loanDepot.com, LLC,

        Plaintiff,

    v.

STEVE SCHNEIDER, CINDY SMOLIN,
SAMANTHA SIEGEL, FERNANDA
BASKE, BOB BOWMAN, and CROSS
COUNTRY MORTGAGE, LLC,

        Defendants.

No. 22-cv-1874

Judge Edmond E. Chang

Magistrate Judge Sheila M. Finnegan

## CROSSCOUNTRY'S OPPOSITION TO
## LOANDEPOT'S MOTION TO DISMISS ITS COUNTERCLAIMS

Brent D. Knight
JONES DAY
110 N. Wacker Drive
Suite 4800
Chicago, Illinois 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bdknight@jonesday.com

Michael A. Platt (admitted *pro hac vice*)
JONES DAY
NorthPoint
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-7221
Facsimile: (216) 579-0212
maplatt@jonesday.com

*Attorneys for Defendant
CrossCountry Mortgage, LLC*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL ALLEGATIONS ...................................................................................... 1

ARGUMENT .............................................................................................................. 6

I.  THIS COURT HAS JURISDICTION OVER ALL CROSSCOUNTRY
    COUNTERCLAIMS AND THERE IS NO PERSUASIVE REASON TO
    DECLINE HEARING THEM ......................................................................... 6

    A.  This Court Has Jurisdiction Over CrossCountry's Counterclaims ...................... 6

    B.  loanDepot's Jurisdictional Analysis Is Factually and Legally Flawed .............. 11

        1.  There Is No Basis to Decline Supplemental Jurisdiction Under
            § 1367(c) ............................................................................................ 12

        2.  loanDepot's Attempt to Distinguish Permissive Claims From
            Compulsory Claims Is Wrong .............................................................. 15

II.  CROSSCOUNTRY HAS SUFFICIENTLY STATED A CLAIM FOR
     COUNTS VI THROUGH XII ......................................................................... 17

    A.  CrossCountry's Abuse of Process Claim (Count XII) Is Adequately Pled ........ 18

    B.  CrossCountry's Lanham Act Claims (Counts VI and VII) Are Adequately
        Pled ...................................................................................................................... 20

    C.  CrossCountry Adequately Pled ICFA And IDPTA Claims (Counts VIII
        and IX) Based On The Same Conduct As Its Lanham Act Claims .................... 25

    D.  CrossCountry Adequately Pled ICFA And IDTPA Claims (Counts X and
        XI) Based on loanDepot's No-Document Loans ................................................ 29

CONCLUSION ........................................................................................................... 30

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Accurate Leather & Novelty Co. v. LTD Commodities Inc.*,
  No. 90 C 6304, 1990 WL 205865 (N.D. Ill. Dec. 7, 1990) ..................................................... 21

*Adams Street Joint Venture v. Harte*,
  231 F.Supp.2d 759 (N.D. Ill. 2002) ...................................................................................... 10

*Alan Ross Machinery Corporation v. Machinio Corporation*,
  No. 17-cv-3569, 2018 WL 6018603 (N.D. Ill. Nov. 16, 2018) ............................................... 24

*Alexander Binzel Corp. v. Nu–Tecsys Corp.*,
  No. 91 C 2092, 2000 WL 310304 (N.D. Ill. 2000) ................................................................. 26

*Ammerman v. Sween*,
  54 F.3d 423 (7th Cir. 1995) .................................................................................................. 8

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
  572 F.3d 440 (7th Cir. 2009) ................................................................................................ 6

*ATC Healthcare Services, Inc. v. RCM Technologies, Inc.*,
  192 F.Supp.3d 943 (N.D. Ill. 2016) ..................................................................................... 26

*Athey Products Corp. v. Harris Bank Roselle*,
  89 F.3d 430 (7th Cir. 1996) ................................................................................................. 26

*Avalos v. IAC/Interactivecorp*,
  No. 13-CV-8351 (JMF), 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014) ................................. 24

*Avery v. State Farm Mut. Auto Ins. Co.*,
  835 N.E.2d 801 (Ill. 2005) .................................................................................................. 29

*Baer v. First Options of Chicago, Inc.*,
  72 F.3d 1294 (7th Cir. 1995) ................................................................................................ 7

*BCBSM, Inc. v. Walgreen Co.*,
  512 F.Supp.3d 837 (N.D. Ill. 2021) ..................................................................................... 30

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 17

## TABLE OF AUTHORITIES
(continued)

*Bhatia v. Vaswani*,
No. 18-cv-2387, 2020 WL 3578004 (N.D. Ill. July 1, 2020) ................................................... 14

*BlueStar Management v. The Annex Club, LLC*,
No. 09 C 4540, 2010 WL 2802213 (N.D. Ill. July 12, 2010) ................................................. 25

*Catilina Nominees Proprietary Ltd. v. Stericycle, Inc.*,
No. 15-CV-10734, 2021 WL 5140478 (N.D. Ill. Nov. 4, 2021) ............................................ 22

*Center for Dermatology and Skin Cancer, Ltd. v. Burwell*,
770 F.3d 586 (7th Cir. 2014) .................................................................................................... 6

*Channell v. Citicorp Nat. Servs., Inc.*,
89 F.3d 379 (7th Cir. 1996) ..................................................................................................... 16

*City of Chi. v. Int'l Coll. of Surgeons*,
522 U.S. 156 (1997) ................................................................................................................. 13

*Community Bank of Trenton v. Schnuck Markets, Inc.*,
887 F.3d 803 (7th Cir. 2018) ................................................................................................... 26

*Coplea v. Bybee*,
8 N.E.2d 55 (Ill. App. Ct. 1937) ............................................................................................. 18

*Cox v. City of Indianapolis*,
No. 1:19-cv-01393-JMS-DLP, 2019 WL 2295465 (S.D. Ind. May 30, 2019) ........................ 13

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) ................................................................................................... 29

*Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*,
546 N.E.2d 33 (Ill. App. Ct. 1989) .......................................................................................... 27

*DR Distributors, LLC v. 21 Century Smoking, Inc.*,
No. 12 CV 50324, 2014 WL 6622544 (N.D. Ill. Nov. 20, 2014) ............................................. 7

*Dyson, Inc. v. Bissell Homecare, Inc.*,
951 F.Supp.2d 1009 (N.D. Ill. 2013) ...................................................................................... 25

*Dyson, Inc. v. Sharkninja Operating LLC*,
259 F.Supp.3d 816 (N.D. Ill. 2017) ........................................................................................ 21

## TABLE OF AUTHORITIES
(continued)

Page(s)

*E.E.O.C. v. Concentra Health Servs., Inc.*,
 496 F.3d 773 (7th Cir. 2007) ........................................................................... 17

*FireBlok IP Holdings, LLC v. Hilti, Inc.*,
 No. 3:19-cv-50122, 2021 WL 6049964 (N.D. Ill. Dec. 21, 2021) ......................... 28

*Gross v. Town of Cicero*,
 No. 03 C 9465, 2005 WL 1126542 (N.D. Ill. May 3, 2005) ................................... 16

*Guild Mortg. Co. LLC v. CrossCountry Mortg. LLC*,
 No. C21-1376-JCC-MLP, 2022 WL 1078574 (W.D. Wash. Apr. 11, 2022) ........................ 15

*Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*,
 551 F.3d 599 (7th Cir. 2008) ........................................................................... 13

*Heck v. Humphrey*,
 512 U.S. 477 (1994)......................................................................................... 18

*Helene Curtis Indus., Inc. v. Milo Corp.*,
 No. 84 C 5217, 1985 WL 1282 (N.D. Ill. May 2, 1985) ......................................... 19

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
 191 F.3d 813 (7th Cir. 1999) ........................................................................... 21

*Houskins v. Sheahan*,
 549 F.3d 480 (7th Cir. 2008) ............................................................................. 8

*Imperial Apparel, Ltd. v. Cosmo's Desi.gner Direct, Inc.*,
 853 N.E.2d 770 (Ill. App. Ct. 2006) ................................................................... 28

*In re Peral Resources LLC*,
 No. 20-31585, 2022 WL 3590593 (Bank. S.D. Tex. Aug. 23, 2022)...................... 12

*In re Repository Technologies, Inc.*,
 601 F.3d 710 (7th Cir. 2010) ............................................................................. 8

*Innovative Design Enterprises, Inc. v. Circulair, Inc.*,
 No. 95 C 6670, 1997 WL 534891 (N.D. Ill 1997).................................................. 21

*International Union of Operating Eng'rs v. Lowe Excavating Co., Inc.*,
 No. 98 C 7956, 1999 WL 350650 (N.D. Ill. May 21, 1999) ................................... 18

## TABLE OF AUTHORITIES
(continued)

Page(s)

*International Union of Operating Engineers, Local 150, AFL-CIO v. Ward,*
    563 F.3d 276 (7th Cir. 2009) ....................................................................... 7

*Kroll v. United States,*
    58 F.3d 1087 (6th Cir. 1995) ....................................................................... 6

*Kumar v. Bornstein,*
    820 N.E.2d 1167 (Ill. App. Ct. 2004) ....................................................... 18

*Leipzig v. AIG Life Ins. Co.,*
    362 F.3d 406 (7th Cir. 2004) ..................................................................... 16

