**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| loanDepot.com, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-cv-06105 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| STEVE SCHNEIDER, CINDY SMOLIN, | ) | |
| SAMANTHA SIEGEL, FERNANDA | ) | |
| BASKE, BOB BOWMAN, JOHN NOYES | ) | |
| and CROSSCOUNTRY MORTGAGE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This trade-secret and employment-separation case arises out of the departure of five loan consultants who left loanDepot, a home-mortgage company.[1] The five former employees—Steve Schneider, Cindy Smolin, Samantha Siegel, Fernanda Baske, Bob Bowman, and John Noyes (collectively, the Individual Defendants)—left to join one of loanDepot's competitors, CrossCountry Mortgage. On April 15, 2022, the Court entered a Temporary Restraining Order (TRO) against the Defendant. R. 21, TRO;[2] R. 100, First Am. Verified Complaint ¶¶ 1–26.[3] The TRO—which after several agreed-on extensions expired on December 15—enjoined all of the Defendants from using documents containing customer information that loanDepot claims the

---

[1] The Court has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

[2] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[3] The verified first amended complaint is affied to by Tom Fiddler, Senior Vice President of Production for loanDepot. First Am. Verified Complaint at 73. The Court can thus rely on the facts alleged as if they were contained in an affidavit.

Individual Defendants improperly took to CrossCountry. TRO ¶¶ 1, 3. The TRO also mandated the return and remediation (that is, permanent removal from the Defendants' possession) of the documents taken, *Id.* ¶ 4, and prevents the Individual Defendants (but not CrossCountry) from soliciting or inducing current loanDepot employees to terminate their employment with loanDepot or apply to CrossCountry. *Id.* ¶ 2. The parties presented separate but related motions: CrossCountry moves to modify the TRO to remove protections for "basic customer-contact information," whereas loanDepot moves for a preliminary injunction with expanded anti-solicitation protections applicable to all of the Defendants. R. 99, Mot. Modify TRO; R. 112, Pl.'s Resp. and Cross-Mot. For the reasons explained in this Opinion, CrossCountry's motion to modify the expiring TRO is denied and loanDepot's cross-motion for a preliminary injunction is granted in part.

## I. Background

### A. Facts

The facts detailed here are undisputed unless otherwise noted. Before moving to CrossCountry in January 2022, all of the Individual Defendants were Chicago-based loanDepot employees responsible for originating and closing consumer home-loans. First Am. Verified Complaint ¶¶ 2, 29–34. Schneider, Smolin, Siegel, Bowman, and Noyes were loanDepot loan consultants that worked with customers to generate and to negotiate home loans, including the loans' rates, fees, and terms. *Id.* ¶¶ 29–31, 33–34, 42. Baske, unlike the others, was a production assistant for Bowman; she helped Bowman with administrative tasks and marketing, as well as the

management of his loan-pipeline and customer-loan files. *Id.* ¶¶ 50–51. As summarized in the TRO, loanDepot claims that, on their way out, the Individual Defendants accessed, downloaded, and took—in coordination with CrossCountry—confidential client information in violation of federal and Illinois trade-secret laws, as well as in breach of the consultants' employment agreements and fiduciary duties. *Id.* ¶¶ 1, 10–19. loanDepot also claims that Bowman, Smolin, and Siegel further breached their employment agreements by soliciting—again with CrossCountry's help—other loan-Depot employees. *Id.* ¶¶ 1, 3–9.

The Individual Defendants all resigned within around two weeks of each other, starting with Smolin, Siegel, and Bowman on January 16, and ending with Noyes on January 28. First Am. Verified Complaint ¶¶ 87–92. CrossCountry, primarily through its employees Rob Sampson and Beth Lewis, began recruiting the Individual Defendants around December 2021, starting with Bowman. *Id.* ¶ 97. Bowman then helped CrossCountry's Sampson and Lewis communicate with Schneider, Smolin, Siegel, Baske, and Noyes. *Id.* ¶¶ 98–105. For this help, CrossCountry discussed providing Bowman extra compensation in the form of an "override"—a percentage of another's employee's loan closings—from Schneider and Smolin. R. 186-8, Lewis and Bowman Chat 1 at 4; R. 186-39, Lewis and Bowman Chat 2 at 4. And Bowman does now, in fact, receive such an override—which has generated around 3% of his total compensation at CrossCountry—on Smolin's loans, though not on Schneider's. R. 158, Def.'s Resp. at 12. (Bowman and CrossCountry allege that Bowman would get an override for anyone who is part of his team, regardless of any recruitment. *Id.*)

Aside from Bowman, Smolin and Siegel (who is Smolin's daughter) also participated, to some degree, in conversations with CrossCountry about possibly recruiting loan-Depot employees, including Schneider. First Am. Verified Complaint ¶¶ 47, 109–113, 118–119.