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    No. 92 C 7768, 1999 WL 47061 (N.D. Ill. Jan. 21, 1999) ....................... 18

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014)...................................................................... 20, 21, 23

*LG Electronics U.S.A., Inc. v. Whirlpool Corp.,*
    809 F.Supp.2d 857 (N.D. Ill. 2011) .......................................................... 26

*Lynam v. Foot First Podiatry Ctrs., P.C.,*
    919 F.Supp. 1141 (N.D. Ill. 1996) .............................................................. 8

*Martin v. Living Essentials, LLC,*
    653 Fed.App'x 482 (7th Cir. 2016) ........................................................... 21

*Martin v. Wendy's International, Inc.,*
    183 F.Supp.3d 925 (N.D. Ill. May 2, 2016)............................................... 23

*Marvellous Day Elec. (S.Z.) Co., Ltd. v. Ace Hardware Corp.,*
    No. 11 C 8756, 11 C8768, 2013 WL 4565382 (N.D. Ill. Aug. 27, 2013) ......................... 27, 28

*McCoy v. Iberdrola Renewables, Inc.,*
    760 F.3d 674 (7th Cir. 2014) ....................................................................... 7

*Medscript Pharmacy, LLC v. My Script, LLC,*
    77 F.Supp.3d 788 (N.D. Ill. 2015) ...................................................... 21, 22

*Microthin.com, Inc. v. Siliconezone USA, LLC,*
    No. 06 C 1522, 2006 WL 3302825 (N.D. Ill. Nov. 14, 2006)..................... 7

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Miller v. Easy Day Studious Pty Ltd.*,
No. 20cv02187-LAB-DEB, 2021 WL 4209205 (S.D. Cal. Sept. 16, 2021) ............................ 24

*Montecatini Edison, S.P.A. v. Ziegler*,
486 F.2d 1279 (D.D.C. 1973) ................................................. 11

*Moreland v. Club 390 Corp.*,
No. 18 C 7441, 2019 WL 13076638 (N.D. Ill. Aug. 26, 2019) ................................. 24

*Ocean Tomo, LLC v. Barney*,
No. 12 C 8450, 2014 WL 2619505 (N.D. Ill. June 12, 2014) ................................. 10

*Pace v. Timmermann's Ranch and Saddle Shop Inc.*,
795 F.3d 748 (7th Cir. 2015) .......................................... 11, 18

*Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*,
657 F.Supp. 1486 (N.D. Ill. 1987) ...................................... 26, 27

*Patel v. Zillow, Inc.*,
No. 17 C 4008, 2018 WL 2096453 (N.D. Ill. May 7, 2018) ................................. 28

*Power Tools & Supply, Inc. v. Cooper Power Tools, Inc.*,
No. 05-CV-73615-DT, 2007 WL 1218701 (E.D. Mich. Apr. 20, 2007) .............................. 12

*Prolite Building Supply, LLC v. MW Manufacturers, Inc.*,
891 F.3d 256 (7th Cir. 2018) ................................................. 8

*Republic Technologies (NA), LLC v. BBK Tobacco & Foods, LLP*,
No. 16C 3401, 2022 WL 910862 (N.D. Ill. Mar. 29, 2022) ................................. 29

*Rocha v. Rudd*,
826 F.3d 905 (7th Cir. 2016) ................................................. 23

*Rothman v. Emory University*,
123 F.3d 446 (7th Cir. 1997) ................................................. 16

*Royal Towing, Inc. v. City of Harvey*,
350 F.Supp.2d 750 (N.D. Ill. 2004) ...................................... 10, 13

*Sanchez & Daniels v. Koresko*,
503 F.3d 610 (7th Cir. 2007) .......................................... 8, 16

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Sapperstein v. Hager*,
    188 F.3d 852 (7th Cir. 1999) ........................................................ 6

*Siegel v. Shell Oil Co.*,
    656 F.Supp.2d 825 (N.D. Ill. 2009) ........................................... 28

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) ...................................................... 6

*Spaulding Moving and Storage, Inc. v. National Forwarding Co., Inc.*,
    No. 07 C 4905, 2008 WL 781929 (N.D. Ill. Mar. 20, 2008) .................. 17

*Switzer Bros., Inc. v. Locklin*,
    207 F.2d 483 (7th Cir. 1953) ...................................................... 11

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ............................................... 1, 17

*Thacker v. Menard, Inc.*,
    105 F.3d 382 (7th Cir.1997) ...................................................... 26

*United States v. Park*,
    389 F.Supp.3d 561 (N.D. Ill. 2019) ........................................... 17

*USAA Fed. Sav. Bank v. PLS Fin. Servs., Inc.*,
    260 F.Supp.3d 965 (N.D. Ill. 2017) ........................................... 30

*VitalGo, Inc. v. Kreg Therapeutics, Inc.*,
    No. 16-cv-5577, 2017 WL 6569633 (N.D. Ill. Dec. 21, 2017)................. 23

*Vulcan Golf, LLC v. Google Inc.*,
    552 F.Supp.2d 752 (N.D. Ill. 2008) ........................................... 27

*Weifang Tengyi Jewelry Trading Co. v. Intuii LLC*,
    No. 18 C 4651, 2019 WL 3889626 (N.D. Ill. Aug. 19, 2019)................. 18

*WorldCom, Inc. v. Transcend Allegiance, Inc.*,
    No. 97 C 6150, 1998 WL 111636 (N.D. Ill. Mar. 6, 1998) ........... 18, 19, 20

*Yucas v. Peoples Nat. Bank*,
    No. 09-609-GPM, 2010 WL 1416140 (S.D. Ill. Apr. 1, 2010) ................. 9

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Zurich American Ins. Co. v. Watts Industries, Inc.*,
   417 F.3d 682 (7th Cir. 2005) ............................................................................................... 14

**STATUTES**

15 U.S.C. § 1127 ............................................................................................................................ 20

28 U.S.C. § 1331 ............................................................................................................................ 12

28 U.S.C. § 1367 ..................................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) .................................................................................................................. 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 6, 17

Fed. R. Civ. P. 8 ........................................................................................................................... 17

Fed. R. Civ. P. 9 ........................................................................................................................... 23

**INTRODUCTION**

loanDepot.com, LLC's ("loanDepot") motion to dismiss CrossCountry Mortgage, LLC's ("CrossCountry") counterclaims is a masterclass in confusion. loanDepot lays out a rigid, complex jurisdictional framework delving into long-rejected distinctions between permissive and compulsory counterclaims while seeking to obfuscate the Court's jurisdiction over CrossCountry's federal counterclaims and ignoring the unitary thread that connects the federal and state counterclaims together; namely, loanDepot's efforts to attack CrossCountry after its own unlawful mortgage activity and its failed attempt to merge with CrossCountry to save it from ruin. Because the Court has supplemental jurisdiction over all claims that have even a "loose factual connection" with CrossCountry's federal claims, not to mention the fact that these issues are inextricably intertwined with CrossCountry's affirmative defenses, this Court has jurisdiction over all the counterclaims.

loanDepot's attempt to dismiss Counts VI through XII under Fed. R. Civ. P. 12(b)(6) similarly fails. To survive a motion to dismiss, CrossCountry must overcome "two easy-to-clear hurdles": (1) the claims must be described "in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests;" and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the 'speculative level.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). As discussed below, CrossCountry more than meets that standard here by naming the who, what, where, when, and how of each claim. loanDepot's arguments to the contrary either ignore or misrepresent the allegations.

Accordingly, this Court should deny loanDepot's motion to dismiss in its entirety.

**FACTUAL ALLEGATIONS**

Since mid-2020, loanDepot has engaged in a scheme to defraud and harm consumers,

thwart lawful competition, and attack CrossCountry, one of its primary competitors. It began with loanDepot's decision to take the company public in 2021. (Countercl. ¶ 16.) In preparation for its Initial Public Offering, loanDepot was desparate to boost its financial performance to inflate its stock price. (*Id.*) To do that, loanDepot's then-CEO, Anthony Hsieh, directed the company to undertake a pattern of illegal conduct in an effort to close more loans, thereby boosting the company's outlook. (*Id.*)

Mr. Hsieh believed that loanDepot was being overly cautious in the underwriting process, and thus believed that loanDepot was closing loans more slowly than it should (or not at all), which harmed the company's overall financial performance. (*Id.* at ¶ 17.) As loanDepot—and indeed the world—knows well, the underwriting process is a crucial part of the home mortgage lending process. (*Id.* at ¶ 18.) With an eye towards the IPO, and with complete disregard for the law, Mr. Hsieh directed loanDepot to close loans without any underwriting process at all. (*Id.* at ¶ 20.) Specifically, on or about August 26, 2020, Mr. Hsieh directed that loanDepot "must immediately close loans regardless of documentation." (*Id.* at ¶ 21.) In October 2020, Mr. Hsieh repeated this directive, stating in a meeting recalled by former loanDepot Chief Operating Officer Tamara Richards that loans should be closed without any underwriting at all:

> Close all loans . . . close without credit reports . . . close without documentation . . . close all loans! We are setting records every month and have grown staffing and capacity, but it's not enough! Trust our borrowers and close loans without documents! I already paid taxes on these loans and the loans are already shown as revenue.