Forensic review by loanDepot revealed that, before resigning, each of the Individual Defendants accessed, downloaded, or transmitted customer information from loanDepot's databases, which are password protected and require dual-device authentication. First Am. Verified Complaint ¶ 62. (CrossCountry claims that there is no evidence, other than loanDepot's verified complaint, that the databases are password-protected. Def.'s Resp. at 13.) Starting again with Bowman and his production assistant, in December 2021 and January 2022, Baske sent customer lists, training materials, reference guides and customer-service templates to her personal email. First Am. Verified Complaint ¶¶ 142–145, 155. She also forwarded several customer emails to Bowman at his CrossCountry email address after he had left loanDepot. *Id.* ¶¶ 148, 153. Bowman, for his part, forwarded his loanDepot list of loans to CrossCountry; it included information like interest rates, customer credit scores, and loan types. *Id.* ¶ 146.

Meanwhile, Smolin and Siegel also downloaded information from loanDepot's databases. Siegel, for instance, downloaded—for herself and her mother—several spreadsheets with thousands of entries containing customer names, mailing addresses, phone numbers, and email addresses, as well as sensitive personal data, like birthdates and credit scores, and loan details, like loan amount, appraisal value, and

interest rates. First Am. Verified Complaint ¶ 124. Smolin received—to her personal Google email account—or had access—through Google Drive—to the spreadsheets that her daughter had downloaded, including one labelled "Siegel DB" that she forwarded to a CrossCountry marketing manager. *Id.* ¶¶ 125, 128.

Schneider similarly accessed several spreadsheets from loanDepot's database before he left in late January 2022; these too contained customer-contact information (including work and mobile phone numbers) and, in some cases, sensitive personal information (like employer names) and loan details (like loan-to-value ratios). First Am. Verified Complaint ¶¶ 160–165. On his last day, he plugged a USB drive into his loanDepot computer and copied two spreadsheets with customer-contact information and loan details. Noyes, the last to leave, did similar things on his way out, except that in addition to using a USB drive to download documents, he printed other records. *Id.* ¶ 169. The day before his resignation, Noyes copied (onto the USB) spreadsheets containing customer-contact information, sensitive personal data (like credit scores), and loan details (for example, again, loan-to-value ratios). *Id.* ¶ 170.

Before departing loanDepot the Individual Defendants had all signed, between 2018 and 2022, various Incentive Agreements or Employee Agreements in which they agreed to not disclose confidential company information, like non-public customer data. *Id.* ¶¶ 67–74, 76–81. Those same agreements also contained non-solicitation provisions preventing employees from recruiting their loanDepot colleagues to other companies while employed at the company and also for one year after termination of their employment. *Id.* ¶¶ 74, 82. Earlier, in late 2017, some of the Individual

5

Defendants—specifically Siegel, Smolin, and Schneider—had signed prior agreements that allowed them, unlike the later 2018–2022 ones, to retain the basic contact information of customers or prospects that they had themselves developed, even while employed at loanDepot. Mot. Modify TRO at 6–7; R. 96 Exhs. 4–6, 2017 Key Employee Agreements. Bowman—who joined loanDepot through the acquisition of another lender—had a similar agreement that carried over from his prior employer, which remaining in effect for some time at loanDepot and which also excluded basic customer information from company-confidentiality protections. Mot. Modify TRO at 7 n.2. The later loanDepot agreements—those which do prohibit taking basic customer-contact information—signed by Bowman, Siegel, and Smolin lack a clause to explicitly supersede prior agreements. R. 129, Def.'s Reply at 6; R. 100 Exhs. B–D, 2018–2019 Incentive Agreements. By comparison, the newer loanDepot agreement signed by Schneider did include an explicit superseding clause. Def.'s Reply at 6; R. 100 Exhs. E–J, 2020–2022 Employee Agreements.