(*Id.* at ¶ 22.) In conjunction with this directive, Ms. Hsieh ordered the executive staff to instruct their sales team to close no-document loans, ordering that 200 loan processors should each close 100 loans per month without documentation to clear a backlog. (*Id.* at ¶ 24.)

Soon after, on November 16, 2020, Mr. Hsieh issued a new order, code named "Project Alpha," pursuant to which loanDepot identified more than 8,000 loans to be closed without

documentation using a select group of loan processors to undertake the task. (*Id.* at ¶ 25.) Because selectively processing loans is a violation of federal law (*id.* at ¶ 26), Mr. Hsieh directed loanDepot's Chief Credit Officer to ignore thousands of loans and not audit them. (*Id.* at ¶ 27.) A substantial part of this scheme occurred in Illinois, where the top seven loanDepot loan originators closed nearly $450 million in loans in 2020. (*Id.* at ¶ 28.) For a shortwhile, the scheme worked. On February 11, 2021, the day of loanDepot's IPO, it's stock price was $14 per share and it eventually rose to $31 per share. (*Id.* at ¶ 30.) As of June of this year, after the illegal scheme was revealed, the stock price had fallen to just $1.40 per share. (*Id.*)

Knowing that its illegal activities would eventually come to light (as they did), loanDepot sought to hide its inflated financial performance by finding a white knight to save it from collapse. (*Id.* at ¶ 32.) This strategy was not just a ruse to hide its inflated stock price; it was also related to internal strife and serious operational problems. (*Id.*) loanDepot was desperate to find a solution. (*Id.* at ¶ 33.) On or about March 26, 2021, Mr. Hsieh and other top loanDepot executives scheduled a call with Ronald Leonhardt, Jr., CrossCountry's CEO, during which Mr. Hsieh proposed a merger between CrossCountry and loanDepot, with Mr. Leonhardt to run the combined company. (*Id.* at ¶ 34.) Mr. Leonhardt rejected the proposal before any details could be discussed. (*Id.* at ¶¶ 34–35.)

Spurned by CrossCountry, and confronted with the reality that it would have to face the consequences of its illegal scheme, loanDepot sought to retaliate. (*Id.* at ¶ 36.) By May 2021, loanDepot's stock price had dropped 50% from the IPO and its loan originators began to flee. (*Id.* at ¶¶ 3, 30.) CrossCountry hired seven former loan-Depot loan originators in California and loanDepot, still stinging from CrossCountry's rejection, sued. (*Id.* at ¶ 37.) During failed negotiations in November 2021, loanDepot's General Counsel made clear that he considered CrossCountry "an adversary to focus on." (*Id.*) But as loanDepot's business continued to

3

decline, and allegations of misconduct at loanDepot were revealed, more loanDepot employees sought refuge at CrossCountry. (*Id.* at ¶ 38.) Indeed, in July of this year, loanDepot announced that it was in the midst of laying off almost 5,000 jobs, over 42% of the company.[1] Yet, loanDepot has continued to bring litigation against CrossCountry for recruiting employees and lawfully competing with loanDepot, including this case. (*Id.* at ¶¶ 69–73.)

loanDepot has also targeted CrossCountry by wrongfully using the names and likenesses of some of the Individual Defendants, in an effort to divert customers from closing a mortgage loan at CrossCountry. (*Id.* ¶¶ 65–68.) Specifically, loanDepot sent marketing emails from the – loanDepot email addresses of Steve Schneider, Cindy Smolin, and Samantha Siegel in March 2022—nearly two months after they resigned from loanDepot—which falsely gave the impression that they still worked for loanDepot. (*Id.*) The email was disseminated to their entire customer mailing list. An excerpt from that email is shown below, which specifically includes a link titled "LEARN MORE!" directly above the loan originators name:



(Mot. to Dismiss, Ex. 1.) This email undoubtedly would cause someone who received it to

---

[1] *See* loanDepot, Inc. SEC Form 8-K, filed July 12, 2022 (reporting that loanDepot is "rightsiz[ing] staffing levels from approximately 11,300 at year-end 2021 to approximately 6,500 by year-end 2022").

believe that Smolin (or Schneider or Siegel) was still at loanDepot and could be contacted there to close a loan. Early discovery has confirmed this confusion; for instance, Siegel received a text message from a confused recipient stating "I thought you didn't work at loanDepot." (*See* INDIVDEF_005112 (Mar. 17, 2022 text message from Siegel: "My friend just texted me confused saying I thought you don't work at loanDepot," providing a screenshot of the email).)

As yet another prong of its attack on CrossCountry, loanDepot sought to steal and misappropriate CrossCountry's protected trade secrets. From early to mid-2022, loanDepot hired several CrossCountry loan officers, including Christopher Vondra, Kirstie Holmes, and Char Ulmer (collectively the "Former CrossCountry Employees"). (Countercl. at ¶ 40.) These individuals each signed employment agreements with CrossCountry containing covenants prohibiting disclosure of confidential information and prohibiting the solicitation of employees or customers and referral sources during and after their employment with CrossCountry. (*Id.* at ¶¶ 44–45.) loanDepot, with full knowledge of these obligations, induced and conspired with the Former CrossCountry Employees to steal protected information and CrossCountry customers. For instance, Vondra stole at least three customer files containing sensitive information that loanDepot used to run credit inquiries for those customers. (*Id.* at ¶ 58.) Holmes forwarded multiple spreadsheets containing non-public data for over 50 CrossCountry customers she had worked with, including loan amount, loan type, interest rates, and the names of leads she obtained from CrossCountry, all to be used at loanDepot. (*Id.* at ¶ 59.) And Ulmer sent at least 25 emails to himself regarding CrossCountry customer leads, including correspondence with at least 18 customers and sent customer files from his CrossCountry email account to his loanDepot email account, including credit scores, underwriting reports, and his loan pipeline. (*Id.* at ¶ 60.)

5

## ARGUMENT

loan Depot asserts two reasons for dismissal of CrossCountry's counterclaims: (1) that the Court lacks jurisdiction over any of the counterclaims, and (2) that certain claims fail to state a claim under Rule 12(b)(6). As demonstrated below, these arguments fail because the Court has jurisdiction due to the fact that all counterclaims form part of the same case or controversy, and CrossCountry has easily surpassed its pleading burden to survive a Rule 12(b)(6) motion.

## I.    THIS COURT HAS JURISDICTION OVER ALL CROSSCOUNTRY COUNTERCLAIMS AND THERE IS NO PERSUASIVE REASON TO DECLINE HEARING THEM.

A motion to dismiss pursuant to Rule 12(b)(1) is "meant to test the sufficiency of the complaint, not to decide the merits of the case." *Center for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). In deciding a motion to dismiss based on subject matter jurisdiction, "the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). The "issue is not whether a plaintiff will ultimately prevail but whether he is entitled to offer evidence to support the claims." *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999). Indeed, in some cases, it "may appear on the face of the pleadings that a recovery is very remote and unlikely[,] but that is not the test." *Id.* (citing *Kroll v. United States*, 58 F.3d 1087, 1090 (6th Cir. 1995)). Instead, jurisdictional challenges, like those asserted here, "require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). CrossCountry has met that requirement here.

### A.    This Court Has Jurisdiction Over CrossCountry's Counterclaims.

As a threshold matter, this Court necessarily has federal-question jurisdiction over Counts I (DTSA), VI (False Association—Lanham Act), and VII (False Advertisement—

6

Lanham Act) of CrossCountry's counterclaims, as each of those claims arise under federal law. (Countercl. ¶ 12.) loanDepot does not—and cannot—dispute that this Court has subject matter jurisdiction to hear these federal law counterclaims. *See, e.g.*, *International Union of Operating Engineers, Local 150, AFL-CIO v. Ward*, 563 F.3d 276, 281 (7th Cir. 2009) ("For purposes of exercising federal jurisdiction under § 1331, such a claim 'arises under' federal law if the law in question creates a federal cause of action.") (citations omitted).

As such, the question as to the remaining state law counterclaims is whether the Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) because they form part of the "same case or controversy" as CrossCountry's DTSA and Lanham Act claims. (Countercl. ¶ 13 (alleging the Court has supplemental jurisdiction "over the remaining counts in the Counterclaim because they form part of the same case or controversy as the Defend Trade Secrets Act claim or the Lanham Act claim")); *see also DR Distributors, LLC v. 21 Century Smoking, Inc.*, No. 12 CV 50324, 2014 WL 6622544, *2-3 (N.D. Ill. Nov. 20, 2014) (finding supplemental jurisdiction over state law counterclaims where they related to the defendant's federal counterclaims, even if they had no relation to plaintiff's original claims).