### B. Procedural History

After the April 15 issuance of the TRO, which was originally to remain in effect until April 29, the parties conferred and requested that it be kept in place through July 14. R. 22, April 17 Status Report. The goal was to give themselves time to complete expedited discovery for preliminary-injunction proceedings while simultaneously working to complete the ordered—under Paragraph 4 of the TRO—non-party forensic review, return, and remediation of the documents taken by Individual Defendants. *Id*. The Court granted this first extension, as well as four additional agreed

6

extensions of the TRO, and the deadline to complete expedited discovery, through December 15, 2022. R. 23, April 17, 2022 Minute Entry; R. 51, June 2, 2022 Minute Entry (extension through August 29); R. 70, July 29, 2022 Minute Entry (extension through September 30); R. 87, September 13, 2022 Minute Entry (extension through November 30); R. 109, October 11, 2022 Minute Entry (final extension through December 15). CrossCountry filed a motion to modify the TRO, which is now formally moot given the TRO's expiration, but the modification arguments will be considered in the context of loanDepot's pending motion for a preliminary injunction. Specifically, the Court will evaluate whether "basic customer-contact information"—defined by CrossCountry as name, phone number, street address, and email address, Mot. Modify TRO at 2—should not be enjoined.

## II. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). The moving party must show: "(1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) that an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (cleaned up).[4] If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008).

### III. Analysis

In evaluating the preliminary-injunction elements, as discussed next, there is no need to weigh witness credibility via a live, in-court hearing, given the documentary evidence and the nature of the issues. First up is the likelihood of success.

### A. Likelihood of Success

loanDepot must first "demonstrate that [its] claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (cleaned up). In assessing the merits, the Court reviews the current record from a neutral and objective viewpoint, without giving the plaintiff the benefit of the doubt. *Id.* at 791–92.

First, the federal and Illinois trade-secret claims against all of the Defendants can be discussed together because the pertinent elements of those claims overlap. The federal Defend Trade Secrets Act (often referred to as DTSA) allows an "owner of a trade secret that is misappropriated ... [to] bring a civil action ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). For purposes of the DTSA, a "trade secret" is information that the owner has taken reasonable measures to keep secret and that derives independent economic value "from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value" from its disclosure or use. 18 U.S.C. § 1839(3). And "misappropriation"

8

is either: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "(B) disclosure or use of a trade secret of another without express or implied consent" under certain conditions. 18 U.S.C. § 1839(5). "[I]mproper means," in turn, is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).

Similarly, the Illinois Trade Secrets Act (ITSA) authorizes a civil action for "[a]ctual or threatened misappropriation[s]" of trade secrets. The Illinois Act defines trade secrets, misappropriation, and improper means in materially the same way as the DTSA. *Compare* 765 ILCS 1065/2(a), (b), (d), *with* 18 U.S.C. § 1839(3), (5), (6). For both the federal and the Illinois trade-secret statutes, then, the basic question is whether the Defendants (1) misappropriated (2) loanDepot trade secrets.

The answer is yes: given the record evidence at this stage, loanDepot is likely to succeed in showing that the Defendants misappropriated trade secrets.[5] First, the Individual Defendants do not actually dispute that they took client information from loanDepot's servers. Before leaving loanDepot, each of the Individual Defendants

---

[5]CrossCountry cites preliminary injunction cases that did not proceed past the analysis of the likelihood of success—the movants having failed to show that they had some likelihood of winning—to make the argument that loanDepot's motion fails because it did not break out the elements of each of its claims against CrossCountry. Def.'s Resp. at 7–9. But the cited cases do not stand for the proposition that a failure to break out the specific elements of each claim mandates denial of a preliminary-injunction motion. Plus, here loanDepot does extensively argue—supported by facts in the record—that the Defendants violated (or aided and abetted the violation of) trade-secret laws, contractual and fiduciary obligations. Pl.'s Resp. and Cross-Mot at 18–25.

logged on to loanDepot's systems to access, to download, or to transmit (or all three) company records like customer lists, training materials, reference guides, and customer-service templates (Baske did those things), First Am. Verified Complaint ¶¶ 142–145, 155; a list of customer loans, including loan details (those things were done by Bowman), *Id.* ¶ 146; and spreadsheets containing customer-contact information, sensitive personal data, and loan details (committed by Smolin, Siegel, Schneider, and Noyes). *Id.* ¶¶ 124, 160–165, 170. What's more, there is now (after expedited discovery) evidence that CrossCountry accepted the loanDepot documents taken by Individual Defendants. In particular, Charles River Associates, the non-party vendor undertaking the forensic review ordered by the Court in the TRO, has identified many thousands of documents taken from loanDepot and held by CrossCountry in its own internal systems. R. 86, Sept. 9, 2022 Joint Status Report.