Under § 1367(a), a district court has jurisdiction over all claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Seventh Circuit has explained that "Section 1367(a) 'authorizes the district courts to exercise jurisdiction to the full extent of Article III's "case or controversy" requirement.'" *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 682 (7th Cir. 2014) (citing *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1299 (7th Cir. 1995)). "Claims form part of the same case or controversy when they 'derive from a common nucleus of operative fact.'" *Id.* at 683. The Seventh Circuit has repeatedly held that "a loose factual

7

connection between the claims is generally sufficient."[2] *Id.*; *accord Houskins v. Sheahan*, 549

F.3d 480, 495 (7th Cir. 2008); *Sanchez & Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007);

*Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995). Importantly, "the supplemental claims

may be separate claims or they may be different counts or grounds or theories in support of what

is essentially a single claim, as long as the claim revolves around a central fact pattern." *Lynam*

*v. Foot First Podiatry Ctrs., P.C.*, 919 F.Supp. 1141, 1148 (N.D. Ill. 1996). The underlying facts

and circumstances are determinative of the supplemental jurisdiction inquiry, not the claims

themselves, and courts have found that "supplemental jurisdiction is appropriate when the

supplemental claim involves the ***same parties***, contracts, and ***course of action*** as the claim

conferring federal jurisdiction." *Prolite Building Supply, LLC v. MW Manufacturers, Inc.*, 891

F.3d 256, 258 (7th Cir. 2018) (emphasis added). Thus, the question is whether the "federal and

state law claims are so entangled that the entire lawsuit should be resolved in federal court." *In*

*re Repository Technologies, Inc.*, 601 F.3d 710, 727–28 (7th Cir. 2010).

The federal and state claims are "so entangled" here. First, the facts underlying Counts II

(Illinois Trade Secrets Act), III (tortious interference with contract), IV (tortious interference

with economic advantage), and V (aiding and abetting breach of fiduciary duty) all are based on

the same core fact allegations as CrossCountry's federal Defend Trade Secrets Act claim

(Count I). Specifically, for each of these counts, CrossCountry alleges that as a result of their

duties, the Former CrossCountry Employees had access to non-public personal information of

potential borrowers, and that information was protected by CrossCountry in a password-

---

[2] Although loanDepot cites *Microthin.com, Inc. v. Siliconezone USA, LLC* for the proposition that "[g]enerally, it is insufficient that the state and federal claims share a factual background." loanDepot leaves out the preceding sentence in the court's opinion, which states that "a loose factual connection is usually enough to satisfy the requirements of supplemental jurisdiction." No. 06 C 1522, 2006 WL 3302825, *3 (N.D. Ill. Nov. 14, 2006) (citations and quotations omitted). Thus, while merely sharing some factual background may not be enough, it is sufficient that there is a loose factual connection between the operating facts underlying the claims.

protected database. (Countercl. ¶¶ 48, 78, 93.) CrossCountry alleges that loanDepot conspired

with and induced these Former Employees to steal non-public customer data and use it to solicit

customers on behalf of loanDepot. (*Id.* at ¶¶ 109–14.) CrossCountry further alleges that the

Former Employees each had employment agreements pursuant to which they agreed that non-

public personal information was a trade secret, and which prohibited the Former Employees from

soliciting customers or prospective customers for two years following termination of their

employment. (*Id.* at ¶¶ 49–56.) Ultimately, CrossCountry alleges that loanDepot knew of the

Former CrossCountry Employees' employment agreements and fiduciary duties but nonetheless

induced and conspired with them to misappropriate trade secrets and improperly solicit

customers. This conduct not only violated the DTSA and the Illinois Trade Secrets Act, but also

amounted to tortious interference with both the Former CrossCountry Employees' employment

agreements and CrossCountry's business relationships with loan customers, *and* caused the

Former CrossCountry Employees to breach their fiduciary duties to CrossCountry. Thus, there

can be no doubt that all these claims arise from the same "nucleus of operative fact"—indeed,

loanDepot uses supplemental jurisdiction for the exact same claims against CrossCountry in this

very suit. (*See* loanDepot Compl. ¶ 26 (ECF No. 1).)

Similarly, the facts underlying Counts VIII (Illinois Uniform Deceptive Trade Practices

Act—False Advertisement/Association) and IX (Illinois Consumer Fraud Protection Act—False

Advertisement/Association) form part of the same "nucleus of operative fact" as CrossCountry's

Lanham Act claims (Counts VI and VII). There can be no real dispute about this. The claims

mirror each other and assert the same conduct—loanDepot's unlawful use of the names and

likenesses of Schneider, Smolin, and Siegel for marketing purposes—as grounds for the claims.

*See Yucas v. Peoples Nat. Bank*, No. 09-609-GPM, 2010 WL 1416140, *3 (S.D. Ill. Apr. 1,

2010) (supplemental jurisdiction exists where "the questions of state law mirror the questions of

federal law.").

Next, Count X (Illinois Uniform Deceptive Trade Practices Act—No Document Loans) and Count XI (Illinois Consumer Fraud Protection Act—No Document Loans) relate to *both* CrossCountry's DTSA (Count I) and Lanham Act (Counts VI and VII) claims. Indeed, the allegations in Counts X and XI provide the impetus for the conduct alleged in the federal counts. To wit, loanDepot's unlawful no-document underwriting scheme, which was orchestrated in an attempt to inflate its financial performance in anticipation of an IPO (Countercl. ¶¶ 16–31), directly necessitated its efforts to merge with CrossCountry. (*Id.* at ¶¶ 32–39.) After being spurned by CrossCountry, loanDepot made concerted efforts to retaliate against CrossCountry by targeting and stealing its employees and trade secrets (Count I). It also suffered a flood of lost customers and exiting employees once its no-document loan scheme was revealed, which caused it to try to retain those customers by mispresenting that Schneider, Smolin, and Seigel were still employees of loanDepot (Counts VI and VII). Put simply, the only way to fully understand CrossCountry's federal trade secret and Lanham Act counts is to hear evidence of loanDepot's no-document loan scheme. The interconnectedness of these claims militates strongly in favor of supplemental jurisdiction for CrossCountry's no-document loan counterclaims. *See, e.g.*, *Adams Street Joint Venture v. Harte*, 231 F.Supp.2d 759, 763 (N.D. Ill. 2002) (finding supplemental jurisdiction where state and federal claims would both require the court to examine the nature of the relationship between the parties, which were the basis for all subsequent allegations, including claims of breach of contract, RICO, fraud, and breach of fiduciary duty); *Royal Towing, Inc. v. City of Harvey*, 350 F.Supp.2d 750, 755 (N.D. Ill. 2004) (finding supplemental jurisdiction where the allegations portrayed "an ongoing pattern of hostilities that occurs over a period of time" that explained the motive behind the defendant's conduct and plaintiff's federal claims); *Ocean Tomo, LLC v. Barney*, No. 12 C 8450, 2014 WL 2619505, at *4 (N.D. Ill. June

10

12, 2014) (finding that a party's "alleged motive is relevant to both the federal and state claims," and on that basis alone, there was a "common nucleus of operative fact" for state law claims).

Lastly, this Court has supplemental jurisdiction over Count XII (abuse of process). To prevail on a claim for abuse of process, one of the elements CrossCountry must prove is "the existence of an ulterior purpose or motive." *Pace v. Timmermann's Ranch and Saddle Shop Inc.*, 795 F.3d 748, 757 (7th Cir. 2015). That "ulterior purpose or motive" will be proven here with facts and evidence related to the malicious targeting of CrossCountry after it rejected loanDepot's merger proposal, which includes its theft of trade secrets and its unlawful marketing of CrossCountry's employees as its own. loanDepot's conduct in this very lawsuit, including seeking an overbroad TRO against CrossCountry based on overstated trade secret claims and its omission of evidence such as the Individual Defendants' employment agreements that explicitly state that customer contact information may be kept by the Individual Defendants, is the basis for this claim. Thus, there is at the very least a "loose factual connection" between the federal claims in this case and loanDepot's abuse of process.

In short, all of CrossCountry's state law counterclaims arise from the same pattern of conduct. This Court accordingly has supplemental jurisdiction over those claims.

## B.    loanDepot's Jurisdictional Analysis Is Factually and Legally Flawed.

loanDepot makes multiple, disjointed arguments as to why this Court should decline to hear CrossCountry's counterclaims despite the fact that it has jurisdiction over them. These arguments ultimately fail in the face of Seventh Circuit precedent that firmly establishes that once a party properly alleges that a court has jurisdiction over its counterclaims, the court does not have discretion to dismiss them. *See Switzer Bros., Inc. v. Locklin*, 207 F.2d 483, 488 (7th Cir. 1953), *cert. denied*, 347 U.S. 912 (1954) (rejecting plaintiff's contention that a permissive counterclaim is "a matter of discretion" for the court, and instead holding that "a party who has a

11

counterclaim, either compulsory or permissive in form, has a right to file it" if the court has jurisdiction); *see also Montecatini Edison, S.P.A. v. Ziegler*, 486 F.2d 1279, 1282 (D.D.C. 1973) (holding that Rule 12 "is not intended to confer any discretion upon the court with respect to a permissive counterclaim. If he elects to plead it, the ***court must entertain it*** so long as it is within the court's subject matter jurisdiction.") (emphasis added); *In re Peral Resources LLC*, No. 20-31585, 2022 WL 3590593, *8 (Bank. S.D. Tex. Aug. 23, 2022) ("Rule 13(b) affords discretion to the movant, not the court, by stating that a pleading *may* state a counterclaim") (emphasis in original); *Power Tools & Supply, Inc. v. Cooper Power Tools, Inc.*, No. 05-CV-73615-DT, 2007 WL 1218701, *3 (E.D. Mich. Apr. 20, 2007) ("once properly pleaded, a court has no discretion to refuse to consider a permissive counterclaim").