CrossCountry argues, however, that it refused to accept loanDepot's confidential information brought by the Individual Defendants and that, in any case, it prohibited access to data transmitted to it from loanDepot. Def.'s Resp. at 3–4, 9–10. But CrossCountry only started blocking access to that type of information in April 2022, as ordered by the Court. TRO; R. 158-14, Meghan Grider ¶ 8. And the contention that CrossCountry refused to accept confidential information—or took adequate measures to refuse it or wall it off—is undermined by the massive quantity of loanDepot documents identified by non-party Charles River in CrossCountry's systems that require return and remediation under the TRO and the agreed-to forensic protocol. Sept. 9,

2022 Joint Status Report. All of the Defendants have misappropriated loanDepot's information.

Moving on to the key question of whether the information qualifies as protectable trade secrets, CrossCountry's primary argument is that a subset of the information taken by the Individual Defendants—basic customer-contact information that CrossCountry requested—cannot qualify as a protectable trade secret. CrossCountry appropriately does not dispute that other personally identifying information and loan details constitute confidential information. Mot. Modify TRO at 8–13. Rather, it contends only that basic customer-contact information is not a protectable trade secret because it is public and loanDepot did not take reasonable measures to keep it secret. *Id.* ¶ 3, 17 n.2; Mot. Modify TRO at 8–13; R. 108, April 14, 2022 Tr. at 22:8–25. Sure, what CrossCountry calls basic contact information—specifically a customer's name, phone number, street address, and email address—might be exposed to the public at large in various ways, such as with a recorder of deeds (name and street address). Or some of the information might be exposed to others on a more limited basis (phone number and email address). But it is the *compilation* of this information specific to *loan* customers that gives the information its economic value. Under Illinois law, customer lists may qualify for trade-secret protection depending on the particular facts. *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 922 (Ill. App. Ct. 2005) ("Whether customers lists are trade secrets depends on the facts of each case.") Here, despite CrossCountry's contention during the TRO proceeding that this kind of information is available at the push of the button, no record evidence supports the notion that the compilation

11

is readily replicable from public sources. Instead, the extensive downloading and spiriting away of the information by the Individual Defendants, and the later downloading by CrossCountry into its system, circumstantially show that basic customer-contact information indeed does have economic value. The reality is that the Defendants really are arguing that the loan industry generally has not treated the customer-contact compilation—this *valuable* compilation—as a trade secret before. But that does not mean that loanDepot was frozen from taking steps to protect the information as a trade secret, so long as all the requisite elements are satisfied.

In the context of the preliminary-injunction motion, there is sufficient evidence to show that loanDepot did take reasonable measures to keep its customer lists secret. In the First Verified Amended Complaint, loanDepot avers (through a representative with knowledge) that its databases are password-protected and that employees have unique credentials that only permit them access to the specific information needed to perform their duties. First Am. Verified Complaint ¶ 62. CrossCountry complains that there is no evidence, other than the sworn complaint, to prove that loanDepot has taken those protective steps. Def.'s Resp. at 13. But there is no reason to think that the affiant, Tom Fiddler, R. 100 at 73, who is the Senior Vice President for Production, would not know what protective steps have been taken by loanDepot. Nor has CrossCountry uncovered anything during discovery to undermine the sworn statements about the protections in place.