Here, CrossCountry has properly alleged that Counts I, VI, and VII satisfy 28 U.S.C. § 1331 because the claims raise a federal question. The Court has no discretion to decline jurisdiction over these claims. Further, CrossCountry has properly alleged supplemental jurisdiction over the remaining counterclaims because they form part of the "same case or controversy" as the federal law counterclaims. 28 U.S.C. § 1367(a). Thus, the only way the Court can decline supplemental jurisdiction over the state law claims is if loanDepot can establish one or more of the specifically enumerated grounds in 28 U.S.C. § 1367(c). But, as discussed below, loanDepot is unable to do so, and its attempt to avoid this result by imposing a heightened pleading standard for permissive counterclaims likewise fails.

### 1. There Is No Basis to Decline Supplemental Jurisdiction Under § 1367(c).

Under 28 U.S.C. § 1367(c), a court may decline to exercise supplemental jurisdiction over a claim under § 1367(a) only if: "(1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court

has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). In considering these factors, a court "should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (quotation omitted). Importantly, "while a district court may relinquish its supplemental jurisdiction if one of the conditions of § 1367(c) is satisfied, it is not required to do so." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008) (citation omitted). Here, loanDepot cannot establish that any of the grounds in §1367(c) support dismissal of CrossCountry's counterclaims.

loanDepot first argues that Counts X and XI should be dismissed under §1367(c)(2) because those counts would substantially predominate over other claims. In considering whether supplemental claims substantially predominate, courts consider whether "the claims based on federal law depend on the outcome of those based on state law." *Royal Towing*, 350 F.Supp.2d at 759. The crux of the issue is "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be . . . left for resolution to state tribunals." *Cox v. City of Indianapolis*, No. 1:19-cv-01393-JMS-DLP, 2019 WL 2295465, at *3 (S.D. Ind. May 30, 2019) (citations omitted). Here, no such concerns exist. As discussed above, far from predominating, Counts X and XI are connected to CrossCountry's federal Lanham Act and DTSA claims because the acts by loanDepot that form the basis for Counts X and XI, namely loanDepot's closing of no-document loans and its failed merger offer to CrossCountry, are the impetus for their subsequent actions targeting CrossCountry's employees and trade secrets and its efforts to pass off CrossCountry's employees as its own. The issues are inextricably intertwined. Nor are

13

the federal claims dependent on the state law claims, such that the outcome of the federal claims are determined by the state law claims. loanDepot may be found liable for CrossCountry's federal claims, regardless of the outcome of the claims based on its no-document loans.

loanDepot next argues that "exceptional circumstances" exist for all CrossCountry counterclaims because those claims—including the federal claims—would "unduly complicate" the litigation. This is demonstrably false. Putting aside that the Court has no discretion to dismiss the federal counterclaims, all the issues presented by CrossCountry's counterclaims would be subject to discovery in this case in any event because the entire narrative of loanDepot's conduct is wrapped up in CrossCountry's affirmative defenses, including the defense of unclean hands. CrossCountry's counterclaims also will not proliferate the issues for discovery or trial. For instance, CrossCountry's counterclaims relating to misappropriation of trade secrets and related claims (Counts I through V) mirror the claims in loanDepot's Complaint. Courts have held that when counterclaims are "essentially responses to the state-law claims in the complaint . . . it makes sense and serves judicial economy to try them in the same case . . . rather than sending them to a different court for resolution." *Bhatia v. Vaswani*, No. 18-cv-2387, 2020 WL 3578004, *7 (N.D. Ill. July 1, 2020).

Moreover, given the procedural posture of this case, the counterclaims do not delay or prejudice loanDepot's claims in any way.[3] The Court has ordered expedited discovery over loanDepot's claims, which is scheduled to be completed by the end of November. At that point, loanDepot will be in a position to seek a preliminary injunction, which if granted, will provide

---

[3] In its footnote 5, loanDepot argues that Counts VI through IX, which are similar to the Individual Defendants' claims, should not be brought here because those claims between loanDepot and the Individual Defendants are subject to arbitration per the employment agreements between those parties. Regardless of the merits of this contention, this argument is unavailing because CrossCountry is not bound by a contract it did not sign. *See Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (finding "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit").

loanDepot substantial relief on their claims (and if not granted, likely will be based on a determination its claims lack merit in the first place). CrossCountry's counterclaims have not and will not interfere with this process. But CrossCountry *would* be prejudiced by dismissing or severing its claims. CrossCountry alleges a prolonged scheme to commit fraud on the market, and to harm CrossCountry specifically. Each of the counterclaims must be presented in the same forum to be properly understood. Severing them would improperly burden CrossCountry and force it to put on multiple showings of the same evidence for its claims and defenses.

loanDepot's citation to *Guild Mortg. Co. LLC v. CrossCountry Mortg. LLC* does not aid its case. No. C21-1376-JCC-MLP, 2022 WL 1078574 (W.D. Wash. Apr. 11, 2022). That case involved a rejection of a request to amend the responsive pleading to add counterclaims. Not only does the amendment of pleadings require a wholly different analysis, but the court primarily focused on the fact that the counterclaims would bring in claims from another state. That is not the case here. Each of CrossCountry's counterclaims here—with the exception of two of the employees loanDepot improperly recruited to misappropriate trade secrets—involve Illinois activity and actions, and/or claims under Illinois law. (Countercl. ¶¶ 28, 31, 41, 66, 69, 91–101, 135-168.) Accordingly, there is no persuasive reason for this Court to decline supplemental jurisdiction. In the interests of "judicial economy, convenience, fairness, and comity," this Court should not decline jurisdiction under § 1367(c) as to CrossCountry's state law counterclaims.

**2.    loanDepot's Attempt to Distinguish Permissive Claims From Compulsory Claims Is Wrong.**

Because loanDepot cannot substantiate a basis for the Court to decline to exercise jurisdiction under the appropriate tests, loanDepot misstates the law regarding permissive counterclaims throughout its Motion in an effort to create a higher standard for CrossCountry. Contrary to loanDepot's assertions, however, the Seventh Circuit has held that the distinction

between compulsory and permissive counterclaims is irrelevant to the question of jurisdiction, and has explicitly instructed courts not to undertake the analysis. *See Channell v. Citicorp Nat. Servs., Inc.*, 89 F.3d 379, 385 (7th Cir. 1996) (instructing courts not to consider whether counterclaims are compulsory or permissive, and instead, the court need only consider § 1367(a).). Indeed, although the distinction may have been relevant at one time, the Seventh Circuit has explained that it is no longer useful because the test for supplemental jurisdiction under 28 U.S.C. § 1367 ("same case or controversy") is broader than the test for a compulsory counterclaim under Federal Rule of Civil Procedure 13(a) ("arises out of the transaction or occurrence that is subject matter of the opposing party's claim"). *See Channell*, 89 F.3d at 385-86 (discussing why distinction between compulsory and permissive counterclaims is unnecessary, and instead instructing courts to "use the language of [§ 1367] to define the extent of their powers"); *see also Gross v. Town of Cicero*, No. 03 C 9465, 2005 WL 1126542, *1 (N.D. Ill. May 3, 2005) (Section 1367 "allows district courts to maintain supplemental jurisdiction over counterclaims, whether compulsory or permissive"); *Sanchez & Daniels*, 503 F.3d at 614 ("The somewhat narrower 'same transaction or occurrence' test that was used before the adoption of § 1367 no longer governs."). The Seventh Circuit could not be more clear on this point:

> Prior to the enactment of § 1367, our case law clearly provided that federal courts have supplemental jurisdiction over compulsory counterclaims, but not over permissive counterclaims. *See Unique Concepts, Inc. v. Manuel*, 930 F.2d 573, 574–75 (7th Cir.), *aff'd*, 937 F.2d 622 (Fed. Cir. 1991). Now, § 1367 provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). ***This language now permits district courts to maintain supplemental jurisdiction over counterclaims, whether compulsory or permissive, so long as the counterclaims "are so related to" the original claims that they form the same case or controversy***.

*Rothman v. Emory University*, 123 F.3d 446, 454 (7th Cir. 1997); *see also Leipzig v. AIG Life*

*Ins. Co.*, 362 F.3d 406, 410 (7th Cir. 2004) ("Even a permissive counterclaim, if part of the same case or controversy . . . may be brought under the supplemental-jurisdiction statute, 28 U.S.C. § 1367(a), ***without an independent basis of jurisdiction***) (emphasis added); *Spaulding Moving and Storage, Inc. v. National Forwarding Co., Inc.*, No. 07 C 4905, 2008 WL 781929, *2 (N.D. Ill. Mar. 20, 2008) ("the Seventh Circuit holds that ***supplemental jurisdiction may be exercised over a permissive counterclaim that does not have an independent basis of jurisdiction*** . . . .") (emphasis added). Thus, if CrossCountry's counterclaims satisfy § 1367(a)—and they do—this Court has jurisdiction to hear them.