CrossCountry also argues that loanDepot cannot claim trade secret protection for basic customer-contact information when loanDepot itself asks for such

information from its new hires and when its own attorney, according to CrossCountry, admitted that loanDepot does not seek to protect it as a trade secret. Mot. Modify TRO at 10–13. As to the first point, there *is* a loanDepot "Marketing Get Started Checklist"—which CrossCountry also referenced in the TRO hearing, April 14, 2022 Tr. at 12:13–13:4—that asks new hires for past and current client contacts. Mot. Modify TRO at 6. But loanDepot also requires that those new hires sign a certification to attest that any information transferred was properly obtained, without violating the law or contractual obligations. R. 112-10, CRM Authorization Form and Certification. So loanDepot's assertions that it keeps basic contact information as a trade secret is consistent with its own new-hire practices.[6] And loanDepot counsel's statement that whether a list of contacts constitutes a trade secret is fact-and-context dependent does not clash with the company's contention here that the contact information that the Individual Defendants took along with sensitive personal data and loan details are— based on the facts and context of this case—a trade secret. In short, the basic customer-contact information taken by the Individual Defendants likely also constitutes loanDepot confidential information protectable as a trade secret.

Returning to the rest of loanDepot's legal claims, on the contractual and fiduciary obligations of the Individual Defendants, there is no dispute that they all signed binding agreements that prohibited the behavior that they engaged in—taking

---

[6]Indeed, a Court-ordered exercise found that, for example, in November 2021 only two of 73 new loanDepot-hires provided the company with customer-contact information—and only *after* attesting that it was legally retrieved—thus suggesting that loanDepot's controls against ill-gotten information are followed. Pl.'s Resp. and Cross-Mot at 14. The magistrate judge presided over expedited discovery with her usual expertise, including on testing this particular new-hire proposition.

customer and loan information and, in the case of some, soliciting their colleagues to change employers. Nor do the Individual Defendants argue that they did not owe fiduciary duties to loanDepot. The only issue in dispute here again is whether basic customer-contact information qualifies for trade-secret protection. CrossCountry argues that because Siegel, Smolin, Schneider, and Bowman once had agreements with loanDepot that allowed them to keep basic customer-contact information after termination, loanDepot cannot now claim trade-secret protection over those contacts. Mot. Modify TRO at 11–12. But all those prior agreements were replaced by new agreements, between 2018 to 2022, that prohibited disclosure of basic customer-contact information. *Id.* ¶¶ 67–74, 76–81; *see Barille v. Sears Roebuck & Co.*, 682 N.E.2d 118, 177 (Ill. App. Ct. 1997) ("It is well settled under the doctrine of merger and the parol evidence rule that a written agreement which is complete on its face supersedes all prior agreements on the same subject matter and bars the introduction of evidence concerning any prior term or agreement on that subject matter."); *see also Kraft v. Number 2 Galesburg Crown Finance Corp.*, 420 N.E.2d 865, 870 (Ill. App. Ct. 1981) ("The doctrine of merger provides that where a subsequent contract is executed which relates to the same subject matter and embraces the same terms as a previous contract, then actions by the parties, based upon the contract, must be based upon the provisions of the subsequently executed contract. The first contract is said to have been merged into the subsequent contract covering the same matters.") It is true that some of the subsequent agreements do not contain an explicit merger provision, but Illinois courts have described the presence of a merger provision as just strengthening

the superseding force of the subsequent contract—not a necessity. *See Barille*, 682 N.E.2d at 177. Here, the Defendants do not contend that the subsequent contracts were not supported by additional consideration beyond the earlier agreements, so there is no basis to simply discard the promised made in the later contracts.

To be sure, it is a point in CrossCountry's favor that for years loanDepot allowed its employees to leave with basic customer-contact information, but that flip-flopping does not refute—at this stage and considering the evidentiary record as a whole—the finding that loanDepot did take reasonable measures in the timeframe relevant to this dispute to keep basic customer-contact information secret. In any case, even setting aside basic customer-contact information, the Individual Defendants likely breached both the older (pre-2018) and newer agreements that they signed between 2018 and 2022 prohibiting disclosure of confidential information—like personally identifying information and loan details—and prohibiting the solicitation of colleagues for new employment.