## II. CROSSCOUNTRY HAS SUFFICIENTLY STATED A CLAIM FOR COUNTS VI THROUGH XII.

In determining whether to grant a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the [claimant], accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo*, 526 F.3d 1081 (citations omitted). To survive a motion to dismiss, the complaint must overcome "two easy-to-clear hurdles": (1) the claims must be described "in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests;" and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the 'speculative level.'" *Id.* at 1084 (citing *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). Thus, a complaint "need only provide a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Id.* at 1081 (citing Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Any ambiguities must be construed in favor of the claimant. *See United States v. Park*, 389 F.Supp.3d 561, 570 (N.D. Ill. 2019).

### A.    CrossCountry's Abuse of Process Claim (Count XII) Is Adequately Pled.

CrossCountry has sufficiently stated an abuse-of-process claim under Illinois law.  Abuse

of process means the "perversion" of process "[through an] illegal object or purpose for which

such process was not legally intended."  *Coplea v. Bybee*, 8. N.E.2d 55, 59 (Ill. App. Ct. 1937)

(internal citation omitted). "The *only* elements necessary to plead a cause of action for abuse of

process are:  (1) the existence of an ulterior purpose or motive and (2) some act in the use of

legal process not proper in the regular prosecution of the proceedings."  *Pace*, 795 F.3d at 757

(citing *Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004)); *see also WorldCom,*

*Inc. v. Transcend Allegiance, Inc.*, No. 97 C 6150, 1998 WL 111636, *3 (N.D. Ill. Mar. 6, 1998)

(stating same elements).  Courts will consider the circumstances occurring before process has

issued in determining whether the abuse of process claim is actionable.  *See International Union*

*of Operating Eng'rs v. Lowe Excavating Co., Inc.*, No. 98 C 7956, 1999 WL 350650 (N.D. Ill.

May 21, 1999) (finding an abuse of process claim under Illinois law adequately alleged where

lawsuit was alleged to have been filed in effort to force defendant into recognizing plaintiff as

defendant's collective bargaining representative).  And allegations that a party "attempted to

abuse the litigation process after it filed its lawsuit" is sufficient to state a claim.  *WorldCom*,

1998 WL 111636, at *3; *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994) ("The gravamen of

[abuse of process] is not the wrongfulness of the prosecution, but some extortionate perversion

of lawfully initiated process to illegitimate ends.").  Consistent with this proposition, courts have

held that abusive post-complaint conduct, including seeking a TRO on improper grounds, is

actionable.  *See Weifang Tengyi Jewelry Trading Co. v. Intuii LLC*, No. 18 C 4651, 2019 WL

3889626, *5 (N.D. Ill. Aug. 19, 2019) (finding abuse of process properly alleged where "Intuii

alleges not just that Weifang moved for a TRO . . . but that Weifang—after learning that the

premise on which the TRO had been granted, that Intuii was a foreign counterfeiter, was

18

incorrect—used the leverage the TRO created to force Intuii to choose between having its business shut down and paying an exorbitant settlement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, No. 92 C 7768, 1999 WL 47061, *2 (N.D. Ill. Jan. 21, 1999) ("Some of Milberg's abusive conduct occurred after Lexecon filed its answer.").

Thus, in *WorldCom*, the court denied a motion to dismiss an abuse-of-process counterclaim where the defendant/counterplaintiff alleged that the plaintiff—a former employer like loanDepot that sued its former employees and their new employer for breach of contract, tortious interference with business relations, and unfair competition—abused the litigation process through its post-filing conduct. The court found the counterclaimant properly pled that the plaintiff was engaging in an on-going scheme to drive up legal expenses, discourage others from doing business with the new employer, monopolize the market, and destroy competition:

> Allegiance maintains as well that it has alleged "significantly more" than a malicious lawsuit: it claims that WorldCom is allegedly using the suit to generate legal expenses, discourage potential suppliers, and discover Allegiance's business plans and potential employees. WorldCom argues that, under Illinois law, these factors primarily relate to motive, not to abuse of the litigation process after Allegiance filed its complaint. I find that Allegiance states enough facts in its complaint to infer a post-filing misuse of the legal process required for an abuse of process claim.

*WorldCom*, 1998 WL 111636, at *4; *see also Helene Curtis Indus., Inc. v. Milo Corp.*, No. 84 C 5217, 1985 WL 1282, at *2 (N.D. Ill. May 2, 1985) (finding abuse-of-process claim properly pled where claims alleged process was initiated to cause "harassment, economic hardship, and distraction from the marketplace in order to control the market [by] use of legal process which are not proper in the regular prosecution of a lawsuit.").

Here, CrossCountry has alleged among other things that loanDepot is using this lawsuit to quell competition and discourage the legal recruitment of employees. (Countercl. ¶¶ 169–174.) Like *WorldCom*, where abuse of process was sufficiently pled through allegations that

prosecution of the lawsuit was intended to "discourage potential suppliers," CrossCountry has alleged that loanDepot seeks to "chill the recruitment of its loan officers, and to strike fear into any loanDepot loan officer who might wish to search for employment elsewhere." (*Id.* at ¶ 173.); *WorldCom*, 1998 WL 111636, at *4. CrossCountry alleges that by filing this lawsuit and driving up fees and costs—including the costs of a third-party vendor to undertake an overly-broad remediation process—loanDepot is actively seeking to "chill the labor market, so CrossCountry will fear lawfully recruiting from loanDepot." (Countercl. ¶ 69.) Indeed, CrossCountry has alleged that loanDepot's complaint, the seeking of a TRO, and over broad discovery is all part of loanDepot's ongoing, years-long scheme to harm CrossCountry. (*Id.* at ¶ 169–174.) CrossCountry has separately filed a Motion to Modify the TRO in this case that describes loanDepot's abuse of process in obtaining and maintaining the TRO. (*See* ECF No. 99.) Under *WorldCom* and related authority, it is clear, then, that CrossCountry has sufficiently alleged an abuse-of-process claim.

**B.  CrossCountry's Lanham Act Claims (Counts VI and VII) Are Adequately Pled.**

The purpose of the Lanham Act is to "mak[e] actionable the deceptive and misleading use of marks . . . to protect persons engaged in such commerce against unfair competition . . . ." 15 U.S.C. § 1127. Courts have recognized that two primary types of claims fall under the Lanham Act: (1) false association or endorsement under 15 U.S.C. §1125(a)(1)(A); and (2) false advertising under 15 U.S.C. §1125(a)(1)(B). *See, e.g.*, *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014) (the Lanham Act "creates two distinct bases of liability: false association, […], and false advertising").

To plead false association, a plaintiff must show that "false or misleading factual representations are likely to confuse or deceive their audience about the plaintiff's 'affiliation,

connection, or association' with the defendant 'or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities.'" *Martin v. Living Essentials, LLC*, 653 Fed.App'x 482, 484 (7th Cir. 2016) (citing *Lexmark*, 572 U.S. at 121-22)). Courts have recognized a "passing off" theory of liability for false association, finding actionable claims when a competitor uses, for example, a sample or photograph of another's product to represent that it was being sold by the competitor. *See, e.g.*, *Innovative Design Enterprises, Inc. v. Circulair, Inc.*, No. 95 C 6670, 1997 WL 534891, *12 (N.D. Ill 1997) ("'Implied passing off' arises when a party, in an effort to solicit sales of its own product, uses a picture or sample of its competitor's product, implying that the competitor's product is actually its own."); *Accurate Leather & Novelty Co. v. LTD Commodities Inc.*, No. 90 C 6304, 1990 WL 205865, at *2–4 (N.D. Ill. Dec. 7, 1990) (photograph of a plaintiff's product in catalog to sell defendant's inferior product actionable under the Lanham Act). To plead a Lanham Act claim for false advertising, a plaintiff must allege: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *see also Dyson, Inc. v. Sharkninja Operating LLC*, 259 F.Supp.3d 816, 828 (N.D. Ill. 2017); *Medscript Pharmacy, LLC v. My Script, LLC*, 77 F.Supp.3d 788, 795 n.4 (N.D. Ill. 2015).

Here, CrossCountry has adequately pled both false association/endorsement and false advertising under the Lanham Act. For false association, CrossCountry alleges that, months after Schneider, Smolin, and Siegel left their employment at loanDepot, loanDepot sent a marketing email from their loanDepot email accounts *en masse* to customers or potential customers that

21

advertised loanDepot's selection of home loan products. (Countercl. ¶¶ 67, 123, 129.)

CrossCountry alleges that this marketing email, which included the Individual Defendants'

pictures, intentionally gave the false impression to customers that Schneider, Smolin, and Siegel

were still employed at loanDepot and solicited business on that basis. (*Id*. at ¶¶ 67, 124.)

CrossCountry further alleges that this mass email was sent for an improper purpose, confused

customers, and resulted in diversion of business from CrossCountry to loanDepot. (*Id*. at

¶¶ 125–26.) This is more than enough to plead a passing-off theory under the Lanham Act. *See*

*Medscript Pharmacy*, 77 F.Supp.3d at 795 (plaintiff stated Lanham Act claim where it alleged

that competitors used prescription pads with plaintiff's name but defendant's fax numbers);

*Catilina Nominees Proprietary Ltd. v. Stericycle, Inc.*, No. 15-CV-10734, 2021 WL 5140478, *5

(N.D. Ill. Nov. 4, 2021) (plaintiff stated Lanham Act claim where they alleged that the defendant

used promotional materials with false or misleading statements to target specific customers).