Finally, CrossCountry is likely to be found liable for aiding and abetting the Individual Defendants' contractual and fiduciary violations, as well as being responsible for tortious interference with contract. The current record shows that CrossCountry, through Rob Sampson and Beth Lewis, worked with Bowman to communicate and recruit loanDepot employees in violation of Bowman's anti-solicitation agreement. *Id.* ¶¶ 98–105. Indeed, it is undisputed that Lewis repeatedly promised extra compensation to Bowman, in the form of an override, for his help with recruiting Schneider and Smolin. Lewis and Bowman Chat 1 at 4; Lewis and Bowman Chat 2

15

at 4. And Bowman does now, in fact, receive an override on Smolin's closed loans at Cross Country. Def.'s Resp. at 12. Aside from Bowman, Smolin and Siegel also talked to CrossCountry about possibly recruiting loanDepot employees, including Schneider. First Am. Verified Complaint ¶¶ 47, 109–113, 118–119. As to the disclosure of confidential information, CrossCountry does not dispute that it requested at least "customer contacts" and "business contacts" from the Individual Defendants. Mot. Modify TRO at 3. As already explained, even that basic contact-information compilation is likely a protected trade secret. But the Individual Defendants took much more than just customer contacts; they also left with sensitive personal information of customers and with customer loan details. And the non-party forensic vendor has now found in CrossCountry's systems thousands of the documents taken by the Individual Defendants that need to be returned or remediated. Sept. 9, 2022 Joint Status Report. In sum, there is a likelihood of success on all of loanDepot's claims against the Defendants.

## B. Inadequate Remedy at Law and Irreparable Harm

The next question is whether a preliminary injunction is necessary to prevent irreparable harm that cannot be "fully rectified by the final judgment after trial." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (cleaned up). "Not every conceivable injury entitles a litigant to a preliminary injunction," *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005), and "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive

relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (cleaned up).

CrossCountry argues that a preliminary injunction is unnecessary for two reasons. One, loanDepot's potential damages could be reasonably quantified because its lost customers "are easily identifiable" and there is "little expectation of long-term customer relationships in the mortgage industry." Def.'s Resp.14–16. And two, because "any potential future harm to loanDepot is already being addressed through [the] remediation" ordered in the TRO. *Id.* at 16–17. On point one, though it is true that loanDepot identifies some specific customer that it thinks it lost because of the Defendants' conduct, Pl.'s Resp. and Cross-Mot. at 7, it is not as if CrossCountry is conceding that there is sufficient proof of causation to calculate damages for all customers found in the disclosed loanDepot-documents that later did business with CrossCountry. Without that type of concession, it likely will be difficult to determine why a customer decided to choose a particular lender. Damages would have to be calculated customer-by-customer, likely devolving into dozens of mini-trials to determine if a customer left or did not borrow through loanDepot because of the Defendants' allegedly illegal conduct or, instead, for other, permissible reasons. And though true that customers shop around for the best-priced loans, there is also no question that loan companies, not just individual loan agents, derive some advantage from maintaining the prior customer relationship—as opposed to being undercut by a former employee. Otherwise, the Individual Defendants would not have worked to

17

extract customer lists from loanDepot's systems and CrossCountry would not have accepted them.

Secondly, the forensic review and remediation ordered by the Court is not complete. The Court has not received any certification from the parties and Charles River that all the documents taken by the Individual Defendants have been returned or removed from the Defendants' possession. Indeed, CrossCountry is presently arguing that a subset of the information taken—basic customer-contact information—should not be returned or remediated. And aside from the documents, there is still the issue of solicitation by the Individual Defendants, some of who have already worked with CrossCountry to recruit their former loanDepot colleagues. On this last point, it is worth repeating that the Court cannot order an improperly solicited employee to return to work for loanDepot. So loanDepot continues to face immediate and irreparable harm without an adequate remedy at law.

### C. Balance of Harms and Public Interest

Finally, the Court, "sitting as would a chancellor in equity," now balances the risks of harm to the Plaintiff and to the Defendants, as well as the public interest. *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The Court's goal in this balancing act is to "minimize the costs of being mistaken" by "weigh[ing] the competing considerations [to] mold appropriate relief." *Stuller*, 695 F.3d at 678 (cleaned up). On the one hand, CrossCountry argues that a preliminary injunction barring the use of the documents taken from loanDepot would result in endless

litigation and restrict consumer choice.[7] Def.'s Resp. at 18. On the other hand, loanDepot points out that the current status quo maintained by the expiring TRO does no (additional) harm to the Defendants. Pl.'s Resp. and Cross-Mot. at 24–25.