 As for false advertising, CrossCountry alleges that loanDepot's emails constituted a false

statement of fact in a commercial advertisement by misleading any customer who received the

mailing into believing that Schneider, Smolin and Siegel were still employed by loanDepot.

(Countercl. ¶ 131.) CrossCountry alleges that these emails materially deceived a large segment

of its audience because it was directed to customers who had previously closed loans with, or

acted as referral sources for, Schneider, Smolin, and Seigel and caused those recipients to click

on the link in the email thinking they would get Schneider, Smolin, or Seigel, but instead were

directed to another loanDepot employee. (*Id.* at ¶¶ 131–32.) CrossCountry further alleges that it

suffered lost revenue and profits as a result of this scheme because loans that otherwise would

have been closed at CrossCountry were diverted to loanDepot because of this confusion. (*Id.* at

¶ 133.) Indeed, early evidence has confirmed these allegations are true. (*See*

INDIVDEF_005112 (Mar. 17, 2022 text message from Samantha Siegel regarding loanDepot's

illegal email: "My friend just texted me confused saying I thought you don't work at loanDepot," providing a screenshot of the email).) Thus, CrossCountry has pled all elements necessary to assert a claim for false advertising under the Lanham Act.

In response to these allegations, loanDepot makes a number of specious arguments. First, it argues that CrossCountry's Lanham Act claims must be assessed under Rule 9(b)'s heightened pleading standard. (Mot. to Dismiss at 18.) Courts in the Seventh Circuit have not resolved the question of which pleading standard applies to Lanham Act claims when they sound in fraud. *See VitalGo, Inc. v. Kreg Therapeutics, Inc.*, No. 16-cv-5577, 2017 WL 6569633, *7-8 (N.D. Ill. Dec. 21, 2017) (discussing how some courts apply Rule 9(b) when claims sound in fraud, while others apply Rule 8(a) for all Lanham Act claims and citing cases in support of same). But even under Rule 9(b), all that must be pled is the "who, what, when, where, and how." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016). And, CrossCountry has done that, as discussed above.

Second, loanDepot erroneously argues that CrossCountry lacks standing to assert Counts VI and VII because it has not alleged proximate economic and reputational injury stemming from loanDepot's illegal email. To have standing under the Lanham Act, a plaintiff must "allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131–32 (describing this requirement as necessary to limit Lanham Act claims to only those that fall within the "zone of interest" of the purpose of the Act). A plaintiff "must show 'economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and . . . that occurs when deception of consumers causes them to withhold trade from the plaintiff.'" *Martin v. Wendy's International, Inc.*, 183 F.Supp.3d 925, 931–32 (N.D. Ill. May 2, 2016) (quoting *Lexmark*, 572 U.S. at 133). CrossCountry has alleged exactly that. loanDepot's false marketing emails targeted customers who had previously closed loans with Schneider, Smolin, and Siegel, with the intent to deceive those customers into believing they still worked

23

for loanDepot. (Countercl. ¶¶ 65–68, 123–27.) CrossCountry alleges that loanDepot redirected

inquiries these customers believed they were sending to Schneider, Smolin, and Siegel to another

loanDepot loan officer and thereby diverted mortgage loans that otherwise would have been

closed by CrossCountry. (*Id*. at ¶¶ 126, 133.) CrossCountry alleges that it suffered lost revenues

and lost profits as a result of loanDepot's actions. (*Id*.) And, CrossCountry alleges that the

email caused reputational harm to CrossCountry by confusing customers in an industry where

relationships between loan originator and customer is crucial. (*Id*. at ¶¶ 125, 132.)

The case law cited by loanDepot in support of its argument that CrossCountry lacks

standing to bring these claims is inapposite. For instance, both *Alan Ross Machinery*

*Corporation v. Machinio Corporation* and *Avalos v. IAC/Interactivecorp* involved claims where

the plaintiff alleged only general confusion in the marketplace, which the respective courts held

was insufficient, standing alone, to constitute loss. No. 17-cv-3569, 2018 WL 6018603, *3

(N.D. Ill. Nov. 16, 2018); No. 13-CV-8351 (JMF), 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014).

Likewise, in *Miller v. Easy Day Studious Pty Ltd.*, the court dismissed a Lanham Act claim

because the plaintiff alleged no financial loss or harm or reputational injury of any sort and was

not even a direct competitor of the defendant. No. 20cv02187-LAB-DEB, 2021 WL 4209205,

*9 (S.D. Cal. Sept. 16, 2021). Here, however, CrossCountry has alleged much more than just

general confusion in the marketplace—it alleges lost revenues and profits on mortgages it would

have otherwise closed if they were not diverted as a result of loanDepot's fraudulent activity.

(Countercl. ¶¶ 126, 133.) That is, CrossCountry alleges a specific injury caused by loanDepot's

conduct. That brings CrossCountry into the "zone of interest" of the Lanham Act. *See Moreland*

*v. Club 390 Corp.*, No. 18 C 7441, 2019 WL 13076638, *3 (N.D. Ill. Aug. 26, 2019) (finding

standing where plaintiffs alleged unauthorized use of their likeness which caused reputational

harm in an industry where reputation was crucial and economic injury because plaintiff and

24

defendant are competitors to the same group of demographics).

Finally, loanDepot's breathless hyperbole regarding the potential consequences of these claims should be disregarded. This is not a case where a "former employer does not immediately take down the employee's bio from its website the second they resign." (Mot. to Dismiss at 21.) loanDepot's fraud was active, not passive.[4] It directly sent an email to all customers and referral sources of specific former employees with the intent to divert business. And it did so *months* after the employees resigned, knowing full well that they no longer worked for loanDepot. Thus, CrossCountry has properly alleged both a passing-off theory and a false-advertising theory under the Lanham Act, and loanDepot's motion to dismiss these claims should be denied.

### C.     CrossCountry Adequately Pled ICFA And IDPTA Claims (Counts VIII and IX) Based On The Same Conduct As Its Lanham Act Claims.

CrossCountry's analogous state law claims under the Illinois Consumer Fraud Act and the Illinois Deceptive Trade Practices Act based on loanDepot's unlawful misrepresentation of Schneider's, Smolin's, and Seigel's employment sufficiently state claims for the same reasons as its Lanham Act claims. Indeed, "Illinois Consumer Fraud and Deceptive Trade Practices Act claims are resolved according to the standard for Lanham Act claims except that for Illinois Consumer Fraud and Deceptive Trade Practices Act claims, a plaintiff must also prove that the defendant intended consumers to rely upon the deception." *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F.Supp.2d 1009, 1029 (N.D. Ill. 2013); *see also BlueStar Management v. The Annex Club, LLC*, No. 09 C 4540, 2010 WL 2802213, *8 (N.D. Ill. July 12, 2010) (holding that because plaintiff stated a claim under the Lanham Act, it also stated a claim under the Consumer Fraud

---

[4] loanDepot attempts to paint the email as a one-off mistake, but CrossCountry alleges it was tactical. (Countercl. ¶¶ 65–68.) Indeed, CrossCountry alleges that loanDepot knowingly sent emails marketing Schneider, Smolin, and Seigel to their clients because it wanted to retain customers that might otherwise leave loanDepot for CrossCountry. (*Id.*) loanDepot's explanation that the email was innocuous does not square with reality, contradicts the well-pled factual allegations, and should not be considered at the motion-to-dismiss stage.

Act and the IDPTA "because the legal inquiry is the same under the Lanham Act as under the Consumer Fraud Act and the Deceptive Trade Practices Act"); *Alexander Binzel Corp. v. Nu–Tecsys Corp.*, No. 91 C 2092, 2000 WL 310304, at *7–8 (N.D. Ill. 2000) ("The elements of a claim under the Illinois Consumer Fraud Act are the same as those under the Lanham Act with the added element that the tortfeasor intend that consumers rely on the deception.") (citing *Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997)).  Here, CrossCountry properly pleaded that loanDepot intended to attract borrowers who otherwise would have closed a loan with CrossCountry through the marketing emails it sent from the accounts of Schneider, Smolin and Siegel.  (Countercl. ¶¶ 68, 124–26, 130–32, 137–39, 144–46.)

loanDepot's arguments for dismissal of CrossCountry's ICFA and IDPTA claims are unavailing.  Specifically, loanDepot argues that the ICFA protects only consumers, and cannot be asserted by non-consumers.  But courts have held for decades that a non-consumer can sue under the ICFA when it is "able to allege that the challenged conduct 'involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.'" *ATC Healthcare Services, Inc. v. RCM Technologies, Inc.*, 192 F.Supp.3d 943, 955 (N.D. Ill. 2016) (citation omitted); *see also Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*, 657 F.Supp. 1486, 1493 (N.D. Ill. 1987) ("businesses have standing to sue under the Consumer Fraud Act to redress competitive injury they suffer when other businesses deceive customers").  Known as the "consumer-nexus test," such a claim requires a showing of a "nexus between the complained of conduct and consumer protection concerns." *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 823 (7th Cir. 2018) (quoting *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996)).  The only question is whether "the challenged practice has a sufficiently close impact on consumers to grant a non-consumer plaintiff a right to bring an action under a consumer-protection statute." *LG Electronics U.S.A.,*

*Inc. v. Whirlpool Corp.*, 809 F.Supp.2d 857, 860 (N.D. Ill. 2011).