The Court agrees that the status quo should be preserved. CrossCountry is not disabled from competing; it can continue to solicit customers that it identifies through a means that is independent of the documents and emails taken from loanDepot. And customers can still independently find CrossCountry. Customers who applied for a loan with CrossCountry between January 17, 2022, and the date of the TRO on April 15 are also excluded from the ban (given the public interest represented by those customers' interests). Shifting gears, it appears that CrossCountry engages in speculation when it asserts that loanDepot will commence litigation against it every time it funds a loan for one of the customers on a loanDepot list, regardless of whether CrossCountry abided by the conditions set by the Court. It should go without saying that loanDepot should not be filing frivolous lawsuits (and there is no evidence that it has). Lastly, as to the public interest, things might be different if CrossCountry and loanDepot constituted a duopoly in the home-loan space. But the reality is that—as CrossCountry suggests, Def.'s Resp. at 15—loan customers have a vast array of choices. So the Court thus is not unduly restricting customer choice. The relative harms and public interest favor maintaining the status quo and issuing a preliminary injunction.

---

[7]CrossCountry also argues that the nationwide no-solicitation bar requested by loanDepot would carry heavy costs. Def.'s Resp. at 18–20. But because that broad of an injunction is not proper (as the Court will later explain), the Court does not need to consider CrossCountry's equitable arguments about it.

### D. Scope and Order

Having determined that a preliminary injunction should be issued, the Court must now determine its scope. As already explained, it is likely that basic customer-contact information, in addition to sensitive customer-personal information and loan details, also are covered by the definition of a protectable trade secret. So the Court will not carve out an exception for it, but rather continue to enjoin its use and mandate its removal or remediation. That leaves just loanDepot's argument that the preliminary injunction should include a nationwide bar prohibiting CrossCountry from enticing or encouraging (or rewarding) any current or former employee of loanDepot to violate their contractual or fiduciary obligations. Pl.'s Resp. and Cross-Mot at 25.

There are two major problems with loanDepot's proposed bar. The first is that it is vague, overbroad, and constitutes an improperly generalized 'obey-the-law' command. *See, e.g.*, *Lineback v. Spurlino Materials*, LLC, 546 F.3d 491, 504 (7th Cir. 2008) (explaining that injunctions that merely instruct the enjoined parties from obeying the law are overbroad and increase the "likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful"). Injunctions must be specific and concrete, so they must describe in "reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

The second major problem is that the proposed nationwide bar bears almost no connection to loanDepot's specific claims in this specific case. That is, the amended complaint does not include any nationwide allegations like, for instance, a

hypothetical claim that CrossCountry has engaged in a national recruiting campaign that aided and abetted the violation of non-solicitation agreements by loanDepot's employees in different states. Rather, loanDepot's actual claims focus specifically on the actions of the Individuals Defendants in Illinois and on CrossCountry's collaboration with those specific individuals. loanDepot does not suggest that the Court has personal or subject matter jurisdiction over any nationwide claim that might support the issuance of a national injunction. Not surprisingly, loanDepot points the Court to alleged facts *outside* of the scope of its case-specific claims. The company raises the prospect of supposed CrossCountry recruitment in California, Georgia, and Minnesota, as well as in New York, where the federal court issued a TRO against CrossCountry. *loanDepot v. CrossCountry*, et al., 22-cv-5971 (S.D.N.Y. September 15, 2022). It is well outside the scope of this case for the Court to estimate the scope and impact of CrossCountry's supposed national recruitment on loanDepot's thousands of employees; it is also unclear if loanDepot is suggesting that discovery in this case should include allegations of recruitment in Georgia, Minnesota, and New York (where another case is already ongoing). In short, loanDepot's proposed nationwide no-solicitation bar is improper as vague, overboard, and detached from the localized claims made in this case.

## Preliminary Injunction

For the reasons explained in this Opinion, IT IS HEREBY ORDERED THAT:

1.     The Individual Defendants, and anyone acting in concert with them, including CrossCountry, are preliminarily enjoined and restrained from directly or indirectly:

      a.     contacting or soliciting any customer or prospective customer listed on any document or email identified in (i) Appendix A to this Order; (ii) any documents in the Individual Defendants' possession after they left loanDepot that contain consumer information that was received from or prepared for customers while the Individual Defendants were still employed by loanDepot; and (ii) any document that was downloaded from or contains customer information that was downloaded from loanDepot's systems or databases, and that the Individual Defendants still have in their possession after leaving loanDepot.

      b.     This Paragraph 1 does *not* apply to customers who (i) have closed a loan with CrossCountry between January 17, 2022, through April 15, 2022; or (ii) customers who had a loan application or refinancing application pending with CrossCountry as of April 15, 2022.

      c.     Furthermore, this Paragraph 1 does *not* apply to customers or prospective customers whom the Individual Defendants or CrossCountry identifies through a means that is independent of the documents and emails set forth in Paragraph 1(a).