Here, CrossCountry has alleged that loanDepot sent the fraudulent email "*en masse* to potential consumers in interstate commerce." (Countercl. ¶¶ 137, 144.) This fraudulent email, as discussed above, clearly implicates consumer protection concerns because it tricked consumers into using loanDepot when those consumers really sought to use loan originators now employed by CrossCountry. Moreover, CrossCountry has alleged that its requested relief would serve the interests of consumers by preventing future harm and rectifying previous wrongs. (*Id.* at ¶ 148.) Courts have held that allegations of misrepresentation and diversion of business, like the claims of fraudulent conduct alleged here, implicate consumer protection concerns. *See, e.g.*, *Vulcan Golf, LLC v. Google Inc.*, 552 F.Supp.2d 752, 777 (N.D. Ill. 2008) (consumer-nexus test met where defendants engaged in a scheme to deceive internet users into going to websites that compete with the plaintiff); *Pain Prevention Lab*, 657 F.Supp. at 1493 (consumer-nexus test satisfied where there were allegations of misrepresentations to the marketplace regarding competing products); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989) (consumer-nexus test satisfied where plaintiff alleged defendant falsely advertised about its prices and services).

Next, loanDepot argues that CrossCountry itself must have been deceived in order to state a claim under the ICFA. Not so. While a consumer may need to allege they were deceived, it is well-established that a non-consumer asserting a claim based on the consumer-nexus test need not make such a showing. Rather, it is sufficient that CrossCountry allege that consumers were deceived, as it has done here. *See, e.g.*, *Marvellous Day Elec. (S.Z.) Co., Ltd. v. Ace Hardware Corp.*, No. 11 C 8756, 11 C8768, 2013 WL 4565382, *5 (N.D. Ill. Aug. 27, 2013) (collecting cases where Illinois state courts "have approved [I]CFA claims by non-consumers where the plaintiff alleges that the defendant intended to deceive consumers, not the plaintiff

27

itself"); *see also Imperial Apparel, Ltd. v. Cosmo's Desi.gner Direct, Inc.*, 853 N.E.2d 770, 782 (Ill. App. Ct. 2006), *rev'd in part on other grounds*, 882 N.E.2d 1011 (Ill. 2008) (reversing dismissal of ICFA claim because "nothing in the Consumer Fraud Act requires that a competitor-plaintiff be deceived by the false representation.") This rule makes sense. If a non-consumer had to allege it was deceived, it could never assert a claim because a non-consumer would always know that the fraudulent activity by another is wrong, and thus they could never be deceived. *See Marvellous Day*, 2013 WL 4565382, *6 ("Allowing a [I]CFA action by a plaintiff who has been damaged by a defendant's attempt to deceive *consumers* furthers the Illinois legislature's purpose in passing the [I]CFA," which is to protect consumers) (emphasis in original). Tellingly, none of loanDepot's citations involve a claim by a non-consumer. *See Patel v. Zillow, Inc.*, No. 17 C 4008, 2018 WL 2096453 (N.D. Ill. May 7, 2018); *Siegel v. Shell Oil Co.*, 656 F.Supp.2d 825 (N.D. Ill. 2009).

Lastly, loanDepot argues that CrossCountry may only seek injunctive relief under the IDPTA, and therefore must plead the likelihood of continuing harm. While it is true that claims arising under the IDPTA require allegations of ongoing harm, *FireBlok IP Holdings, LLC v. Hilti, Inc.*, No. 3:19-cv-50122, 2021 WL 6049964, *4 (N.D. Ill. Dec. 21, 2021), CrossCountry has alleged such harm. (Countercl. ¶¶ 140, 146.) Specifically, CrossCountry alleges that loanDepot wrongfully used the name and likeness of its employees to improperly solicit customers and that loanDepot was able to close loans through that improper solicitation. (*Id.* at ¶¶ 140, 146–47, Prayer for Relief(d).) The harm is ongoing because loanDepot continues to profit from its wrongful actions. And CrossCountry has requested injunctive relief to prevent loanDepot from continuing to use the name and likeness of its employees. (*Id.* at Prayer for Relief(d).) As such, loanDepot's challenges to Counts VIII and IX fail.

### D. CrossCountry Adequately Pled ICFA And IDTPA Claims (Counts X and XI) Based on loanDepot's No-Document Loans.

loanDepot's arguments regarding CrossCountry's ICFA and IDTPA claims for loanDepot's fraudulent practice of authorizing loans without underwriting similarly fail.

First, as above, CrossCountry's claims satisfy the consumer-nexus test. CrossCountry has alleged a fraudulent scheme that harms consumers and the market in general, including mortgage loan industry competitors such as CrossCountry (and all other retail loan companies). (Countercl. ¶¶ 16–31, 159–61.) This conduct is the specific harm that Congress set out to prevent under the Dodd-Frank Act, and clearly causes harm to consumers. (*Id.* at ¶ 160.) Moreover, the conduct allowed loanDepot to undercut all other competitors in the retail mortgage lending industry, causing harm to CrossCountry and others. (*Id.* at ¶ 31.) loanDepot also fails to appreciate that when mortgage loan providers originate a loan, they implicitly certify compliance with the law. Therefore, loanDepot's no-document loan scheme also deceived consumers because the product they received was fraudulently mispresented. (*Id.* at ¶ 153.) And clearly, the harm seeking to be redressed here would benefit consumers—it would provide them with the fundamental protection gauranteed by federal law. (*Id.* at ¶¶ 156–57.)

Second, loanDepot's assertion that CrossCountry failed to allege an Illinois injury is both wrong and disingenuous. Because the ICFA has no extraterritorial effect, to state a claim under the ICFA, a party must allege that the improper activity occurred "primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 853–54 (Ill. 2005). However, the injury alleged need not be solely focused in Illinios. *See Republic Technologies (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16C 3401, 2022 WL 910862, *4 (N.D. Ill. Mar. 29, 2022) (holding that "[i]f all conduct must occur within Illinois . . . the statute which seeks to protect plaintiffs from this kind of harm loses much of its efficacy."). This is a highly fact-specific

inquiry with no bright-line rule. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009). Here, CrossCountry has alleged that the no-document loan conduct inflicted "severe damage on the consuming public, in Illinois and elsewhere." (Countercl. ¶¶ 4, 5.) CrossCountry has alleged significant injury in Illinois because loanDepot has fifteen branches in the state, including nearly *$450 million* in mortgage loans in 2020 alone from the top seven loan originators. (*Id.* at ¶ 28.) It follows that a significant part of loanDepot's illegal scheme must have taken place in Illinois. Accordingly, this is not a case, as loanDepot tries to analogize, where CrossCountry alleged an insignficant connection to Illinois. *See BCBSM, Inc. v. Walgreen Co.,* 512 F.Supp.3d 837, 857 (N.D. Ill. 2021) (dismissing claim where the only alleged connection to Illinois was the defendant's headquarters and the location of a small number of drugstores relative to the Company's U.S. and international presence.[5]); *USAA Fed. Sav. Bank v. PLS Fin. Servs., Inc.*, 260 F.Supp.3d 965, 972 (N.D. Ill. 2017) (dismissing claim where the only alleged connection to Illinois was the defendant's headquarters.).

Finally, CrossCountry has plainly alleged future harm as it relates to the no-document loan practices of loanDepot. (Countercl. ¶¶ 156, 167.) Indeed, CrossCountry brings this claim with the specific purpose of ensuring that loanDepot no longer continues its no-document loan practices.

## <u>CONCLUSION</u>

For the reasons stated above, this Court should deny loanDepot's motion to dismiss in its entirety.

---

[5] Walgreens pled it had 583 stores in Illinois at the time. *See BCBSM*, 512 F. Supp. 3d at 857. This amounts to only approximately 6% of Walgreens' U.S. based stores—which is an even smaller percentage if international operations are taken into account. *See* Walgreens Newsroom, *Store Count by State*, https://news.walgreens.com/press-center/frequently-asked-questions/store-count-by-state.htm (last visited Sept. 22, 2022) (listing 9,021 total U.S. based Walgreens drugstores through August 31, 2020).

Dated: September 28, 2022

Respectfully submitted,

/s/ *Brent D. Knight*
Brent D. Knight
JONES DAY
110 N. Wacker Drive
Suite 4800
Chicago, Illinois 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bdknight@jonesday.com

Michael A. Platt (admitted *pro hac vice*)
JONES DAY
NorthPoint
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-7221
Facsimile: (216) 579-0212
maplatt@jonesday.com

*Attorneys for Defendant*
*CrossCountry Mortgage, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

The foregoing document was served on counsel of record by undersigned counsel on

September 28, 2022 by electronic mail through the Court's CM/ECF system.

*/s/ Brent D. Knight*_____
Brent D. Knight