2.      The Individual Defendants preliminarily shall not solicit or induce, directly or indirectly, any employee of the Plaintiff to terminate their employment with the Plaintiff or apply for employment at CrossCountry.

3.      All of the Defendants, and anyone acting in concert with them, are preliminarily enjoined and restrained from accessing, utilizing, relying on, divulging, disclosing, transferring, reproducing, copying, storing, distributing, or misappropriating (i) the documents listed in Appendix A to this Order; (ii) any documents in the Individual Defendants' possession after they left loanDepot that contain consumer information that was received from or prepared for customers while the Individual Defendants were still employed by loanDepot; and (iii) any document that was downloaded from or contains customer information that was downloaded from loanDepot's systems or databases, and that the Individual Defendants still have in their possession after leaving loanDepot.

4.      All of the Defendants shall return *all* copies of (i) the documents listed in Appendix A to this Order; (ii) any documents in the Individual Defendants' possession after they left loanDepot that contain consumer information that was received from or prepared for customers while the Individual Defendants were still employed by loanDepot; and (iii) any document that was downloaded from or contains customer information that was downloaded from loanDepot's systems or databases, and that the Individual Defendants still have in their possession after leaving loanDepot. The Defendants shall bear the costs of the return and the remediation.

23

5.    Although the Court is still not entering a preservation order, the Defendants are warned that they must ensure a complete and fulsome litigation hold. Given the forensic-examination results, the absence of corresponding records and emails on the other side of communications will be highly suspicious.

6.    The Plaintiff shall maintain the $75,000 deposit with the Clerk of the Court as security for this Order.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 20, 2022

## Appendix A

All Cindy's Contacts-2022-01-02-18-43-55.xlsx
Main DB.xlsx
Marketing Ideas.docx
Marketing Ideas.pdf
contacts db.xlsx
Main Funded DB.xlsx
THKG Goodies 2021 ALL.xlsx
THKG Goodies 2021 agents.xlsx
Holiday Gift 2020 v2.xlsx
Cindy's Funded Loans Amount Product--2022-01-02-17-25-05.xlsx
Cindy's Funded Loans Amount Product-2022-01-02-18-12-59.xlsx
Cindy's Funded Loans Amount Product-2022-01-03-08-56-41.xlsx
Cindy's Funded Loans Amount Product-2022-01-11-13-14-49.xlsx
Cindy's Funded Loans Amount Product-2022-01-11-13-18-59.xlsx
Cindy's Funded Loans Amount Product-2022-01-11-13-44-14.xlsx
All Cindy's Contacts-2022-01-11-17-44-53.xlsx
All Cindy's Contacts-2022-01-11-18-03-05.xlsx
All Cindy's Contacts- 2022-01-11-18-12-37.xlsx
Main Funded DB(AutoRecovered).xlsx
Siegel DB.xlsx
"Leaderboard" email (Para 97)
"Google Sheets" – "Smolin Loan Pipeline"
"Google Sheets" – "Pre-Approval Tracker"
Contacts-2022.xlsx
All My Contacts-2022-01-23-14-11-06.xlsx
Funded Version 1.xlsx
LO DB – Funded YTD-2022-01-23-16-03-33.xlsx
LO DB – Funded YTD – 2022-01-26-22-03-46.xlsx
LO DB – Funded YTD – 2022 -01-23-14-32-12.xlsx
LO DB – Funded YTD – 2022-01-26-22-04-40.xlsx
Clients 7-26-2021.xlsx
Copy of Funded 2018 to Present with Cont-2019-05-31-07-05-34.xlsx
Copy of Funded 2018 to Present with Cont-2019-09-10-05-21-52.xlsx
All Funded Loans w Borrower Info – 2021 (version 1)